SEAN D. REYES (USB #7969)
Utah Attorney General
STANFORD E. PURSER (USB #13440)
Utah Solicitor General
KATHY A.F. DAVIS (USB #4022)
Assistant Attorney General
JASON DEFOREST (USB #14628)
Assistant Attorney General
1594 West North Temple
Suite 300, Salt Lake City, UT 84114
(801) 538-9600
spurser@agutah.gov
kathydavis@agutah.gov
jdeforest@agutah.gov
*Attorneys for Plaintiff State of Utah*

TYLER R. GREEN (USB #10660)
CONSOVOY MCCARTHY PLLC
222 S. Main Street, 5th Floor
Salt Lake City, UT 84101
(703) 243-9423
tyler@consovoymccarthy.com
*Attorney for Plaintiff State of Utah*

D. DAVID DEWALD*
Deputy Attorney General
Office of the Attorney General of Wyoming
109 State Capitol
Cheyenne, WY 82002
(307) 777-7895
david.dewald@wyo.gov
*Attorney for Plaintiff State of Wyoming*

DANIEL SHAPIRO*
KATHLEEN S. LANE*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
daniel@consovoymccarthy.com
katie@consovoymccarthy.com
*Attorneys for Plaintiff State of Utah*

*\*Application for admission pro hac vice forthcoming*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| STATE OF UTAH,<br>STATE OF WYOMING,<br><div align="right">*Plaintiffs*,</div><br>v.<br><br>DEB HAALAND, in her official capacity as the Secretary of the U.S. Department of the Interior; U.S. DEPARTMENT OF THE INTERIOR; TRACY STONE-MANNING, in her official capacity as the Director of the Bureau of Land Management; and U.S. BUREAU OF LAND MANAGEMENT,<br><br><div align="right">*Defendants*.</div> | Case No. _____ |

## COMPLAINT

The National Environmental Policy Act ("NEPA") requires agencies contemplating a major action to carefully consider possible environmental consequences before moving forward with that action. The Bureau of Land Management's ("BLM") new "Public Lands Rule" qualifies as such an action and this case arises from the Bureau of Land Management's failure to uphold that NEPA obligation.

The Public Lands Rule overhauls BLM's substantive priorities under the Federal Land and Policy Management Act ("FLPMA") and represents a sea change in how the agency will carry out its mission moving forward, providing proposed guidelines for the management of all 245 million acres of federal public land—including millions of acres in the Plaintiff States. More specifically, it revises existing regulations and creates new land-management tools not contemplated or authorized under FLPMA.

NEPA demands that a Rule of such significance be subject to careful environmental study. But when BLM first proposed the Public Lands Rule, it previewed its intent to sidestep NEPA's procedures. The Plaintiff States objected. So did local-government entities, non-profit organizations, industry groups, members of Congress, and many others. Interested parties of all stripes entreated BLM to take the "hard look" that NEPA requires before pushing through a Rule that could harm the environment.

BLM brushed all these objections aside, by relying on an inapplicable NEPA exclusion and unreasonably concluding that no extraordinary circumstances warrant further review. BLM's action was arbitrary and capricious, and the Public Lands Rule should be set aside.

## PARTIES

1.      Plaintiff State of Utah is a sovereign State of the United States of America. Sean D. Reyes is the Attorney General of Utah. He is authorized to sue on Utah's behalf.

2.      Plaintiff State of Wyoming is a sovereign State of the United States of America. Bridget Hill is the Attorney General of Wyoming. She is authorized to sue on Wyoming's behalf.

3.      Defendant Deb Haaland is the Secretary of the United States Department of the Interior. Secretary Haaland is sued in her official capacity.

4.      Defendant United States Department of the Interior is a federal agency. It oversees the Bureau of Land Management.

5.      Defendant Tracy Stone-Manning is the Director of the Bureau of Land Management. Director Stone-Manning is sued in her official capacity.

6.      Defendant Bureau of Land Management is an agency within the United States Department of the Interior. It manages all of the 245 million acres of federal public lands. BLM promulgated the challenged Public Lands Rule.

<u>**JURISDICTION AND VENUE**</u>

7.      This Court has subject-matter jurisdiction over this case because it arises under the laws of the United States. *See* 28 U.S.C. §1331; 5 U.S.C. §§701-06. An actual controversy exists between the parties within the meaning of 28 U.S.C. §2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief under 28 U.S.C. §§2201-02, 5 U.S.C. §§705-06, and its inherent equitable powers. The claims presented arise under NEPA, 42 U.S.C. §4321 *et seq.*, and the Administrative Procedure Act.

8.      The Public Lands Rule is a final agency action that is judicially reviewable under the Administrative Procedure Act. 5 U.S.C. §§704, 706.

9.      Venue is proper in this Court under 28 U.S.C. §1391(e) because Plaintiff State of Utah resides within the District of Utah, a substantial part of the events or omissions giving rise to the claim took place in Utah, and the State of Utah contains 22.8 million acres of public lands managed by the BLM that are subject to and affected by the Public Lands Rule.

## BACKGROUND

### I.  Statutory Background

#### A.  The National Environmental Policy Act

10.     NEPA imposes procedural requirements to "ensure[] that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

11.     NEPA "also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Id.* "Simply by focusing the agency's attention on the environmental consequences of a proposed project, NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Id.*

12.     In short, NEPA provides "a set of action-forcing procedures that require that agencies take a hard look at environmental consequences" before they act. *Id.* (cleaned up).

13.     NEPA establishes three levels of review for agencies to assess proposed actions: an Environmental Impact Study, an Environmental Assessment, or a Categorical Exclusion.

14.     An Environmental Impact Study is "a detailed written statement" and the most comprehensive of these three levels of review.  40 C.F.R. §1508.1(j). An agency must prepare an EIS if it proposes a major federal action that will significantly affect the quality of the human environment. *See* 40 C.F.R. §1502.3.

15.     If the agency is uncertain whether its actions will have significant environmental effects, the agency can instead prepare an Environmental Assessment. An EA is a "concise public document prepared by a Federal agency to aid an agency's compliance with [NEPA] and support its determination of whether to prepare an environmental impact statement or a finding of no significant impact [FONSI]." 40 C.F.R. §1508.1(h). A FONSI, in turn, is "a document by a Federal agency briefly

presenting the reasons why an action … will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared." 40 C.F.R. §1508.1(l).

16.    An agency can avoid preparing an EIS or an EA only in limited circumstances: when the agency determines that the proposed action fits within a "categorical exclusion."

17.    "Categorical exclusion means a category of actions that the agency has determined … normally do not have a significant effect on the human environment." 40 C.F.R. §1508.1(d). Each agency can identify "categories of actions that normally do not have a significant effect on the human environment, and therefore do not require preparation of an environmental assessment or environmental impact statement." 40 C.F.R. §1501.4(a).

18.    But even "[i]f an agency determines that a categorical exclusion identified in its agency NEPA procedures covers a proposed action, the agency shall evaluate the action for extraordinary circumstances in which a normally excluded action may have a significant effect." 40 C.F.R. §1501.4(b).

19.    As relevant here, BLM's categorical exclusion covers "[p]olicies, directives, regulations, and guidelines: that are of an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case." 43 C.F.R. §46.210(i).

20.    Actions identified under Section 46.210 "are categorically excluded … *unless* any of the extraordinary circumstances in section 46.215 apply." 43 C.F.R. §46.210 (emphasis added). "Any action that is normally categorically excluded *must be evaluated* to determine whether it meets any of the extraordinary circumstances in section 46.215; if it does, further analysis and environmental documents *must be prepared* for the action." 43 C.F.R. §46.205(c)(1) (emphases added).

21.    Section 46.215 lists twelve possible extraordinary circumstances under which an action that would otherwise be categorically excluded requires additional environmental analysis. 43 C.F.R. §46.215.

22.    Extraordinary circumstances exist when an action (a) has "significant impacts on public health or safety;" (b) has "significant impacts on … natural resources and unique geographic characteristics," (c) has "highly controversial environmental effects or involve[s] unresolved conflicts concerning alternative uses of available resources," (d) has "highly uncertain and potentially significant environmental effects or involve[s] unique or unknown environmental risks," (e) "establish[es] a precedent for future action or represent[s] a decision in principle about future actions with potentially significant environmental effects," (f) has "a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects," (g) has "significant impacts on properties listed, or eligible for listing, on the National Register of Historic Places as determined by the bureau," (h) has "significant impacts on species listed, or proposed to be listed, on the List of Endangered or Threatened Species or have significant impacts on designated Critical Habitat for these species," (i) "[v]iolate[s] a federal law, or a State, local, or tribal law requirement imposed for the protection of the environment," (j) has "a disproportionately high and adverse effect on low income or minority populations," (k) "[l]imit[s] access to and ceremonial use of Indian sacred sites on Federal lands by Indian religious practitioners or significantly adversely affect[s] the physical integrity of such sacred sites," or (l) "[c]ontribute[s] to the introduction, continued existence, or spread of noxious weeds or non-native invasive species known to occur in the area or action that may promote the introduction, growth, or expansion of the range of such species." *Id.*

**B.  The Federal Land Policy and Management Act**

23.     In FLPMA, Congress declared that it is the policy of the United States "that management [of public lands] be on the basis of multiple use and sustained yield unless otherwise specified by law." 43 U.S.C. §1701(a)(7).

24.     Congress defined the term "multiple use" as:

> the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output.

*Id.* §1702(c).

25.     Congress defined the term "sustained yield" as "the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the public lands consistent with multiple use." *Id.* §1702(h).

26.     "The term 'principal or major uses' includes, and is limited to, domestic livestock grazing, fish and wildlife development and utilization, mineral exploration and production, rights-of-way, outdoor recreation, and timber production." *Id.* §1702(l).

## II.  Factual Background

### A. BLM Proposes a Rule Establishing Conservation Leases and Making "Conservation" a "Use" on Par with Other Defined FLPMA Uses.

27.     On April 3, 2023, BLM proposed a new rule on "Conservation and Landscape Health" ("Proposed Rule"). 88 Fed. Reg. 19583.

28.     With this Proposed Rule, BLM sought to "clarify that conservation is a 'use' within FLPMA's multiple-use framework," to "revise existing regulations to better meet FLPMA's requirement that the BLM prioritize designating and protecting Areas of Critical Environmental Concern (ACECs)," and to "provide an overarching framework for multiple BLM programs to promote ecosystem resilience on public lands." 88 Fed. Reg. at 19583-84.

29.     In numerous places, BLM emphasized that the Proposed Rule would provide a "framework" to guide the agency's future actions in its management of the public lands. *See, e.g.*, 88 Fed. Reg. 19584 ("The proposed rule provides a framework to protect intact landscapes, restore degraded habitat, and ensure wise decisionmaking[.]"); *id.* ("The proposed regulatory changes would … establish a more comprehensive framework for the BLM to identify, evaluate, and consider special management attention for ACECs in land use planning."); *id.* at 19588 (explaining that the rule "aims to … establish[] a regulatory framework for those seeking to use the public lands"); *id.* at 19591 ("[T]he proposed rule would provide a framework for the BLM to issue conservation leases on public lands for the purpose of pursuing ecosystem resilience through mitigation and restoration."); *id.* at 19592 ("Proposed § 6102.5 would set forth a framework for the BLM to make wise management decisions based on science and data[.]").

30.     The Proposed Rule also notified the public of BLM's intent to avoid preparing an Environmental Impact Statement by applying the Categorical Exclusion—a term it abbreviated as "CX"—at 43 C.F.R. §46.210(i). The agency further noted its "plans to document the applicability of the CX concurrently with the development of the final rule." 88 Fed. Reg. at 19596.

31.    The media heralded the proposal as a "sweeping draft rule" representing a "seismic shift in lands management." *See, e.g.*, Scott Streater, *BLM proposed seismic shift in lands management*, E&E News (March 30, 2023), https://perma.cc/8GWG-CH2D.

**B. Inside and outside the notice-and-comment process, interested parties showed BLM why the Proposed Rule required NEPA review.**

**1. Commenters established that BLM must perform NEPA review.**

32.    BLM provided a 90-day comment period on the Proposed Rule. It ultimately received 216,403 comments from the public in that 90-day period. *See* Conservation and Landscape Health, 89 Fed. Reg. 40308, 40315 (May 9, 2024).

33.    Numerous commenters raised concerns about the agency's intent to rely on the categorical exclusion and argued that the Rule would have significant environmental consequences. These commenters included agencies and interest groups in the Plaintiff States, local-government entities in other States, grassroots organizations, industry groups, and more. Although these commenters had varied perspectives on the merits of the Proposed Rule, *all* of them highlighted concerns about BLM moving forward without conducting the environmental study that NEPA requires.

34.    The Public Lands Policy Coordinating Office ("PLPCO") of the Utah Department of Natural Resources submitted a comment letter on the State of Utah's behalf. It argued that "BLM's reliance on this CX is misplaced" and highlighted the lack of "explanation in the federal notice justifying application of the CX." Utah Dep't of Nat. Res. Pub. Lands Policy Coordinating Office, Comment Letter on Proposed Rule on Conservation and Landscape Health at 5 (June 30, 2023), https://perma.cc/F5VQ-S5C4.

35.    PLPCO argued that BLM's reliance on the CX was unjustified because "[t]he sea-change created by the Proposed Rule certainly cannot be described as 'administrative, financial, legal, technical or procedural.'" *Id.* And even assuming BLM's reliance on the CX was proper, "the Proposed

Rule should still be subject to NEPA due to the 'extraordinary circumstances' created by the Proposed Rule." *Id.* at 6. PLPCO explained that "all" of the extraordinary circumstances in 43 C.F.R. §46.215 "have potential applicability to the Proposed Rule." *Id.*

36.    PLPCO also highlighted concerns about the environmental consequences of the Proposed Rule, including by arguing that the Proposed Rule would endanger mature and old-growth forests, *see id.* at 25, disallow the sort of active management most needed to support landscape health, *id.* at 36, and make restoration work "harder to accomplish," to the detriment of Utah's "landscape, water, and wildlife," *id.* at 37.

37.    The Wyoming County Commissioners Association ("WCCA"), an organization representing the Boards of County Commissioners for all 23 Wyoming counties, highlighted similar concerns. *See* Wyoming County Comm'rs Ass'n, Comment Letter on Proposed Rule on Conservation and Landscape Health at 7 (July 5, 2023), https://perma.cc/M5ZJ-JWHU. WCCA explained that it did "not believe that the BLM's use of a CX is appropriate for the Proposed Rule under the law or as a matter of sound practice" because the "Proposed Rule is not simply administrative, financial, legal, technical, or procedural in nature." *Id.*

38.    WCCA added that the "Proposed Rule presents a substantial departure from past interpretations of BLM's responsibilities," *id.* "will directly impact the actual management of public lands," *id.*, and will lead to "conflicts" between alternative uses of land, including in ways that might implicate "habitat for the Greater-sage Grouse," *id.* at 5.

39.    A coalition of Wyoming local governments likewise argued that BLM's reliance on the categorical exclusion was inappropriate. *See* Coalition of Local Gov'ts, Comment Letter on Proposed Rule on Conservation and Landscape Health at 10 (July 5, 2023), https://perma.cc/UWC7-CFCM. The coalition contended that "if this proposed rule moves forward, the BLM must prepare an

environmental impact statement," highlighting that the proposal was "both major and significant in that it completely changes how over 247.3 million acres of public lands are managed." *Id.*

40.    Similarly, a coalition of Arizona and New Mexico Counties—representing "more than 700,000 in combined county populations"—asserted that "an Environmental Impact Statement is required" "due to the existence of all twelve extraordinary circumstances contained in §46.215." Coalition Of Ariz./N.M. Counties for Stable Economic Growth, Comment Letter on Proposed Rule on Conservation and Landscape Health at 1-2 (May 23, 2023), https://perma.cc/VV8L-FWGN.

41.    A collection of ten counties in Western States and three non-profit groups likewise argued that BLM would violate NEPA by relying on the CX. *See* Comments of Chaves County, NM, et al., Comment Letter on Proposed Rule on Conservation and Landscape Health (July 5, 2023), https://perma.cc/RQ6S-ZR2B. They highlighted "the extremely broad, programmatic nature of the Proposed Rule" and "the significant amount of controversy surrounding the changes mandated by the Proposed Rule," concluding that "BLM cannot avoid compliance with NEPA under a CE." *Id.* at 3. And they argued that the Proposed Rule would "make dramatic changes to planning and management of the public lands, causing significant … environmental impacts." *Id.* at 1.

42.    A grassroots organization of Arizona farmers and ranchers likewise argued that CXs are not "applicable to rules of this magnitude." Ariz. Farm Bureau Fed'n, Comment Letter on Proposed Rule on Conservation and Landscape Health at 2 (July 5, 2023), https://perma.cc/KW9C-VDSC. "The proposed Rule, as presented, is attempting to transform the landscape in a significant way, and thus does not qualify under a CX." *Id.* Thus, the comment requested that BLM "explain how a number of extraordinary circumstances, specifically subsections (b), (c), (d), (e), (f), (h), (i), and (l) and potentially (j) and (k) of 46.215 are not applicable to the proposed Rule. Otherwise, it appears that CXs could be used any time an agency deems appropriate or convenient, and furthermore, contradicts the purpose of CXs for projects with limited scope." *Id.* at 2-3.

43.     The Idaho Farm Bureau Federation, which represents nearly 80,000 Idaho families, said the same. Idaho Farm Bureau Fed'n, Comment Letter on Proposed Rule on Conservation and Landscape Health at 1-2 (June 28, 2023), https://perma.cc/S93S-HE7F ("It is inappropriate to use a Categorical Exclusion (CX) for a rule of this magnitude … Clearly, the proposed rule, by its own admission, is attempting to transform the landscape in a significant way."). The comment letter added that if "BLM's allegation is allowed to stand that the proposed rule meets the criteria of a CX under 43 CFR 46.210(i), then there is no proposed action, no matter how sweeping, that would not fit within these criteria." *Id.* at 2. "The proposed rule is completely contrary to the limited scope of specific projects intended to be allowed under a categorical exclusion and it seems unlikely that BLM is not fully aware that the proposal is circumventing the applicable laws as written." *Id.*

44.     The American Clean Power Association made similar arguments. *See* Am. Clean Power Ass'n, Comment Letter on Proposed Rule on Conservation and Landscape Health at 1-2 (July 5, 2023), https://perma.cc/888R-MUNK. First, ACP argued that "the rule is not simply 'administrative, financial, legal, technical or procedural in nature'" because the rule "dictates preferences for land management decisions with the potential to profoundly change BLM's management of land." *Id.* at 17. Second, the rule "meets multiple extraordinary circumstance triggers." *Id.* at 18. Overall, ACP requested an EIS and advised BLM that proceeding without NEPA review "leaves the rule vulnerable to challenge." *Id.* at 17.

45.     The Large-Scale Solar Association raised the same objections. *See* Large-Scale Solar Ass'n, Comment Letter on Proposed Rule on Conservation and Landscape Health (July 5, 2023), https://perma.cc/35R2-C36E. The Association argued that "BLM would violate NEPA by relying on this CX to approve the Proposed Rule and would instead be required to prepare an EIS." *Id.* at 13. The comment also highlighted that although "BLM frames the Proposed Rule as being procedural in

nature, clear direction given to local authorized officers by the Proposed Rule makes it substantive, not procedural, in its provisions and consequences." *Id.*

46.     The National Mining Association also shared these concerns. *See* Nat'l Mining Ass'n, Comment Letter on Proposed Rule on Conservation and Landscape Health (July 5, 2023), https://perma.cc/KVA4-VGS6. NMA explained that "there are several extraordinary circumstances that preclude the BLM from categorically excluding the proposed rule from review under NEPA. The most obvious, however, is the precedent the proposed rule established for future land use on the BLM's 245 million acres of federal land[.]" *Id.* at 16.

47.     The Nevada Mining Association likewise requested the preparation of an EIS and highlighted that "BLM may not shirk its responsibility under NEPA in its rush to pass the proposed rule." Nev. Mining Ass'n, Comment Letter on Proposed Rule on Conservation and Landscape Health at 6 (June 29, 2023), https://perma.cc/2UPD-AAMV. NVMA explained that extraordinary circumstances apply because the "Proposed Rule will have highly controversial environmental effects and/or will involve unresolved conflicts concerning alternative uses of available resources." *Id.* And "the conservation leasing system will have highly controversial environmental effects that have not been adequately studied and will represent a decision in principle about future actions." *Id.*

48.     Companies involved in gold mining likewise argued that extraordinary circumstances apply. *See* Nev. Gold Mines, LLC and Barrick Gold Corp., Comment Letter on Proposed Rule on Conservation and Landscape Health at 6 (July 5, 2023), https://perma.cc/M965-V4VG. They specifically highlighted that the Proposed rule will "have highly controversial environmental effect[s]," "involve unresolved conflicts concerning alternative[] uses of available resources," "establish a precedent for future action," and "have a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects." *Id.* at 8.

2. **Outside the Proposed Rule's comment process, interested parties highlighted BLM's NEPA failings.**

49.     The proposed rule also inspired significant controversy beyond the formal comment process. Members of both houses of the U.S. Congress fervently opposed the proposed rule and introduced legislation to prevent BLM from moving forward with the proposal.

50.     On May 2, 2023, at a hearing of the Senate Committee on Energy and Natural Resources, U.S. Senator John Barasso (R-WY) discussed the proposed rule with Interior Secretary Haaland.

51.     News reports describing the hearing characterized Barasso as having "berated" Secretary Haaland over the rule, "saying she was 'giving radicals a new tool to shut out the public.'" Barasso also complained that the proposed rule was "mak[ing] non-use a use" and "turning federal law on its head." Matthew Brown, *Biden plan to sell land leases for conservation gets pushback*, AP News (May 16, 2023), https://perma.cc/54JW-RMBJ.

52.     On May 3, 2023, Senator Barasso sponsored a Senate bill to block BLM from implementing the Rule. Twelve Senators from eight Western States (Alaska, Idaho, North Dakota, Utah, Nebraska, Oklahoma, South Dakota, and Wyoming) cosponsored the legislation. *See* S. 1435, 118th Cong. (2023).

53.     In a statement, Senator Barasso described BLM's proposed rule as "outrageous" and "a threat to our Wyoming way of life and our economy." Senate Cmte. on Energy & Nat. Res., *Barasso Legislation Protects Western Way of Life* (May 3, 2023), https://perma.cc/F6U6-DHTH. He stated that "the radicals in the Biden administration are trying to upend a system that is foundational to public land access and productivity." *Id.*

54.     The proposed legislation, if passed, would have required BLM to withdraw the Proposed Rule and forbidden BLM from taking "any action to finalize, implement, or enforce the proposed rule … or any substantially similar rule." S. 1435, 118th Cong. (2023).

55.     On May 17, 2023, in the U.S. House of Representatives, Representative John Curtis of Utah introduced the Western Economic Security Today (WEST) Act, which likewise sought to require BLM to withdraw the proposed rule. *See* H.R. 3397, 118th Cong. (2023).

56.     On June 15, 2023, the House Committee on Natural Resources held a legislative hearing on H.R. 3397 featuring testimony from Representative Curtis, South Dakota Governor Kristi Noem, Wyoming Governor Mark Gordon, and others.

57.     Governor Noem testified in support of H.R. 3397, explaining that "the rule BLM as proposed would be bad for the country" for a variety of reasons. *Hearing on H.R. 3397 Before the H. Comm. On Nat. Res.*, 118th Cong. 7 (2023) (statement of Kristi Noem, Governor of the State of South Dakota). For example, she argued that the Proposed Rule would "negatively impact our ability to manage our forests responsibly to the benefit of our land, wildlife, public safety, and economy," *id.* at 2, and "would make it impossible to responsibly conserve or utilize our land," *id.* at 7.

58.     In addition to raising substantive concerns about the proposed rule, Governor Noem emphasized that BLM's proposal "fails to follow long-established NEPA requirements." *Id.* at 2. She specified that the proposal "should trigger an environmental impact statement" and criticized BLM's conclusion "that the proposed rule is too broad and thus exempt from the NEPA process." *Id.* at 4. She concluded by noting that "the proposed rule opens the door for a mechanism to circumvent the NEPA process and not require an environmental impact study." *Id.* at 7.

59.     Similarly, Governor Gordon testified that the "proposed rule was rushed forward without material input from Wyoming or other states" and "did not have the benefit of the views of impacted public land users." *Hearing on H.R. 3397 Before the H. Comm. On Nat. Res.*, 118th Cong. 2 (2023) (statement of Mark Gordon, Governor of the State of Wyoming). Noting that his own "ranch lies in core sage-grouse habitat," he highlighted that Wyoming "successfully manage[s] the nation's

largest population of the Greater Sage-grouse" and explained that the Proposed Rule could impair cooperation essential to that success. *Id.* at 2.

60. Governor Gordon further argued that the Proposed Rule would "undermin[e] local conservation efforts," stymie progress towards "thriving populations of the public's wildlife [and] healthier ecology," impact "riparian systems," and leave invasive species "unchecked." *Id.* at 4-5. He also emphasized that what "this rule proposed is not trivial. It appears to have the potential to completely undermine how public lands are managed in our country and upend major pillars of my state's—indeed, the country's economy, our people's standard of living, and the viability of far too many local communities." *Id.* at 5.

**C. BLM ignores those repeated warnings and adopts the Final Rule without satisfying its NEPA obligations.**

61. BLM released an unofficial, prepublication version of the Final Rule on April 18, 2024.

62. The official Final Rule (also referred to herein as the "Public Lands Rule") appeared in the Federal Register on May 9, 2024. *See* Conservation and Landscape Health, 89 Fed. Reg. 40308 (May 9, 2024). It set an effective date of June 10, 2024. *Id.*

63. In a press release, DOI explained that the Final Rule would "help guide the balanced management of America's public lands." *See* Dep't of Interior, *Biden-Harris Administration Finalizes Strategy to Guide Balanced Management, Conservation of Public Lands* (Apr. 18, 2024), https://perma.cc/Z5WK-4H8J.

64. The Final Rule reiterated BLM's understanding that the Rule would "provide[] an overarching framework for multiple BLM programs" and guide BLM's decisionmaking in various ways. 89 Fed. Reg. at 40308.

65. But the Final Rule gave short shrift to the procedural concerns raised in numerous public comments and congressional hearings.

66.     As in the Proposed Rule, BLM invoked the categorical exclusion in 43 C.F.R. §46.210(i), which applies to agency actions "of an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to NEPA process, either collectively or case-by-case." 89 Fed. Reg. at 40333.

67.     The agency asserted that this "categorical exclusion applies because the rule sets out a framework but is not self-executing in that it does not itself make substantive changes on the ground and will not (absent future decisions that implement the rule) restrict the BLM's discretion to undertake or authorize future on-the-ground action; thus, the rule is administrative in nature." *Id.* And with respect to those future decisions, BLM concluded that their environmental effects were "too speculative or conjectural to meaningfully evaluate." *Id.*

68.     The agency also concluded—without any analysis in the Final Rule—"that *none* of the extraordinary circumstances identified at 43 C.F.R. 46.215 applies to this rulemaking." *Id.* (emphasis added).

69.     Although § 46.215 lists *twelve* different extraordinary circumstances, BLM did not cite which (if any) of those twelve specific, potentially applicable circumstances it considered, let alone explain its reasons for rejecting the (undisclosed) circumstances' applicability. *See id.*

70.     BLM's release of the Final Rule inspired further action in Congress.

71.     On April 30, 2024, the U.S. House of Representatives passed the *WEST Act* requiring the BLM Director to withdraw the Rule. H.R. 3397, 118th Cong. (2023).

72.     The bill passed the House with bipartisan support, with a final vote of 212-202.

73.     In a press release, Representative Curtis explained that the Final Rule "undermines the very people who rely on our federal lands for ranching, grazing, recreation, and beyond." Congressman John Curtis, Press Release, *House Passes Curtis Bill to Protect Public Lands* (Apr. 30, 2024),

https://perma.cc/5T7T-UWC2. Representative Curtis was "pleased that the House voted in a bipartisan manner to pass [his] bill revoking [the rule's] implementation."

74.    On June 10, 2024—the Final Rule's effective date—the agency published an additional document to supplement its analysis of the categorical exclusion and extraordinary circumstances. *See* BLM, *CX Documentation for the Conservation and Landscape Health Rule* (June 10, 2024), https://perma.cc/LK8G-NELQ (hereinafter "CX Documentation"). In this document, and for the first time, BLM laid out all twelve extraordinary circumstances in §46.215 and offered a brief rationale for concluding that each one was inapplicable.

## III. BLM's failure to comply with its obligations under NEPA injures the Plaintiff States.

75.    BLM's uninformed decisionmaking injures the Plaintiff States by creating increased environmental risks. *See Dine Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831, 840 (10th Cir. 2019) ("Under NEPA, an injury of alleged increased environmental risks due to an agency's uninformed decisionmaking may be the foundation for injury in fact under Article III." (cleaned up)).

76.    "[I]n making its decision without following NEPA's procedures, the agency created an increased risk of actual, threatened, or imminent environmental harm." *Id.* (quoting *Cmte. to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 449 (10th Cir. 1996)).

77.    That "increased risk of environmental harm injures [the States'] concrete interests." *Id.* (quoting *Lucero*, 102 F.2d at 449). The States will "suffer the environmental consequences of [BLM's] action." *Lucero*, 102 F.3d at 449.

78.    In addition to the "harm to [their] lands," the States will also bear "a financial burden" because of the Rule. *New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 696 n.13 (10th Cir. 2009).

### A. The Rule injures the State of Utah.

79.    In Utah, two State agencies in particular will suffer significant financial burdens: Utah's Division of Wildlife Resources (DWR) and the Utah Department of Agriculture and Food (UDAF).

DWR is expressly allowed to hold the restoration and mitigation leases authorized by the Final Rule and UDAF oversees the State's Conservation Districts, the only other state agency allowed to hold such leases. *See* Shirley Decl. ¶ 11, Exhibit 1; Buttars Decl. ¶ 17, Exhibit 2. These agencies intend to apply for every restoration and mitigation lease that becomes available because there are significant environmental risks to the State if these leases are held by other individuals or entities. *See* Shirley Decl. ¶¶ 10-11; Buttars Decl. ¶ 17.

80.    To ensure the State is prepared to obtain and manage as many leases as possible under the new Rule, DWR and UDAF will incur significant costs.

81.    DWR has identified both one-time and recurring costs the agency will incur as a direct result of the Rule. Those include a budget increase to fund lease payments, hiring personnel (*e.g.*, a Habitat Biologist) to review and implement leases, and administrative costs related to managing lease data. In total, DWR anticipates that it will spend $5,035,000 as a direct result of the Rule. Shirley Decl. ¶ 24. DWR would not have to spend that more than $5 million in new costs but for the Rule.

82.    UDAF has likewise identified costs related to increased workload and resource allocation. *See* Buttars Decl. ¶ 17. The Public Lands Rule has "significantly increased the workload on [UDAF's] staff and necessitated the use of additional resources within UDAF to prepare for [lease] applications." *Id.*

83.    DWR and UDAF must take these steps to guard against the "increased risk of environmental harm" created by the Rule. *Lucero*, 102 F.2d at 449.

84.    The Rule increases the risk of environmental harm in Utah by allowing BLM to hand control of leased lands to individuals and entities that may refuse to coordinate with the State to manage water supply, wildfire risk, and invasive plant and animal species. A lack of coordination threatens environmental harm across the entire State by impairing the State's ability to manage those risks. *See* Shirley Decl. ¶¶ 9-10.

85.     The Public Lands Rule authorizes BLM to issue restoration and mitigation leases for activities, such as passive management, that can lead to degraded landscapes, proliferation of noxious weeds, and a heightened risk of catastrophic wildfires on State lands. *See* Buttars Decl. ¶ 18.

86.     The Public Lands Rule also creates uncertainty regarding which lands will soon be leased or designated as ACECs. *See* Buttars Decl. ¶¶ 14, 21. That uncertainty *alone* will impede the implementation of rangeland improvement projects, such as those managed by Utah's Grazing Improvement Program ("GIP"). *See id.* ¶¶ 4, 19. These projects lead to significant positive environmental outcomes, including benefits to water quality, native wildlife species, and native flora species. *Id.* ¶¶ 7-9. By postponing or eliminating GIP's anticipated environmental improvements, the uncertainty created by the Rule causes imminent environmental harm. *Id.* ¶ 19.

87.     Thus, the State of Utah has suffered an injury in fact because BLM's "disregard of [NEPA's] procedural requirement[s] results in an increased risk of environmental harm" and "the increased risk is to the [State's] concrete and particularized interests." *Lucero*, 102 F.3d at 449.

**B.  The Rule injures the State of Wyoming.**

88.     The State of Wyoming will likewise suffer an injury in fact as a result of the Final Rule. *See id.*

89.     The Public Lands Rule creates unique environmental risks in Wyoming because the State is home to the world's largest population of Greater Sage-grouse. *See* Wendtland Decl. ¶ 14, Exhibit 3. Sage grouse populations have been generally declining in the western United States. *Id.* ¶ 16.

90.     To protect the sage grouse species, Wyoming employs a unique conservation system called the "sage grouse core area protection strategy." Under that system, the State and its agencies are required to prioritize the maintenance and enhancement of sage grouse habitats and populations. *See id.*

91.    Wyoming also has a Sage Grouse Implementation Team ("SGIT") with members appointed by the governor. By statute, SGIT is specifically charged with seeking "cooperation and participation" from federal entities, including BLM, and making recommendations to Wyoming's governor regarding actions to "maintain and enhance sage grouse populations and sage grouse habitats in Wyoming." Wyo. Stat. Ann. § 9-19-101(c), (f); *see* Wendtland Decl. ¶¶ 12-13.

92.    SGIT implements State of Wyoming Executive Department Executive Order 2019-3, Greater Sage Grouse Core Area Protection ("Sage Grouse Executive Order"). Wendtland Decl. ¶ 14.

93.    Wyoming coordinates and works collaboratively with federal land-management agencies, including BLM, to ensure a uniform and consistent application of the State's Sage Grouse Executive Order to maintain and enhance sage grouse populations and habitat. *See id.* ¶ 17. The Land Quality Division of the Wyoming Department of Environmental Quality even exercises regulatory jurisdiction over land use and mining projects directly affecting sage grouse habitat in Wyoming, even though many such projects are located on lands otherwise managed by the BLM. *See id.* ¶ 15.

94.    The State maintains approximately 15 million acres of sage grouse habitat within its boundaries. *See id.* ¶ 16.

95.    The Public Lands Rule increases the risk of environmental harm in Wyoming by allowing BLM to hand control of leased lands to individuals and entities that have no duty to coordinate with the State to implement the State's Sage Grouse Executive Order. *See id.* ¶ 18. The Public Lands Rule thus creates an increased risk of harm to the sage grouse species in Wyoming.

96.    What's more, the Public Lands Rule increases the risk of environmental harm in Wyoming by allowing BLM to hand control of leased lands to individuals and entities that have no duty to coordinate with the State to manage water supply, mitigate wildfire risk, or address invasive plant and animal species. A lack of coordination threatens environmental harm across the entire State by impairing the State's ability to manage those risks. *See id.* ¶ 18.

97.    The above-identified increased risks of environmental harm injure Wyoming's concrete and particularized interests in its lands by impairing the State's ability to manage and protect the sage grouse population and habitat in Wyoming.

98.    The Final Rule also interferes with the State's ability to regulate various land uses on BLM-managed public lands, including uses over which the Land Quality Division of the Wyoming Department of Environmental Quality ("LQD") has "almost exclusive regulatory authority," such as coal mining. Wendtland Decl. ¶ 9. The State "actual[ly] use[s]" the lands where these uses occur and thus has a "concrete interest" in the way they are managed. *Lucero*, 102 F.3d at 449.

### C. These injuries are traceable to the Rule and redressable by a Court order vacating the Rule.

99.    The States' injuries are "fairly traceable to the failure of [BLM] to conduct a NEPA … analysis." *Sierra Club v. U.S. Dep't of Energy*, 287 F.3d 1256, 1265 (10th Cir. 2002). "An injury under the NEPA results not from the agency's decision, but rather from the agency's uninformed decisionmaking." *Id.* (cleaned up).

100.    The States' injuries are redressable by a favorable decision requiring BLM to comply with NEPA. "Under the National Environmental Policy Act, the normal standards for redressability are relaxed; a plaintiff need not establish that the ultimate agency decision would change upon National Environmental Policy Act compliance. Rather, the [State] must establish, as it has, that its injury would be redressed by a favorable decision requiring [BLM] to comply with National Environmental Policy Act's procedures." *Lucero*, 102 F.3d at 452 (cleaned up). "That [BLM] may not change its decision … after preparing an environmental impact statement is immaterial." *Id.*

101.    While the States have standing under the traditional analysis, "[i]n determining that [the States] ha[ve] standing because of the threat of environmental damage to lands within [their] boundaries," the Court should also "consider that states have special solicitude to raise injuries to their

quasi-sovereign interest in lands within their borders." *New Mexico ex rel. Richardson*, 565 F.3d at 696 n.13 (citing *Massachusetts v. EPA*, 549 U.S. 497, 519-20 (2007)).

102.    The States' alleged environmental injuries fall within the zone of interests protected by NEPA. *See Catron Cnty. Bd. of Comm'rs v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429, 1433 (10th Cir. 1996).

## CLAIMS FOR RELIEF
## COUNT I
## BLM's Reliance on the Categorical Exclusion is Arbitrary and Capricious
## (5 U.S.C. §706)

103.    Plaintiffs repeat and incorporate by reference each of the Complaint's allegations stated above.

104.    The challenged rule is a final agency action under the APA. 5 U.S.C. §704.

105.    The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* §706(2).

106.    An agency's decision to invoke a categorical exclusion is reviewed under the arbitrary-and-capricious standard. *See Citizens' Cmte. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1023 (10th Cir. 2002).

107.    The "arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). BLM's decision to invoke the categorical exclusion is neither.

108.    Start with the latter requirement—BLM's failure to reasonably explain its decision to rely on the categorical exclusion.

109.    BLM invoked the categorical exclusion at 43 C.F.R. §46.210(i), which applies to "[p]olicies, directives, regulations, and guidelines: that are of an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or

conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case."

110.    BLM provided only one sentence in the Final Rule to explain its view that the Rule is "of an administrative, financial, legal, technical, or procedural nature." *Id.*

111.    Specifically, the agency contends that the categorical exclusion at §46.210(i) "applies because the rule sets out a framework but is not self-executing in that it does not itself make substantive changes on the ground and will not (absent future decisions that implement the rule) restrict the BLM's discretion to undertake or authorize future on-the-ground action; thus, the rule is administrative or procedural in nature." 89 Fed. Reg. 40333.

112.    In its supplementary analysis, BLM added that the Rule "is administrative and procedural in nature" because "[a]ny future change in management or authorization of on-the-ground activities would be subject to a separate decision-making process." CX Documentation, *supra*, at 1.

113.    Rather than being reasonable, BLM's analysis is conclusory. And none of the factors it highlights in support of its conclusion are relevant to whether the Final Rule is in fact "administrative or procedural" as those terms are used in the categorial exclusion.

114.    First, BLM highlights that the Rule "sets out a framework" for "future decisions" that will be subject to a separate decisionmaking process. But BLM does not explain why these facts are relevant to whether the Rule is "administrative or procedural."

115.    Next, rules that implement a change to an existing framework—for example, by "revis[ing]" existing regulations—"qualify as 'substantive' action" and "meet the relatively low threshold to trigger some level of environmental analysis under [NEPA]." *Cal. ex rel. Lockyer v. U.S. Dep't of Agriculture*, 575 F.3d 999, 1013 (9th Cir. 2009).

116.    The Final Rule qualifies as substantive under that standard because it revises existing regulations—as BLM intended it would. *See, e.g.*, 89 Fed. Reg. at 40308 ("the rule … revises existing

regulations to better meet FLPMA's requirement that the BLM prioritize designating and protecting areas of critical environmental concern (ACECs)"); *id.* at 40313 ("This rule … revises the existing regulations implementing FLPMA's direction in sections 201(a) and 202(c)(3) (43 U.S.C. 1711(a) and 1712(c)(3)) that the BLM shall give priority to the designation and protection of ACECs.").

117.    On its face, this indisputable and intended consequence of the Final Rule means BLM had a plain obligation to conduct "some level of environmental analysis under" NEPA. *Cal. ex rel. Lockyer*, 575 F.3d at 1013. BLM failed to do so.

118.    Third, the terms "administrative" and "procedural" as used in the categorical exclusion BLM invoked are not ambiguous. The Final Rule does not satisfy either one.

119.    Throughout the Code of Federal Regulations, agencies consistently use the term "administrative" to categorically exclude from NEPA review actions related to internal agency organization and management, such as personnel and budget decisions. *See, e.g.,* 7 C.F.R. §1b.3 (USDA) (categorically excluding certain "administrative functions" like "personnel" and "organizational changes"); 40 C.F.R. §6.204(a)(2)(i) (EPA) (grouping categorical exclusions for "administrative" actions with "financial, personnel, and management actions necessary to support the normal conduct of EPA business"); 14 C.F.R. §1216.304(d)(1) (NASA) (categorically excluding "administrative activities including," among other things, "personnel actions," "organizational changes," and "budget proposals"); 18 C.F.R. §380.4(a)(1) (FERC) ("internal administrative and management actions … including procurement, contracting, [and] personnel actions").

120.    But BLM's Final Rule does not relate to internal agency management. Instead, as discussed, it revises the substantive framework for how BLM will carry out the management of the public lands. Thus, the Rule does not qualify as "administrative" under the categorical exclusion.

121.    Nor does the Rule qualify as "procedural" under the categorical exclusion. As "[a]n example of a categorically excluded procedural action," BLM has highlighted its "proposed revision

of [its] Departmental NEPA Manual chapter." *BLM National Environmental Policy Act Handbook* (H-1790-1), at 14 (referring to National Environmental Policy Act Revised Implementing Procedures, 71 Fed. Reg. 4159-01 (Jan. 25, 2006)). That action, too, was unrelated to the agency's substantive land-management priorities. It addressed the agency's internal rules for managing the NEPA process and determining which of its future actions require an EA or EIS. *See* 71 Fed. Reg. at 4159 ("The proposed procedures update BLM's general NEPA process to incorporate changes in responsibilities, clarify requirements for public participation, identify the appropriate level of NEPA compliance for various types of actions, and incorporate new Departmental requirements.").

122.    Other agencies maintain similar categorical exclusions for "procedural" actions, and the kinds of actions that qualify under those exclusions are similarly unrelated to the agency's substantive priorities. *See, e.g.*, 18 C.F.R. §380.4(a)(2)(ii) (FERC categorical exclusion for rules that are "clarifying, corrective, or procedural, or that do not substantially change the effect of … regulations being amended"); *see Solar Energy Indus. Ass'n v. FERC*, 80 F.4th 956, 992 (9th Cir. 2023) (analyzing that CX, conceding that an "update to [FERC] Form 556—used by QFs [qualifying facilities] when applying for certification—can reasonably be described as a 'procedural' change," and otherwise "reject[ing] FERC's contention … that the more substantive elements of [its action] fall within the categorical exclusion").

123.    If the Court determines that the categorical exclusion is "genuinely ambiguous" after "resort[ing] to all the standard tools of interpretation," then BLM's interpretation of its own regulation could be entitled to *Kisor* deference. *Kisor v. Wilkie*, 588 U.S. 558, 573 (2019); *see also, e.g.*, *Solar Energy Indus*, 80 F.4th at 992 ("Although we owe some deference to FERC's interpretation of its own regulation … the categorical exclusion cannot reasonably be read so broadly." (citing *Kisor*)).

124.    But even assuming the terms "administrative" and "procedural" in the categorical exclusion were genuinely ambiguous, BLM's interpretation of those terms to cover the Public Lands

Rule is unreasonable. And under *Kisor*, "the agency's reading" of the categorical exclusion "must fall within the bounds of reasonable interpretation." *Id.* at 576 (cleaned up).

125.    Here, it is unreasonable to interpret the categorical exclusion covering regulations "of an administrative, financial, legal, technical or procedural nature" to cover a rule that revises BLM's substantive land-management priorities and "provides an overarching framework for multiple BLM programs." 89 Fed. Reg. at 40308. By invoking that unreasonable interpretation as its reason for failing to conduct proper NEPA review, BLM has acted arbitrarily and capriciously under 5 U.S.C. §706.

126.    What's more, it is unreasonable to interpret the categorical exclusion covering actions "whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis" to cover this Rule. As the States have shown, the Final Rule itself causes non-speculative environmental effects that BLM should have carefully studied. *See supra* ¶¶ 75-98. So BLM is wrong that this Rule does not "directly result in any environmental effects." CX Documentation, *supra*, at 1. Again, by invoking an unreasonable interpretation of the CX as its reason to sidestep NEPA review, BLM has acted arbitrarily and capriciously.

## COUNT II
### BLM's Failure to Analyze Extraordinary Circumstances is Arbitrary and Capricious
### (5 U.S.C. §706)

127.    Plaintiffs repeat and incorporate by reference each of the Complaint's allegations stated above.

128.    BLM's conclusion that no extraordinary circumstances apply is arbitrary and capricious because, at minimum, BLM failed to "reasonably explain[]" its determination in the Final Rule. *Prometheus Radio Project*, 592 U.S. at 423.

129.    Numerous commenters explained why many, if not all, extraordinary circumstances apply and thus trigger NEPA review. But in the Final Rule, BLM did not even *try* to respond to those comments or explain its reasoning. Instead, in a single sentence, it simply stated its conclusion "that

none of the extraordinary circumstances identified at 43 CFR 46.215 applies to this rulemaking." 89 Fed. Reg. 40333.

130.    The Final Rule thus left this Court without any analysis whatsoever. And under such circumstances, it is difficult to "ensure[] that the agency has … reasonably considered the relevant issues and reasonably explained the decision." *Prometheus Radio Project*, 592 U.S. at 423.

131.    On the Rule's effective date, the agency published a never-before-seen analysis of the extraordinary circumstances in §46.215. *See* CX Documentation, *supra*, at 2-4. That document included a brief rationale for each of the twelve extraordinary circumstances.

132.    As PLPCO and other commenters argued, all twelve extraordinary circumstances apply to the Public Lands Rule. *See* PLPCO Comment Letter, *supra*, at 6 & n.11. BLM had an obligation to reasonably explain why they do not apply—especially after numerous commenters raised the issue. It failed to do so in the Final Rule itself, and its supplementary analysis is unreasonable. Three of the twelve extraordinary circumstances are worth emphasizing here.

133.    *First*, extraordinary circumstances exist if the Rule "[e]stablish[es] a precedent for future action or represent[s] a decision in principle about future actions with potentially significant environmental effects." 43 C.F.R. §46.215(e).

134.    BLM provided a one-sentence rationale in its supplemental document explaining why this extraordinary circumstance does not apply: "The rule does not mandate a particular land use planning or individual project-level decision; is a procedural rule only." CX Documentation, *supra*, at 3. That explanation is unreasonable. Nothing in the terms of §46.215(e) suggests that it applies only to "particular land use planning or individual project-level decision[s]." To the contrary: Section 46.215(e) discusses actions that "represent a decision in principle about future actions," and it is more likely that an action will do so if it is a broad change as opposed to an individual, project-level one.

135.    In all events, the extraordinary circumstance in §46.215(e) unequivocally applies here.

136.    For one, the Final Rule represents a decision in principle about future actions because it "provides an overarching framework for multiple BLM programs to facilitate ecosystem resilience on public lands." 89 Fed. Reg. at 40308; *see also, e.g.*, *id.* at 40309 (the amendments to the ACEC regulations "establish a more comprehensive framework for the BLM to identify, evaluate, and consider special management attention for ACECs in land use planning"); *id.* at 40321 ("the rule provides a framework for the BLM to issue restoration and mitigation leases on public lands"); *id.* at 40322 (the Rule "sets forth a framework for the BLM to make informed management decisions based on science and data"); *id.* at 40328 (the Rule provides "a framework for how mitigation will be deployed under the rule"); *id.* at 40333 ("the rule sets out a framework").

137.    For another, in several places the Final Rule explains that its purpose is to guide BLM's decisionmaking in future actions with potentially significant environmental effects. *See, e.g.*, 89 Fed. Reg. at 40318 ("The final rule defines the term 'intact landscape' to guide the BLM with implementing direction."); *id.* at 40320 ("BLM updated the final rule … to … enumerate guiding principles for restoration and mitigation actions"); *id.* at 40321 (explaining that "several provisions [of the Final Rule] guide the evaluation of which lands are suitable for leasing"); *id.* at 40326 (the Rule "establishes procedures for addressing potential ACECs that are identified outside of an ongoing planning process").

138.    Because the Final Rule provides new "framework[s]" to "guide" BLM's decisionmaking about designating ACECs and issuing restoration and mitigation leases, the Final Rule "represent[s] a decision in principle about future actions with potentially significant environmental effects." 43 C.F.R. §46.215(e).

139.    *Second*, extraordinary circumstances apply if a Rule has "highly controversial environmental effects or involve[s] unresolved conflicts concerning alternative uses of available resources." 43 C.F.R. §46.215(c).

140.    "A federal action is controversial if a substantial dispute exists as to its size, nature, or effect." *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1333 (9th Cir. 1992) (cleaned up). "[W]here the record reveal[s] the arguable existence of public controversy based on potential environmental consequences," the agency must "explain why an exception for actions involving public controversy based on potential environmental effects ha[s] no application." *California v. Norton*, 311 F.3d 1162, 1177 (9th Cir. 2002) (cleaned up).

141.    The record here leaves no doubt—the Proposed Rule generated extensive public controversy and substantial dispute regarding the environmental consequences of BLM's proposal. The Proposed Rule received 216,403 comments from the public during the formal comment process, many of which raised serious concerns about the possible environmental consequences. *See supra* ¶¶ 32-48. Beyond that, the Proposed Rule inspired multiple hearings in Congress and bills in both houses that would have required the agency to withdraw the Rule altogether.  *See supra* ¶¶ 49-59.

142.    Courts have found agency actions with far fewer comments and far less public debate to be "highly controversial." *See, e.g., Sierra Club v. Bosworth*, 510 F.3d 1016, 1030-31 (9th Cir. 2007) (highlighting "a large number of comments, close to 39,000").

143.    BLM did not address any of this in its analysis of §46.215(c). Instead, it asserted that the "rule will not directly and of its own force result in environmental effects, let alone highly controversial ones[.]" CX Documentation, *supra*, at 2. That conclusion is unresponsive to and unreasonable in light of the numerous comments the agency received that disputed the agency's characterization of the Rule's environmental effects. "Given the large number of comments … and the strong criticism from several affected Western state agencies," among others, BLM could not "summarily conclude that the effects of the [agency action] are not controversial." *Bosworth*, 510 F.3d at 1030-31.

144.    The Final Rule also "involve[s] unresolved conflicts concerning alternative uses of available resources." 43 C.F.R. §46.215(c). The Final Rule includes language meant "to clarify that leases will not preclude access to or across leased lands for recreation use, research use, or other compatible authorized uses, in addition to casual use." 89 Fed. Reg. at 40317. But the Rule leaves open questions regarding what uses will be considered "compatible" with lease activities and what the Rule's effect will be on uses like mining and grazing.

145.    BLM stated that "it does not anticipate that this rulemaking will lead to significant new conflicts among alternative uses." CX Documentation, *supra*, at 2-3. Yet many comments raised the potential for such conflicts. *See, e.g.*, PLPCO Comment Letter, *supra*, at 24-25. BLM's statement is thus unresponsive to the comments the agency received and unreasonable in light of them.

146.    *Third*, extraordinary circumstances exist if the Rule has "a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects." 43 C.F.R. 46.215(f).

147.    The Final Rule makes numerous changes to BLM's framework for managing the public lands. It creates the new restoration and mitigation leasing tool, 89 Fed. Reg. at 40310; adjusts the type of information it requires BLM to use in its decisionmaking, *id.* at 40311; changes the process for designating ACECs (including, in some cases, allowing designation without public comment), *id.* at 40313; and defines more than two dozen terms, *id.* at 40316. The agency itself recognizes that the Final Rule is related to numerous "future actions, including both land use planning and individual project-level decisions, [and] including decisions to issue a restoration or mitigation lease." *Id.* at 40333. BLM promises it will conduct a NEPA review for these actions later. *See id.*

148.    "Cumulative effects" include environmental effects of "reasonably foreseeable actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. §1508.1(g)(3). These effects "include ecological …, aesthetic, historic, cultural, economic,

social, or health." *Id.* §1508.1(g)(4). They "may also include those [effects] resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effects will be beneficial." *Id.*

149.    BLM's supplementary analysis concluded that there are no "cumulatively significant environmental effects" here because "[t]he rule does not make land use planning or individual project-level decisions, and the location and timing of proposed actions to implement the rule are unknown." CX Documentation, *supra*, at 3. That conclusion is unreasonable for at least two reasons.

150.    *First*, the plain terms of §46.215(f) apply to "other actions" broadly, not more narrowly to "land use planning or individual project-level" actions. *Id.*

151.    *Second*, it is immaterial that "the location and timing of proposed actions to implement the rule are unknown." *Id.* A "cumulative effects" analysis includes all actions that are "reasonably foreseeable," and there is no requirement that an agency pin down a precise location and time of a future action that it can reasonably foresee. 40 C.F.R. §1508.1(g)(3). And here, many actions, such as the issuance of restoration and mitigation leases, are "reasonably foreseeable" such that BLM should have considered their cumulative impacts.

152.    In all events, the extraordinary circumstance in §46.215(f) plainly applies here. Even assuming the individual future actions identified in the Final Rule will have "individually insignificant … environmental effects"—an unlikely prospect—taken together, they will undoubtedly have "cumulatively significant" environmental consequences. 43 C.F.R. 46.215(f).  Even if "the agency believes that the [cumulative] effects will be beneficial," 40 C.F.R. §1508.1(g)(4), that does not excuse BLM from the requirement to conduct a NEPA analysis where an extraordinary circumstance applies. Section 46.215(f) thus demands that the Rule be subject to NEPA review now.

153.    Numerous comments specifically highlighted the need for BLM to analyze the potential applicability of extraordinary circumstances. At an absolute minimum, those public

comments created uncertainty about whether any of the extraordinary circumstances applied. And "[i]f there is uncertainty about whether one or more of the extraordinary circumstances apply," BLM's own internal handbook directs the agency to at least "prepare an EA to determine whether an EIS is required." *BLM National Environmental Policy Act Handbook* (H-1790-1), *supra*, at 19. "All categorically excluded actions *must be subjected to sufficient review* to determine if any of the extraordinary circumstances apply." *Id.* (emphasis added).

154.    "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983). But here, "the agency submitted no reasons at all" in the Final Rule to support its conclusion that none of the extraordinary circumstances applies. *Id.* And the reasons it gave in its supplemental analysis were unreasonable.

155.    BLM's "decision to classify [the] action as falling within [the] categorical exclusion" without analyzing potential extraordinary circumstances was thus "arbitrary and capricious" and should "be set aside." *Citizens' Cmte. to Save Our Canyons*, 297 F.3d at 1023.

## PRAYER FOR RELIEF

156.    The Plaintiff States respectfully request that the Court enter judgment for them and against Defendants and provide the following relief:

    a.  a declaration that the Final Rule is arbitrary and capricious within the meaning of 5 U.S.C. §706(2)(A);

    b.  vacatur of the Final Rule;

    c.  a preliminary and permanent injunction barring enforcement of the Final Rule; and

    d.  any other relief that the Court deems just and proper.

Dated: June 18, 2024

Respectfully submitted,

/s/ Jason DeForest

TYLER R. GREEN (USB #10660)
CONSOVOY MCCARTHY PLLC
222 S. Main Street, 5th Floor
Salt Lake City, UT 84101
(703) 243-9423
tyler@consovoymccarthy.com
*Attorney for Plaintiff State of Utah*

DANIEL SHAPIRO*
KATHLEEN S. LANE*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
daniel@consovoymccarthy.com
katie@consovoymccarthy.com
*Attorneys for Plaintiff State of Utah*

*\*Application for admission pro hac vice forthcoming*

SEAN D. REYES (USB #7969)
Utah Attorney General
STANFORD E. PURSER (USB #13440)
Utah Solicitor General
KATHY A.F. DAVIS (USB #4022)
Assistant Attorney General
JASON DEFOREST (USB #14628)
Assistant Attorney General
1594 West North Temple
Suite 300, Salt Lake City, UT 84114
(801) 538-9600
spurser@agutah.gov
kathydavis@agutah.gov
jdeforest@agutah.gov
*Attorneys for Plaintiff State of Utah*

D. DAVID DEWALD*
Deputy Attorney General
Office of the Attorney General of Wyoming
109 State Capitol
Cheyenne, WY 82002
(307) 777-7895
david.dewald@wyo.gov
*Attorney for Plaintiff State of Wyoming*