## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| STATE OF UTAH, and<br>STATE OF WYOMING,<br><br>        *Plaintiffs*,<br><br>  v.<br><br>DEB HAALAND, in her official capacity as<br>the Secretary of the U.S. Department of the<br>Interior; U.S. DEPARTMENT OF THE<br>INTERIOR; TRACY STONE-MANNING, in<br>her official capacity as the Director of the<br>Bureau of Land Management; and U.S.<br>BUREAU OF LAND MANAGEMENT,<br><br>        *Defendants*. | Case No. 2:24-cv-00438<br><br>Magistrate Judge Daphne A. Oberg |

**MOTION AND MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR
A STAY UNDER 5 U.S.C. §705 OR FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

Table of Contents.................................................................................................................i

Table of Authorities.............................................................................................................ii

Introduction ........................................................................................................................1

Background ..........................................................................................................................2

    A.  NEPA requires agencies to take a hard look at the environmental consequences of their actions. ................................................................................................................2

    B.  BLM failed to satisfy its NEPA obligations with respect to the Public Lands Rule. ...3

        i.  When BLM first proposed the Public Lands Rule, it previewed its intent to sidestep NEPA, inspiring objections both in and outside of the formal comment process.................................................................................................3

        ii.  BLM ignored all those objections and acted without satisfying its obligations under NEPA..............................................................................................................6

Argument..............................................................................................................................7

  I.  The Plaintiff States will likely succeed on the merits.............................................7

    A.  The Plaintiff States have standing. .........................................................................7

        i.  The States' injuries are sufficient to support standing. ........................................8

        ii.  The States' injuries are fairly traceable to the Final Rule and likely redressable by a court order vacating the Final Rule. .............................................................12

    B.  BLM acted arbitrarily and capriciously by invoking the CX and failing to analyze extraordinary circumstances...............................................................................................12

        i.  BLM's reliance on the categorical exclusion in §46.210(i) is arbitrary and capricious. ....................................................................................................................13

        ii.  BLM's failure to analyze extraordinary circumstances is arbitrary and capricious. ....................................................................................................................16

  II.  The other factors also favor the Plaintiff States. ..................................................21

    A.  The Final Rule irreparably harms the States....................................................21

    B.  The balance of equities and public interest likewise favor the States. .........................23

Conclusion...........................................................................................................................24

# TABLE OF AUTHORITIES

**Cases**

*Against Ruining Our Env't v. Haaland,*
  59 F.4th 1016 (10th Cir. 2023) ............................................................................................12

*Against Ruining Our Env't v. Jewell,*
  839 F.3d 1276 (10th Cir. 2016) ...........................................................................................21

*All. For the Wild Rockies v. Cottrell,*
  632 F.3d 1127 (9th Cir. 2011).............................................................................................24

*Amoco Prod. Co. v. Vill. Of Gambell,*
  480 U.S. 532 (1987).............................................................................................................23

*Cal. ex rel. Lockyer v. U.S. Dep't of Agriculture,*
  575 F.3d 999 (9th Cir. 2009)...............................................................................................14

*California v. Norton,*
  311 F.3d 1162 (9th Cir. 2002)..............................................................................................18

*Cmte. to Save the Rio Hondo v. Lucero,*
  102 F.3d 445 (10th Cir. 1996)....................................................................................... 7, 8, 12

*Colorado v. EPA,*
  989 F.3d 874 (10th Cir. 2021)................................................................................................7

*Davis v. Mineta,*
  302 F.3d 1104 (10th Cir. 2002) ...............................................................................21, 22, 23

*Dine Citizens Against Ruining Our Envt. v. Bernhardt,*
  923 F.3d 831 (10th Cir. 2019)........................................................................................passim

*District of Columbia v. U.S. Dep't of Agric.,*
  444 F. Supp. 3d 1 (D.D.C. 2020) ........................................................................................22

*Douglas County v. Babbitt,*
  48 F.3d 1495 (9th Cir. 1995)..................................................................................................8

*FCC v. Prometheus Radio Project,*
  592 U.S. 414 (2021)...................................................................................................... 13, 16

*Greenpeace Action v. Franklin,*
  14 F.3d 1324 (9th Cir. 1992).................................................................................................18

*High Sierra Hikers Ass'n v. Blackwell,*
  390 F.3d 630 (9th Cir. 2004)................................................................................................21

*Kisor v. Wilkie,*
  588 U.S. 558 (2019)..............................................................................................................16

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ..................................................................................................21

*New Mexico ex rel. Richardson v. BLM*,
    565 F.3d 683 (10th Cir. 2009) ..................................................................................7

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) .......................................................................................... 2, 24

*Sierra Club v. Bosworth*,
    510 F.3d 1016 (9th Cir. 2007) .................................................................................19

*Sierra Club v. U.S. Dep't of Energy*,
    287 F.3d 1256 (10th Cir. 2002) .......................................................................... 9, 12

*Solar Energy Indus. Ass'n v. FERC*,
    80 F.4th 956 (9th Cir. 2023) ...................................................................................15

*Uranium Watch v. U.S. Forest Serv.*,
    2010 WL 3703807 (D. Utah. Sept. 14, 2010) .........................................................21

*Valley Cmty. Pres. Comm'n v. Mineta*,
    373 F.3d 1078 (10th Cir. 2004) ..............................................................................22

**Statutes**

5 U.S.C. §705 .................................................................................................................1

5 U.S.C. §706(2) ...........................................................................................................12

42 U.S.C. §4332(C) .........................................................................................................2

43 U.S.C. §1701(a)(7)......................................................................................................3

43 U.S.C. §1702(c) ..........................................................................................................3

43 U.S.C. § 1702(h).........................................................................................................3

43 U.S.C. 1711(a) .........................................................................................................14

43 U.S.C. §1712(c)(3)....................................................................................................14

**Regulations**

7 C.F.R. §1b.3...............................................................................................................14

14 C.F.R. §1216.304(d)(1)............................................................................................14

18 C.F.R. §380.4(a)(1)...................................................................................................15

18 C.F.R. §380.4(a)(2)(ii)..............................................................................................15

40 C.F.R. §1501.4(b).......................................................................................................3

40 C.F.R. §1502.3............................................................................................................2

40 C.F.R. §1508.1 ......................................................................................................2, 3, 19, 20

40 C.F.R. §6.204(a)(2)(i) ...............................................................................................14

43 C.F.R. §46.205(c)(1) ..................................................................................................5

43 C.F.R. §46.210(i). ..............................................................................................4, 6, 13, 16

43 C.F.R. §46.215 ...............................................................................................passim

71 Fed. Reg. 4159 ..........................................................................................................15

88 Fed. Reg. 19583 .................................................................................................... 3, 4

89 Fed. Reg. 40308 ......................................................................................................passim

**Other Authorities**

*BLM National Environmental Policy Act Handbook* (H-1790-1) ................................................... 15, 21

BLM, *CX Documentation for the Conservation and Landscape Health Rule* (June 10, 2024) ...................passim

Dep't of Interior, *Biden-Harris Administration Finalizes Strategy to Guide Balanced Management, Conservation of Public Lands* (Apr. 18, 2024) ....................................................................................................6

*Hearing on H.R. 3397 Before the H. Comm. On Nat. Res.*, 118th Cong. 7 (2023) ..........................................5

Idaho Farm Bureau Fed'n, Comment Letter on Proposed Rule on Conservation and Landscape Health at 1-2 (June 28, 2023) ...............................................................................................................4

Matthew Brown, *Biden plan to sell land leases for conservation gets pushback*, AP News (May 16, 2023) ........5

S. 1435, 118th Cong. (2023) .................................................................................................5

Scott Streater, *BLM proposed seismic shift in lands management*, E&E News (March 30, 2023), ...................3

Utah Dep't of Nat. Res. Pub. Lands Policy Coordinating Office ("PLPCO"), Comment Letter on Proposed Rule on Conservation and Landscape Health at 5 (June 30, 2023), ......................... 4, 5, 17

## INTRODUCTION

The Bureau of Land Management's ("BLM") new "Public Lands Rule" represents a seismic shift in the agency's management of 245 million acres of federal public land. The Public Lands Rule as finally published (the "Final Rule" or "Public Lands Rule") overhauls BLM's substantive priorities under the Federal Land Policy and Management Act ("FLPMA"). It revises existing regulations. And it creates brand new land-management tools. BLM intended those changes to significantly impact the environment: the agency has explained that it fashioned the Final Rule in response to an alleged increased degradation of the public lands and intended the Final Rule to make those lands more resilient. And, given the sweeping nature of the changes, the Final Rule will undoubtedly have significant environmental consequences.

A rule of such significance must be subject to careful environmental study under the National Environmental Policy Act ("NEPA"). NEPA requires an agency to follow specific procedures to ensure that the agency has adequately considered possible environmental impacts, that is, taken a "hard look," before it proceeds with a major action. BLM failed to satisfy those procedural obligations for the Final Rule—and thus has violated NEPA.

This Court should grant a preliminary injunction or a stay under 5 U.S.C. §705 to prevent BLM from taking any action under the Final Rule while this litigation proceeds. The States are likely to succeed on the merits of their claim that BLM failed to comply with NEPA. And if they do succeed, they will be entitled to vacatur of the Final Rule and remand to the agency for the careful environmental study and hard look that NEPA requires. In the meantime, the States will suffer irreparable injury if the Final Rule is not enjoined or stayed. The balance of equities and public interest favor granting this motion to preserve the status quo and prevent irreparable harm to the environment.

**BACKGROUND**

BLM failed to satisfy its procedural obligations under NEPA when it issued the Final Rule. Plaintiff States bring this action to hold BLM to those obligations and ensure that BLM carefully considers environmental consequences before overhauling its framework for managing all 245 million acres of Americans' public land.

**A.  NEPA requires agencies to take a hard look at the environmental consequences of their actions.**

NEPA unequivocally requires agencies contemplating any major action to carefully consider possible environmental consequences before moving forward. It is a procedural statute that does not require substantive results.  It imposes "a set of action-forcing procedures that require that agencies take a hard look at environmental consequences" before they act. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). "Simply by focusing the agency's attention on the environmental consequences of a proposed project, NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Id.* NEPA establishes three levels of review for agencies to assess proposed actions.

First, the highest level of review requires an Environmental Impact Study ("EIS"). This level applies when an agency proposes a major action that will significantly affect the quality of the human environment; in those circumstances, the agency must prepare a "detailed written statement" assessing the foreseeable environmental effects of the proposed action. 40 C.F.R. §1508.1(d); *see also* 42 U.S.C. §4332(C); 40 C.F.R. §1502.3.

Second, if the agency is uncertain whether its actions will have significant environmental effects, it can conduct a less-comprehensive review and prepare an Environmental Assessment ("EA"). An EA is a "concise public document prepared by a federal agency to aid an agency's compliance with [NEPA] and support its determination of whether to prepare an environmental impact statement or a finding of no significant impact [FONSI]." 40 C.F.R. §1508.1(h). A FONSI, in

2

turn, is "a document by a federal agency briefly presenting the reasons why an action … will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared." 40 C.F.R. §1508.1(l).

Third, in limited circumstances, the agency can avoid preparing either an EIS or an EA by determining that its proposed action fits within a "categorical exclusion." Categorical exclusions are "a category of actions that the agency has determined … normally do not have a significant effect on the human environment." 40 C.F.R. §1508.1(d). But even when an agency determines that an action fits within a categorical exclusion, the agency is required to "evaluate the action for extraordinary circumstances in which a normally excluded action may have a significant effect." 40 C.F.R. §1501.4(b).

**B. BLM failed to satisfy its NEPA obligations with respect to the Public Lands Rule.**

**i. When BLM first proposed the Public Lands Rule, it previewed its intent to sidestep NEPA, inspiring objections both in and outside of the formal comment process.**

In April 2023, BLM proposed a sweeping new rule on "Conservation and Landscape Health," seeking, among other things, to clarify FLPMA's multiple-use framework. 88 Fed. Reg. 19583 ("Proposed Rule"). In FLPMA, Congress declared that the public lands should be managed "on the basis of multiple use and sustained yield" and defined those terms. 43 U.S.C. §1701(a)(7); *see also id.* §§1702(c); 1702(h). With its Proposed Rule, BLM outlined its intent to "clarify that conservation is a 'use' within FLPMA's multiple-use framework," "revise existing regulations to better meet FLPMA's requirement that the BLM prioritize designating and protecting Areas of Critical Environmental Concern (ACECs)," and "provide an overarching framework for multiple BLM programs to promote ecosystem resilience on public lands." 88 Fed. Reg. at 19583-84. These proposed changes represented a "seismic shift in lands management." Scott Streater, *BLM proposed seismic shift in lands management*, E&E News (March 30, 2023), https://perma.cc/8GWG-CH2D.

3

For NEPA compliance, BLM noted its intent to avoid preparing an EIS or an EA. Instead, the agency outlined its plans to invoke a categorical exclusion—which it abbreviated "CX"—and "document the applicability of the CX concurrently with the development of the final rule." 88 Fed. Reg. at 19596.

BLM received 216,403 comments on the Proposed Rule from the public. *See* 89 Fed. Reg. 40308, 40315 (May 9, 2024). Numerous commenters raised concerns about the agency's intent to rely on the CX and argued that the Proposed Rule would have significant environmental consequences. These commenters included agencies and interest groups in the Plaintiff States, local-government entities in other States, grassroots organizations, industry groups, and more. Although these commenters had varied perspectives on the merits of the Proposed Rule, *all* of them highlighted concerns about BLM moving forward without conducting the environmental study that NEPA requires.

For one, numerous commenters argued that BLM's reliance on the CX was "misplaced" because "[t]he sea-change created by the Proposed Rule certainly cannot be described as 'administrative, financial, legal, technical or procedural.'" Utah Dep't of Nat. Res. Pub. Lands Policy Coordinating Office ("PLPCO"), Comment Letter on Proposed Rule on Conservation and Landscape Health at 5 (June 30, 2023), https://perma.cc/F5VQ-S5C4; *see also, e.g.*, Idaho Farm Bureau Fed'n, Comment Letter on Proposed Rule on Conservation and Landscape Health at 1-2 (June 28, 2023), https://perma.cc/S93S-HE7F ("Clearly, the proposed rule, by its own admission, is attempting to transform the landscape in a significant way … [if] BLM's allegation is allowed to stand that the proposed rule meets the criteria of a CX under 43 CFR 46.210(i), then there is no proposed action, no matter how sweeping, that would not fit within these criteria."); *see generally* Compl. ¶¶32-48 (detailing numerous other comment letters).

4

For another, many commenters also argued that even if BLM had properly invoked the CX, extraordinary circumstances applied, thereby requiring the agency to conduct further environmental study. DOI's NEPA regulations provide that "[a]ny action that is normally categorically excluded must be evaluated to determine whether it meets *any* of the extraordinary circumstances in section 46.215; if it does, further analysis and environmental documents must be prepared for the action." 43 C.F.R. §46.205(c)(1) (emphasis supplied). Section 46.215, in turn, lists twelve extraordinary circumstances that warrant further environmental review. Commenters, and especially Plaintiff States, argued that all twelve extraordinary circumstances applied to the Proposed Rule. *See, e.g.*, PLPCO Comment Letter, *supra*, at 6 (arguing that "all" of the extraordinary circumstances in 43 C.F.R. §46.215 "have potential applicability to the Proposed Rule"); *see also, e.g.*, Compl. ¶¶35, 40, 42, 44, 46, 47, 48. In particular, commenters highlighted that extraordinary circumstances applied because the Proposed Rule would "[e]stablish a precedent for future action," would have "highly controversial environmental effects," and would relate "to other actions with individually insignificant but cumulatively significant environmental effects." 43 C.F.R. §46.215(c), (e), (f).

Outside the formal comment process, state and federal elected officials prominently and repeatedly objected to BLM's intended course of action. They specifically highlighted the need for the agency to comply with NEPA. *See Hearing on H.R. 3397 Before the H. Comm. On Nat. Res.*, 118th Cong. 7 (2023) (statement of Kristi Noem, Governor of South Dakota); *Id.* at 2 (statement of Mark Gordon, Governor of Wyoming). Indeed, both houses of the U.S. Congress held hearings on the Proposed Rule and introduced legislation to require BLM to withdraw the Proposed Rule altogether. *See* S. 1435, 118th Cong. (2023); R. 3397, 118th Cong. (2023) *Biden plan to sell land leases for conservation gets pushback*, AP News (May 16, 2023), https://perma.cc/54JW-RMBJ (noting Wyoming Senator Barasso's opposition).

### ii. BLM ignored all those objections and acted without satisfying its obligations under NEPA.

More than a year after its initial proposal, BLM issued the Final Rule, which the Biden Administration titled the "Public Lands Rule." *See* Conservation and Landscape Health, 89 Fed. Reg. 40308 (May 9, 2024); *see also* Dep't of Interior, *Biden-Harris Administration Finalizes Strategy to Guide Balanced Management, Conservation of Public Lands* (Apr. 18, 2024), https://perma.cc/Z5WK-4H8J.

Despite all the comments and controversy surrounding the Proposed Rule (and BLM's intent to sidestep NEPA), BLM refused to conduct any level of environmental study. Instead, as proposed, BLM invoked the categorical exclusion in 43 C.F.R. §46.210(i), which applies to agency actions "of an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to NEPA process, either collectively or case-by-case."

In response to the many comments arguing that the CX did not apply, BLM offered little explanation. The agency asserted that the "categorical exclusion applies because the rule sets out a framework but is not self-executing in that it does not itself make substantive changes on the ground and will not (absent future decisions that implement the rule) restrict the BLM's discretion to undertake or authorize future on-the-ground action; thus, the rule is administrative in nature." 89 Fed. Reg. at 40333. And with respect to those future decisions, BLM concluded that their environmental effects were "too speculative or conjectural to meaningfully evaluate." *Id.*

And in response to the many comments arguing that extraordinary circumstances required further review under NEPA, BLM offered no explanation at all in the Final Rule. The agency simply concluded—without any analysis—"that *none* of the extraordinary circumstances identified at 43 C.F.R. §46.215 applies to this rulemaking." *Id.* (emphasis added). Although §46.215 lists *twelve* different extraordinary circumstances, BLM did not cite which (if any) of those twelve specific, potentially

6

applicable circumstances it considered, let alone explain its reasons for rejecting the (undisclosed) circumstances' applicability. *See id.*

On June 10, 2024—the Final Rule's effective date—the agency published an additional document to supplement its analysis of the CX and extraordinary circumstances. *See* BLM, *CX Documentation for the Conservation and Landscape Health Rule* (June 10, 2024), https://perma.cc/LK8G-NELQ (hereinafter "CX Documentation"). In this document, and for the first time, BLM laid out and briefly analyzed all twelve extraordinary circumstances in §46.215. But this additional document still failed to provide a reasonable explanation for the agency's extraordinary circumstances conclusion.

## ARGUMENT

This Court should grant a stay under Section 705 of the APA or preliminarily enjoin BLM from taking action under the Final Rule. For either form of relief, the relevant factors are the same: (1) likelihood of success on the merits, (2) irreparable injury, (3) balance of equities, and (4) the public interest. *See Colorado v. EPA*, 989 F.3d 874, 883 (10th Cir. 2021). Each factor favors the Plaintiff States.

## I. The Plaintiff States will likely succeed on the merits.

### A. The Plaintiff States have standing.

"Under NEPA, 'an injury of alleged increased environmental risks due to an agency's uninformed decisionmaking may be the foundation for injury in fact under Article III.'" *Dine Citizens Against Ruining Our Envt. v. Bernhardt*, 923 F.3d 831, 840 (10th Cir. 2019) (quoting *Cmte. to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 559 (10th Cir. 1996)).

Here, the States have "standing because of the threat of environmental damage to lands within [their] boundaries … as well as a financial burden through the costs of lost resources." *New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 696 n.13 (10th Cir. 2009). The States' injuries are fairly traceable to the Final Rule and likely redressable by a court order vacating the Final Rule and remanding to the

agency for compliance with NEPA. And while the States have standing under the traditional analysis, they also "have special solicitude to raise injuries to their quasi-sovereign interest in lands within their borders." *Id.*

### i. The States' injuries are sufficient to support standing.

The States have suffered injuries in fact because of BLM's failure to adhere to its obligations under NEPA. The injury-in-fact analysis here "breaks down into two parts." *Dine Citizens*, 923 F.3d at 840 (quoting *Lucero*, 102 F.3d at 449). The States "must show that (1) in making its decision without following NEPA's procedures, the agency created an increased risk of actual, threatened, or imminent environmental harm, and (2) the increased risk of environmental harm injures [the States'] concrete interests." *Id.* (cleaned up). The States clear both hurdles.

### 1. Utah has suffered an injury in fact.

First, Utah has shown that "in making its decision without following NEPA's procedures, the agency created an increased risk of actual, threatened, or imminent environmental harm." *Id.* For one, the Utah Department of Agriculture and Food (UDAF) Commissioner has explained that the Final Rule authorizes BLM to issue restoration and mitigation leases for activities, such as passive management, that can lead to degraded landscapes, proliferation of noxious weeds, and a heightened risk of catastrophic wildfires on State lands. *See* Buttars Decl. ¶18, Exhibit 1; *see also* 89 Fed. Reg. at 40341 (defining "restoration" to include "passively … assisting the recovery of an ecosystem"). In other words, Utah has legitimate interests in protecting its lands "adjacent to" federal lands, and those interests "could be threatened by how the adjoining federal lands are managed." *Douglas County v. Babbitt*, 48 F.3d 1495, 1501 (9th Cir. 1995); *see also Lucero*, 102 F.3d at 449 (citing this portion of *Douglas County* approvingly).

For another, BLM is empowered to issue these leases without any requirement that leaseholders coordinate with State agencies in managing these risks. *See* Shirley Decl. ¶10, Exhibit 2.

A lack of coordination impairs Utah's ability to manage its water supply, wildfire risk, and invasive plant and animal species, thereby creating risks of environmental harm that would not exist but for the Final Rule. *See id.*

What's more, the Final Rule creates uncertainty about which lands will soon be leased or designated as ACECs. *See* Buttars Decl. ¶¶17, 21. That uncertainty *alone* will impede the implementation of rangeland improvement projects, such as those managed by Utah's Grazing Improvement Program ("GIP"). *See* Buttars Decl. ¶¶4, 19. Those GIP projects lead to significant positive environmental outcomes, including benefits to water quality, native wildlife species, and native flora species. *Id.* ¶¶7-9. By postponing or eliminating GIP's anticipated environmental improvements, the uncertainty created by the Final Rule causes imminent environmental harm. *Id.* ¶19.

"To establish an increased risk of environmental injury," Utah does not need to prove that particular leases "will surely harm the environment, and that [they] will go forth because of" the Final Rule. *Sierra Club v. U.S. Dep't of Energy*, 287 F.3d 1256, 1265 (10th Cir. 2002). Utah "need only show that, in making its decision without following the NEPA … procedures, the agency created an increased risk of actual, threatened, or imminent environmental harm." *Id.* Here, Utah has shown both that the Final Rule itself creates an increased risk of environmental harm *and* that BLM's implementation of the Final Rule is "a necessary step" towards the issuance of leases, "which ha[ve] the potential of harming the environment. This is sufficient to establish an increased risk of environmental harm." *Id.*

And those environmental harms injure Utah's concrete interests. The Final Rule increases the workload for multiple State agencies in Utah. Utah's Division of Wildlife Resources (DWR), along with the State's Conservation Districts, which are overseen by UDAF, are both authorized under the Final Rule to hold restoration and mitigation leases and must expend resources to participate in, or at

minimum evaluate, the leasing program. Even before BLM begins issuing leases, those agencies will suffer multiple concrete harms resulting from the Final Rule's creation of the leasing tool.

*First*, DWR must retain additional personnel to handle Utah's leasing efforts and prepare the "detailed restoration or mitigation development plans" that the Final Rule requires applicants to submit. 89 Fed. Reg. at 40322. To that end, DWR must retain a Habitat Biologist to review leases, provide BLM with lease recommendations for leases issued to non-State entities, and implement restoration efforts under any leases granted to the State. *See* Shirley Decl. ¶12. DWR must also retain a Lands and Realty Biologist, a Range Trend Biologist, a Grant Writer, and administrative and legal personnel. Hiring all of those individuals will cost DWR an estimated $475,000 yearly. *See* Shirley Decl. ¶¶12-17. In addition, evaluating leases will increase the workload for existing personnel at UDAF, necessitating the use of additional resources within that agency. *See* Buttars Decl. ¶21.

*Second*, Utah must increase DWR's budget to fund the leases themselves and efforts related to the leasing program. DWR has identified significant one-time costs it must cover related to the new leasing program, including $450,000 to develop a database for environmental data. *See* Shirley Decl. ¶22. Under the Final Rule, BLM can require States to provide this data. 89 Fed. Reg. at 40322 (as part of the application process, BLM "can require additional information such as environmental data and proof that the applicant has the technical and financial capability to perform the restoration and mitigation activities"). The agency has also identified significant recurring costs, including $2,000,000 annually to fund lease payments. *See* Shirley Decl. ¶¶18-20. In all, DWR has projected one-time and recurring costs totaling $5,035,000. Shirley Decl. ¶24.

To be sure, the Final Rule gives no indication regarding where restoration and mitigation leases may be issued. *See* 89 Fed. Reg. at 40321. But Utah is home to 22.8 million acres of public land, and BLM is highly likely to issue leases covering at least some of that ground. And even if BLM *never issues* a single lease in Utah, the State will nonetheless have suffered those concrete harms because the harms

arise from the Final Rule itself and the creation of the leasing tool—not the ultimate approval of leases. Indeed, the uncertainty surrounding which lands will be leased and to whom the leases will issue only *increases* the burden on Utah by requiring it to prepare for numerous contingencies. As UDAF's Commissioner explains, it is essential that Utah be proactive in addressing any change to how lands within its borders might be managed—anything less than proactive management can lead to "catastrophic" environmental harms. Buttars Decl. ¶22.

### 2. Wyoming has suffered an injury in fact.

First, Wyoming has also shown that "in making its decision without following NEPA's procedures, the agency created an increased risk of actual, threatened, or imminent environmental harm." *Dine Citizens*, 923 F.3d at 840.

Wyoming is home to the world's largest population of Greater Sage-grouse, and the Final Rule increases the risk of harm to the sage grouse by undermining Wyoming's ability to manage sage grouse populations and habitat. Wyoming has a Sage Grouse Implementation Team ("SGIT") charged with implementing the State of Wyoming Executive Department Executive Order 2019-3, Greater Sage Grouse Core Area Protection ("Sage Grouse Executive Order"). *See* Wendtland Decl. ¶¶12-14, Exhibit 3. Wyoming maintains approximately 15 million acres of sage grouse habitat and works collaboratively with federal land-management agencies, including BLM, to ensure a uniform and consistent application of the Sage Grouse Executive Order. *See id.* ¶15.

The Final Rule increases the risk of environmental harm in Wyoming by allowing BLM to cede control of leased lands to individuals and entities that have no duty to coordinate with Wyoming to implement the Sage Grouse Executive Order. *See id.* ¶18. That lack of coordination alone creates an increased risk of harm to the sage grouse species in Wyoming. And even if BLM never grants any leases, the Final Rule itself injures Wyoming by changing BLM's overarching framework for managing the public lands and thereby impeding Wyoming's efforts to protect sage grouse.

11

Second, "the increased risk of environmental harm injures [Wyoming's] concrete interests." *Dine Citizens*, 923 F.3d at 840. Wyoming's unique and substantial efforts to manage and enhance sage grouse populations and habitat demonstrate Wyoming's "concrete and particularized interests" in sage-grouse protection and show that Wyoming will "suffer the environmental consequences" of the Final Rule. *Lucero*, 102 F.3d at 449.

### ii.  The States' injuries are fairly traceable to the Final Rule and likely redressable by a court order vacating the Final Rule.

The States' injuries are "fairly traceable to the failure of [BLM] to conduct a NEPA … analysis." *Sierra Club v. U.S. Dep't of Energy*, 287 F.3d 1256, 1265 (10th Cir. 2002). "An injury under the NEPA results not from the agency's decision, but rather from the agency's uninformed decisionmaking." *Id.* (cleaned up).

The States' injuries are redressable by a favorable decision requiring BLM to comply with NEPA. "Under the National Environmental Policy Act, the normal standards for redressability are relaxed; a plaintiff need not establish that the ultimate agency decision would change upon National Environmental Policy Act compliance. Rather, the [State] must establish, as it has, that its injury would be redressed by a favorable decision requiring [BLM] to comply with National Environmental Policy Act's procedures." *Lucero*, 102 F.3d at 452 (cleaned up). "That [BLM] may not change its decision … after preparing an environmental impact statement is immaterial." *Id.*

### B.  BLM acted arbitrarily and capriciously by invoking the CX and failing to analyze extraordinary circumstances.

"NEPA does not create a cause of action, so NEPA challenges are brought under the APA." *Dine Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1029 (10th Cir. 2023). The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2). An agency's decision to invoke a categorical exclusion is reviewed under the arbitrary-and-capricious standard, *Citizens' Cmte.*

*to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1023 (10th Cir. 2002), which requires "that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

### i. BLM's reliance on the categorical exclusion in §46.210(i) is arbitrary and capricious.

BLM invoked the categorical exclusion at 43 C.F.R. §46.210(i), which applies to "[p]olicies, directives, regulations, and guidelines: that are of an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case." Its decision to do so was neither "reasonable [n]or reasonably explained." *Prometheus Radio Project*, 592 U.S. at 423.

*First*, BLM's decision to invoke the CX was not reasonably explained. BLM provided only one sentence in the Final Rule to explain its view that the Final Rule is "of an administrative, financial, legal, technical, or procedural nature." The agency contends that §46.210(i) "applies because the rule sets out a framework but is not self-executing in that it does not itself make substantive changes on the ground and will not (absent future decisions that implement the rule) restrict the BLM's discretion to undertake or authorize future on-the-ground action; thus, the rule is administrative or procedural in nature." 89 Fed. Reg. at 40333. In its supplementary analysis, BLM also added that the Final Rule "is administrative and procedural in nature" because "[a]ny future change in management or authorization of on-the-ground activities would be subject to a separate decision-making process." CX Documentation, *supra*, at 1.

BLM's analysis is conclusory, and none of the factors it highlights in support of its conclusion are relevant to whether the Final Rule is in fact "administrative or procedural" as those terms are used in the CX. For one, BLM highlights that the Final Rule "sets out a framework" for "future decisions"

that will be subject to a separate decisionmaking process. But BLM does not explain why these facts are relevant to whether the Final Rule is "administrative or procedural."

For another, rules that implement a change to an existing framework—for example, by "revis[ing]" existing regulations—"qualify as 'substantive' action" and "meet the relatively low threshold to trigger some level of environmental analysis under [NEPA]." *Cal. ex rel. Lockyer v. U.S. Dep't of Agriculture*, 575 F.3d 999, 1013 (9th Cir. 2009). Under that standard, the Final Rule qualifies as substantive because it revises existing regulations—as BLM intended it would. *See, e.g.*, 89 Fed. Reg. at 40313 ("This rule … revises the existing regulations implementing FLPMA's direction in sections 201(a) and 202(c)(3) (43 U.S.C. §§1711(a) and 1712(c)(3)) that the BLM shall give priority to the designation and protection of ACECs."). On its face, this indisputable and intended consequence of the Final Rule means BLM had a plain obligation to conduct "some level of environmental analysis under" NEPA. *Cal. ex rel. Lockyer*, 575 F.3d at 1013. BLM failed to do so.

*Second*, the relevant terms in 46.210(i) are not ambiguous. But even assuming they were, BLM's interpretation of those terms to cover the Public Lands Rule is unreasonable.

BLM contends that the Final Rule is covered by 46.210(i) because the Final Rule is "administrative or procedural in nature." 89 Fed. Reg. at 40333. But the terms "administrative" and "procedural" in the CX are not ambiguous, and neither term applies here.

The Final Rule is not "administrative." Throughout the Code of Federal Regulations, agencies consistently use the term "administrative" to categorically exclude from NEPA review actions related to internal agency organization and management, such as personnel and budget decisions. *See, e.g.*, 7 C.F.R. §1b.3 (USDA) ("categorically excluding" certain "administrative functions" like "personnel" and "organizational changes"); 40 C.F.R. §6.204(a)(2)(i) (EPA) (grouping categorical exclusions for "administrative" actions with "financial, personnel, and management actions necessary to support the normal conduct of EPA business"); 14 C.F.R. §1216.304(d)(1) (NASA) (categorically excluding

14

"administrative activities including," among other things, "personnel actions," "organizational changes," and "budget proposals"); 18 C.F.R. §380.4(a)(1) (FERC) ("internal administrative and management actions … including procurement, contracting, [and] personnel actions"). But the Final Rule does not relate to internal agency management. Instead, as discussed, it revises the substantive framework for how BLM will carry out the management of the public lands. Thus, the Final Public Lands Rule does not qualify as "administrative" under the CX invoked by BLM.

Nor is the Final Rule "procedural." As "[a]n example of a categorically excluded procedural action," BLM has highlighted its "proposed revision of [its] Departmental NEPA Manual chapter." *BLM National Environmental Policy Act Handbook* (H-1790-1), at 14 (referring to National Environmental Policy Act Revised Implementing Procedures, 71 Fed. Reg. 4159-01 (Jan. 25, 2006)). That action, too, was unrelated to the agency's substantive land-management priorities. It addressed the agency's internal rules for managing the NEPA process and determining which of its future actions require an EA or EIS. *See* 71 Fed. Reg. at 4159.

Other agencies maintain similar categorical exclusions for "procedural" actions, and the kinds of actions that qualify under those exclusions are similarly unrelated to the agency's substantive priorities. *See, e.g.*, 18 C.F.R. §380.4(a)(2)(ii) (categorical exclusion for rules that are "clarifying, corrective, or procedural, or that do not substantially change the effect of … regulations being amended"); *see Solar Energy Indus. Ass'n v. FERC*, 80 F.4th 956, 992 (9th Cir. 2023) (analyzing that CX, conceding that an "update to [FERC] Form 556—used by QFs [qualifying facilities] when applying for certification—can reasonably be described as a 'procedural' change," and otherwise "reject[ing] FERC's contention … that the more substantive elements of [its action] fall within the categorical exclusion").

But even assuming this Court determines that the BLM's CX is "genuinely ambiguous" after "resort[ing] to all the standard tools of interpretation," BLM's interpretation of those terms to cover

15

the Final Rule must be reasonable. *See Kisor v. Wilkie*, 588 U.S. 558, 573 (2019). And here, it is unreasonable to interpret the CX covering regulations "of an administrative, financial, legal, technical or procedural nature" to apply to a rule that revises BLM's substantive land-management priorities and "provides an overarching framework for multiple BLM programs." 89 Fed. Reg. at 40308. As Utah and many others objected from the beginning: "[if] BLM's allegation is allowed to stand that the proposed rule meets the criteria of a CX under 43 CFR 46.210(i), then there is no proposed action, no matter how sweeping, that would not fit within these criteria." Idaho Farm Bureau Fed'n Comment Letter, *supra*, at 1-2.

What's more, it is unreasonable to interpret the CX covering actions "whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis" to apply to this Final Rule. 43 C.F.R. §46.210(i). As the States have shown, the Final Rule itself causes non-speculative environmental effects that BLM should have carefully studied. *See supra,* Section II.A. So, BLM is wrong that this Final Rule does not "directly result in environmental effects." CX Documentation, *supra*, at 1.

### ii. BLM's failure to analyze extraordinary circumstances is arbitrary and capricious.

BLM's conclusion that no extraordinary circumstances apply is arbitrary and capricious because BLM failed to "reasonably explain[]" its determination. *Prometheus Radio Project*, 592 U.S. at 423. Numerous commenters explained why many extraordinary circumstances apply and thus trigger NEPA review. But in the Final Rule, BLM did not even *try* to respond to those comments or explain its reasoning. Instead, in a single sentence, it simply stated its conclusion "that none of the extraordinary circumstances identified at 43 CFR 46.215 applies to this rulemaking." 89 Fed. Reg. at 40333. On the Final Rule's effective date, the agency published a never-before-seen analysis of the extraordinary circumstances in §46.215. *See* CX Documentation, *supra*, at 2-4. That document included a brief rationale for each of the twelve extraordinary circumstances.

As PLPCO and other commenters argued, all twelve extraordinary circumstances are potentially applicable to the Final Rule. *See* PLPCO Comment Letter, *supra*, at 6. BLM had an obligation to reasonably explain why they do not apply—especially after numerous commenters raised the issue. It failed to do so in the Final Rule itself, and its supplementary analysis is unreasonable. Three of the twelve extraordinary circumstances are worth emphasizing here.

*First*, extraordinary circumstances exist if the Rule "[e]stablish[es] a precedent for future action or represent[s] a decision in principle about future actions with potentially significant environmental effects." 43 C.F.R. §46.215(e).

BLM provided a one-sentence rationale in its supplemental document explaining why this extraordinary circumstance does not apply: "The rule does not mandate a particular land use planning or individual project-level decision; it is a procedural rule only." CX Documentation, *supra*, at 3. That explanation is unreasonable. Nothing in the terms of §46.215(e) suggests that it applies only to "particular land use planning or individual project-level decision[s]." To the contrary: Section 46.215(e) discusses actions that "represent a decision in principle about future actions," and it is more likely that an action will do so if it is a broad change as opposed to an individual, project-level one.

In all events, the extraordinary circumstance in §46.215(e) unequivocally applies here. For one, the Final Rule represents a decision in principle about future actions because it "provides an overarching framework for multiple BLM programs to facilitate ecosystem resilience on public lands." 89 Fed. Reg. at 40308; *see also, e.g.*, *id.* at 40309 (the amendments to the ACEC regulations "establish a more comprehensive framework for the BLM to identify, evaluate, and consider special management attention for ACECs in land use planning"); *id.* at 40321 ("the rule provides a framework for the BLM to issue restoration and mitigation leases on public lands"); *id.* at 40322 (the Final Rule "sets forth a framework for the BLM to make informed management decisions based on science and data"); *id.* at

17

40328 (the Final Rule provides "a framework for how mitigation will be deployed under the rule"); *id.* at 40333 ("the rule sets out a framework").

For another, in several places the Final Rule explains that its purpose is to guide BLM's decisionmaking in future actions with potentially significant environmental effects. *See, e.g.*, 89 Fed. Reg. at 40318 ("The final rule defines the term 'intact landscape' to guide the BLM with implementing direction."); *id.* at 40320 ("BLM updated the final rule … to … enumerate guiding principles for restoration and mitigation actions"); *id.* at 40321 (explaining that "several provisions [of the Final Rule] guide the evaluation of which lands are suitable for leasing"); *id.* at 40326 (the Final Rule "establishes procedures for addressing potential ACECs that are identified outside of an ongoing planning process").

*Second*, extraordinary circumstances apply if the Final Rule has "highly controversial environmental effects." 43 C.F.R. §46.215(c). "A federal action is controversial if a substantial dispute exists as to its size, nature, or effect." *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1333 (9th Cir. 1992) (cleaned up). "[W]here the record reveal[s] the arguable existence of public controversy based on potential environmental consequences," the agency must "explain why an exception for actions involving public controversy based on potential environmental effects ha[s] no application." *California v. Norton*, 311 F.3d 1162, 1177 (9th Cir. 2002) (cleaned up).

The record here leaves no doubt—the Final Rule generated extensive public controversy. The Proposed Rule received 216,403 comments from the public during the formal comment process, many of which raised serious concerns about the possible environmental consequences. *See supra* 3-5. Beyond that, the Proposed Rule inspired multiple hearings in Congress and bills in both houses that would have required the agency to withdraw the Proposed Rule altogether. *See supra* 5. Indeed, courts have found agency actions with far fewer comments and far less public debate to be "highly

controversial." *See, e.g.*, *Sierra Club v. Bosworth*, 510 F.3d 1016, 1030-31 (9th Cir. 2007) (highlighting "a large number of comments, close to 39,000").

BLM did not address any of this in its analysis of §46.215(c). Instead, it asserted that the "rule will not directly and of its own force result in environmental effects, let alone highly controversial ones[.]" CX Documentation, *supra*, at 2. That conclusion is unresponsive to and unreasonable in light of the numerous comments the agency received. "Given the large number of comments … and the strong criticism from several affected Western state agencies," among others, BLM could not "summarily conclude that the effects of the [agency action] are not controversial." *Bosworth*, 510 F.3d at 1030-31.

*Third*, extraordinary circumstances apply if an agency action has "a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects." 43 C.F.R. §46.215(f). This circumstance is likewise present here.

The Final Rule makes numerous changes to BLM's framework for managing the public lands. It creates the new restoration and mitigation leasing tool, 89 Fed. Reg. at 40310; adjusts the type of information it requires BLM to use in its decisionmaking, *id.* at 40311; changes the process for designating ACECs (including, in some cases, allowing designation without public comment), *id.* at 40313; and defines more than two dozen terms (including a sweeping, unbounded definition for what qualifies as an "intact landscape"), *id.* at 40308, 40316.

The cumulative effects of these numerous changes will surely be significant. "Cumulative effects" include environmental effects of "reasonably foreseeable actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. §1508.1(g)(3). These effects "include ecological …, aesthetic, historic, cultural, economic, social, or health." *Id.* §1508.1(g)(4). They "may also include those [effects] resulting from actions which may have both

19

beneficial and detrimental effects, even if on balance the agency believes that the effects will be beneficial." *Id.*

BLM's supplementary analysis concluded that there are no "cumulatively significant environmental effects" here because "[t]he rule does not make land use planning or individual project-level decisions, and the location and timing of proposed actions to implement the rule are unknown." CX Documentation, *supra*, at 3. That conclusion is unreasonable for at least two reasons.

One, the plain terms of §46.215(f) apply to "other actions" broadly, not more narrowly to "land use planning or individual project-level" actions. *Id.* And two, it is immaterial that "the location and timing of proposed actions to implement the rule are unknown." *Id.* A "cumulative effects" analysis includes all actions that are "reasonably foreseeable," and there is no requirement that an agency pin down a precise location and time of a future action that it can reasonably foresee. 40 C.F.R. §1508.1(g)(3). And here, many actions, such as the issuance of restoration and mitigation leases, are "reasonably foreseeable" such that BLM should have considered their cumulative impacts.

In all events, the extraordinary circumstance in §46.215(f) plainly applies here. Even assuming the individual future actions identified in the Final Rule will have "individually insignificant … environmental effects"—an unlikely prospect—taken together, they will undoubtedly have "cumulatively significant" environmental consequences. 43 C.F.R. §46.215(f). Even if "the agency believes that the [cumulative] effects will be beneficial," 40 C.F.R. §1508.1(g)(4), that does not excuse BLM from the required NEPA analysis where an extraordinary circumstance applies.

Numerous comments specifically highlighted the need for BLM to analyze the potential applicability of extraordinary circumstances. At an absolute minimum, those public comments created uncertainty about whether any of the extraordinary circumstances applied. And "[i]f there is uncertainty about whether one or more of the extraordinary circumstances apply," BLM's own internal handbook directs the agency to at least "prepare an EA to determine whether an EIS is required."

20

*BLM National Environmental Policy Act Handbook* (H-1790-1), at 19. "All categorically excluded actions *must be subjected to sufficient review* to determine if any of the extraordinary circumstances apply." *Id.* (emphasis added).

"It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983). But here, "the agency submitted no reasons at all" to support its conclusion that none of the extraordinary circumstances applies. *Id.* And the supplemental explanations it supplied were unreasonable. BLM's "decision to classify [the] action as falling within [the] categorical exclusion" without adequately and reasonably analyzing extraordinary circumstances was thus "arbitrary and capricious." *Citizens' Cmte. to Save Our Canyons*, 297 F.3d at 1023.

## II.  The other factors also favor the Plaintiff States.

### A.  The Final Rule irreparably harms the States.

The Final Rule irreparably injures the States in at least three ways: First, BLM's procedural violation, on its own, causes the States irreparable injury. Second, the Final Rule causes the States to divert resources, which cannot be recovered. Third, the Final Rule irreparably injures the States' environmental interests.

First, the Plaintiff States are irreparably harmed by BLM's procedural violation. The States have shown that they are likely to succeed on their claim that BLM violated NEPA's procedures. *See supra,* Section II. On its own, the agency's failure to adhere to its obligations under NEPA irreparably injures the States by depriving them of the opportunity to stop the "bureaucratic steam roller" before it's too late. *Davis v. Mineta*, 302 F.3d 1104, 1115 (10th Cir. 2002) (cleaned up), *abrogated on other grounds by Dine Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281-82 (10th Cir. 2016); *see also Uranium Watch v. U.S. Forest Serv.*, 2010 WL 3703807, at *8 (D. Utah. Sept. 14, 2010) (quoting *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 642 (9th Cir. 2004)) ("In the NEPA context, irreparable

21

injury flows from the failure to evaluate the environmental impact of a major federal action."). As the Tenth Circuit has recognized, "[t]he difficulty of stopping a bureaucratic steam roller, once started," is "a perfectly proper factor for a district court to take into account on a motion for preliminary injunction," and recognizing that reality supports a conclusion that "plaintiffs have established irreparable harm under NEPA." *Davis*, 302 F.3d at 1115.

Second, the Rule will cause State agencies to commit administrative resources in NEPA processes and corresponding litigation related to mitigation or restoration leases. Under the Final Rule, mitigation and restoration leases are subject to project-level NEPA. *See* 89 Fed. Reg. at 40327. Thus, if the Final Rule is not enjoined, State agencies will likely have to participate in project-specific NEPA processes under this procedurally-flawed rule to protect their interests. *See, e.g.*, Kropatsch Decl. ¶6, Exhibit 4; Bruce Decl. ¶10, Exhibit 5. An injunction is therefore necessary to halt the effects of the Final Rule *before* State agencies divert agency resources towards engaging in lease-issuance NEPA proceedings. Otherwise, the Plaintiffs States will be forced to waste agency resources that would otherwise be spent on regulatory efforts. Kropatsch Decl. ¶7; Bruce Decl. ¶11; *cf. District of Columbia v. U.S. Dep't of Agric.*, 444 F.Supp. 3d 1, 42 (D.D.C. 2020) (noting that "harms from the forced diversion of resources are similar to those recognized as irreparable harm in other suits").

Third, absent an injunction, BLM's action will irreparably harm the States' environmental interests. "Environmental harm is, by its nature, generally irreparable," and such harm "may be presumed when an agency fails to comply with the required NEPA procedure." *Valley Cmty. Pres. Comm'n v. Mineta*, 373 F.3d 1078, 1086 (10th Cir. 2004); *Davis*, 302 F.3d at 1115.

Here, the Plaintiff States have shown that "the environmental harm" caused by BLM's NEPA violation "results in irreparable injury to [the States'] specific environmental interests." *Davis*, 302 F.3d at 1115. As already discussed, the uncertainty surrounding the Final Rule causes imminent environmental harm by impeding the implementation of rangeland improvement projects, such as

22

those managed by Utah's GIP. *See* Buttars Decl. ¶19. Similarly, handing control over leased lands to individuals and entities that may refuse to coordinate with DWR regarding the management of wildlife and its habitat poses imminent environmental harms across Utah.  UDAF and DWR have therefore raised "specific environmental interests" in managing Utah's water supply, wildfire risk, and invasive plant and animal species. *Davis*, 302 F.3d at 1115. Likewise, the Final Rule threatens Wyoming's ability to manage its wildlife by causing a potential mismatch in wildlife management policy and complicating conservation efforts. *See* Bruce Decl. ¶¶12-18. And Wyoming has raised "specific environmental interests" related to its unique role in protecting sage grouse populations and habitat. *Id.*; *see supra* at 11-12. More specifically, allowing BLM to hand control of leased lands to individuals and entities that have no duty to coordinate with the implementation of Wyoming's Sage Grouse Executive Order creates an increased risk of harm to the sage-grouse species in Wyoming. *See* Wendtland Decl. ¶18. This is of significant environmental concern for a state with regulatory jurisdiction over land use and mining projects directly affecting sage-grouse habitat, which encompasses approximately 15 million acres across Wyoming. *Id.* at 16.

These harms to the environment in the States cannot "be adequately remedied by money damages and [are] … permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Vill. Of Gambell*, 480 U.S. 532 (1987). The States have shown that their lands "will be directly impacted" by the Final Rule, and the "scope of this [Final Rule] supports a conclusion that the injury is significant." *Davis*, 302 F.3d at 1115. "Thus, [the States] have established irreparable harm under NEPA." *Id.*

**B. The balance of equities and public interest likewise favor the States.**

As the Supreme Court has explained, if "[e]nvironmental injury" is "sufficiently likely … the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Production Co.*, 480 U.S. at 545. And in NEPA cases, courts have "often noted" that it serves the public interest to "suspend[]" an agency's action until the agency can complete the "careful consideration of

23

environmental impacts" that NEPA requires. *All. For the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011).

Here, the States have shown that BLM's implementation of the Final Rule is likely to cause specific and imminent environmental harm. It thus serves the public interest to prevent BLM from causing such harm while this litigation unfolds. BLM has not yet approved any leases using the restoration and mitigation leasing tool, so enjoining the agency from doing so preserves the status quo. What's more, BLM can hardly claim that implementing the Final Rule is particularly urgent to prevent environmental harm: The agency took over a year to finalize the Public Lands Rule after it was proposed, and even though the Final Rule has now gone into effect, the agency has yet to publish instructional memoranda that would guide the approval of leases under the Final Rule.

Furthermore, it is in the public interest that this procedurally-inadequate rule be enjoined because it directly and indirectly impacts resources the States' citizens need. For example, Wyoming's public lands help support public education and other State institutions. *See* Wyo. Stat. Ann. § 36-2-101. But these lands are sometimes completely surrounded by BLM-managed land. The potential for BLM to decide to temporarily manage an ACEC or issue a mitigation or restoration lease near Wyoming trust lands devalues State lands. *See generally,* Scoggin Decl., Exhibit 6. Further, the Final Rule threatens critical revenue derived from oil and gas leasing in Wyoming. Kropatsch Decl. ¶9-23.

Enjoining the Final Rule thus serves the public's interest in ensuring that "the agency 'has indeed considered environmental concerns in its decisionmaking process,'" as mandated by NEPA. *Robertson*, 490 U.S. at 349.

## CONCLUSION

This Court should grant Plaintiff States' motion and enter a preliminary injunction or a stay under 5 U.S.C. §705.

Dated: July 11, 2024

TYLER R. GREEN (USB #10660)
CONSOVOY MCCARTHY PLLC
222 S. Main Street, 5th Floor
Salt Lake City, UT 84101
(703) 243-9423
tyler@consovoymccarthy.com
*Attorney for Plaintiff State of Utah*

DANIEL SHAPIRO*
KATHLEEN S. LANE*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
daniel@consovoymccarthy.com
katie@consovoymccarthy.com
*Attorneys for Plaintiff State of Utah*

*Application for admission pro hac vice forthcoming*

Respectfully submitted,

/s/ Jason DeForest
SEAN D. REYES (USB #7969)
Utah Attorney General
STANFORD E. PURSER (USB #13440)
Utah Solicitor General
KATHY A.F. DAVIS (USB #4022)
Assistant Attorney General
JASON DEFOREST (USB #14628)
Assistant Attorney General
1594 West North Temple
Suite 300, Salt Lake City, UT 84114
(801) 538-9600
spurser@agutah.gov
kathydavis@agutah.gov
jdeforest@agutah.gov
*Attorneys for Plaintiff State of Utah*

D. DAVID DEWALD*
Deputy Attorney General
Office of the Attorney General of Wyoming
109 State Capitol
Cheyenne, WY 82002
(307) 777-7895
david.dewald@wyo.gov
*Attorney for Plaintiff State of Wyoming*

25

## CERTIFICATE OF COMPLIANCE

I, Jason DeForest, certify that this motion contains 7726 words and complies with DUCivR 7-1(a)(4).

 /s/ Jason DeForest              
Jason DeForest

## CERTIFICATE OF SERVICE

I hereby certify that on July 11, 2024, I have mailed by United States Postal Service the document to the following non-CM/ECF participants:

Bureau of Land Management
1849 C Street, N.W.
Washington, DC 20240

Tracy Stone-Manning
Bureau of Land Management
1849 C Street, N.W.
Washington, DC 20240

U.S. Department of the Interior
1849 C Street, N.W.
Washington, DC 20240

Deb Haaland
U.S. Department of the Interior
1849 C Street, N.W.
Washington, DC 20240

Merrick B. Garland, Attorney General
U.S. Department of Justice950 Pennsylvania Ave. NW
Washington, D.C. 20530

Trina A. Higgins
U.S. Attorney, District of Utah
111 S. Main Street, Ste. 1800
Salt Lake City, UT 84111

/s/   Jason DeForest
Jason DeForest