# Exhibit 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| STATE OF UTAH, <br> STATE OF WYOMING, <br><br>          *Plaintiffs*, <br><br>     v. <br><br> DEB HAALAND, in her official capacity as the Secretary of the U.S. Department of the Interior; U.S. DEPARTMENT OF THE INTERIOR; TRACY STONE-MANNING, in her official capacity as the Director of the Bureau of Land Management; and U.S. BUREAU OF LAND MANAGEMENT, <br><br>          *Defendants*. | Case          No. <br><br> _____ |

## DECLARATION OF KYLE WENDTLAND IN SUPPORT OF COMPLAINT

I, Kyle Wendtland, declare as follows:

1. My name is Kyle Wendtland. I am over twenty-one years of age, and I am fully competent and duly authorized to make this Declaration. The facts contained in this Declaration are based on my personal knowledge or information available to me in the performance of my professional duties.

2. I am the Administrator of the Land Quality Division of the Wyoming Department of Environmental Quality "(LQD"). I received a Bachelor of Science in Range Management with a focus on disturbed land reclamation and a Master of Science in fire/plant ecology from the University of Wyoming.

3. I have been the LQD Administrator in the Wyoming Department of Environmental Quality for over nine years. Prior to that, for decades I was employed in the mining industry, environmental engineering-related positions, and in governmental environmental regulation. I have extensive experience; have received state and national reclamation awards; and I am

1

considered an expert in reclamation (specifically sagebrush establishment on disturbed lands), bonding, mining, and environmental regulation from both the private and regulatory perspectives.

4. As LQD Administrator, my duties include administration of the LQD program, which regulates all solid mineral types, degrees, and magnitude of mining in Wyoming, ranging from small acreage sand and gravel mines to large industrial scale surface coal mines, and everything in between.

5. In my role as LQD Administrator, I am routinely involved in a range of land use activities, and I make decisions that directly influence and permit various mining and related land use activities that take place on federal public lands managed by the United States Department of the Interior Bureau of Land Management ("BLM") in Wyoming.

6. I am familiar with the final rule promulgated by the BLM entitled "Conservation and Landscape Health," 89 Fed. Reg. 40308 (May 9, 2024) ("Final Rule").

7. DEQ Director Todd Parfitt submitted comments on July 5, 2023 regarding the draft version of the Final Rule, which concerned matters within the jurisdiction of the LQD and raised a number of concerns and objections with the rule, with which I concur.

8. In my opinion, the Final Rule harms Wyoming by interfering with the State's ability and authority to regulate various land uses on land managed by the BLM and I am providing this Declaration in support of the Complaint filed in the case caption set forth in this Declaration on page 1 hereof.

9. The LQD is the lead state permitting agency for a host of activities that take place on BLM-managed public lands in Wyoming for activities such as coal mining, sand and gravel operations, uranium exploration and production, trona exploration and production, bentonite exploration and production, and commercial scale hard rock mining. In fact, with certain mining

2

operations such as surface coal mining, the U.S. Department of Interior Office of Surface Mining and Reclamation Enforcement (OSMRE) gives LQD almost exclusive regulatory authority over coal mining under the federal Surface Mining Control and Reclamation Act (SMCRA), even on BLM-managed public lands. Thus, it is critical that the BLM likewise give a detailed role to LQD concerning how the Final Rule is to be implemented with respect to coal mining on BLM-managed lands.

10. Under SMCRA, states "enact and administer their own regulatory programs" for administration of surface coal mining in their respective states. *Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 289 (1981). This is true even with such mining on federal public lands. Indeed "SMCRA exhibits extraordinary deference to the States." *Bragg v. W. Va. Coal Ass'n*, 248 F.3d 275, 293 (4th Cir. 2001). SMCRA gives state regulators (such as LQD) the power to assume "**exclusive** jurisdiction over the regulation of surface coal mining and reclamation operations" with a few limited exceptions. 30 U.S.C. § 1253(a) (emphasis added). Despite this authority, the Final Rule ignores the critical role the LQD plays in land management decisions relating to mining in Wyoming, including on BLM-managed lands.

11. In addition to my role as LQD Administrator, I am a member of the Wyoming Sage Grouse Implementation Team ("SGIT"). SGIT was created by Wyoming Statute, and as a team consists of at least two (2) persons from each of the following interests: (a) agriculture, (b) mining, (c) oil and gas industry, and (d) conservation or sportsman's groups. Additionally, the SGIT consists of at least one member from each of the following interests: (a) county government, (b) the wind generation and transmission industry, (c) Wyoming Game and Fish Commission, (d) Wyoming Department of Agriculture, (e) Wyoming Department of Environmental Quality, (f) Wyoming Wildlife and Natural Resource Trust Fund Board, (g) Wyoming Oil and Gas

3

Conservation Commission, (h) Wyoming Office of State Lands and Investments, (i) a member of the Wyoming Legislature's House of Representatives, and (j) a member of the Wyoming Legislature's Senate. I am the Wyoming Department of Environmental Quality representative on the SGIT.

12. By Wyoming Statute, the SGIT is specifically charged with seeking the "cooperation and participation from the following federal entities in carrying out its duties: (i) United States Bureau of Land Management, (ii) United States Fish and Wildlife Service, (iii) United States Forest Service, and (iv) United States Natural Resource Conservation Service." Wyo. Stat. Ann. § 9-19-101(c).

13. The SGIT is charged by Wyoming law to review data and make recommendations regarding actions and funding to maintain and enhance sage grouse populations and sage grouse habitats in Wyoming, including on BLM-managed land. Additionally, the SGIT is charged by statute to make recommendations regarding regulatory actions necessary to protect, maintain, and enhance sage grouse populations and sage grouse habitats in Wyoming.

14. The SGIT implements State of Wyoming Executive Department Executive Order 2019-3, Greater Sage Grouse Core Area Protection ("Sage Grouse Executive Order"). As noted in the Sage Grouse Executive Order, Wyoming contains the world's largest population of Greater Sage-grouse (*Centrocercus urophasianus*) and Wyoming contains abundant sagebrush-steppe habitat in which sage grouse typically reside.

15. The United States Department of the Interior has recognized Wyoming's exclusive right to manage sage grouse populations in Wyoming. As part of that management authority, LQD exercises regulatory jurisdiction over land use and mining projects directly affecting sage grouse habitat in Wyoming; many such projects are located on lands otherwise managed by the BLM.

16.     Sage grouse populations have been generally declining in the western United States, so Wyoming has employed a unique conservation system to prevent listing of the sage grouse as a threatened or endangered wildlife species under the federal Endangered Species Act. Wyoming employs a sage grouse core area protection strategy, which serves to conserve and protect the species. Wyoming, along with federal land management agencies such as the BLM has generally coordinated sage grouse conservation actions across land boundaries, which encompass approximately 15 million acres of habitat for the species within Wyoming.

17.     Under its unique system, Wyoming and state agencies are required to prioritize the maintenance and enhancement of sage grouse habitats and populations. Moreover, development in Wyoming is conducted in a manner that recognizes and achieves an order of avoidance, minimization, and where appropriate, compensatory mitigation to assure the long-term sustainability of sage grouse populations and their habitat. Fire suppression efforts and invasive species control and management is emphasized, including on land managed by the BLM. Wyoming further works to ensure that the State works with agencies such as the BLM in a collaborative manner to ensure a uniform and consistent application of the Sage Grouse Executive Order to protect, maintain, and enhance sage grouse populations and habitat.

18.     The Final Rule increases the risk of environmental harm in Wyoming by allowing BLM to hand control of leased lands to individuals and entities that are not under any duty to coordinate with the State of Wyoming to implement the Sage Grouse Executive Order, to manage water supply, to mitigate wildfire risk, and to address invasive plant and animal species. In my opinion, a lack of coordination threatens environmental harm across the entire state by impairing Wyoming's ability to manage those risks. In the Final Rule, the BLM failed to perform any analysis of these potential environmental harms.

5

19.     The Final Rule also harms Wyoming and the management of sage grouse populations and sage grouse habitat in Wyoming by interfering with (and ignoring) the important role the SGIT takes with protecting sage grouse populations and sage grouse habitat in Wyoming.

20.     In fact, the Final Rule makes almost no mention of sage grouse, and does not mention the SGIT. More importantly, the Final Rule does not provide any defined role for the SGIT with respect to sage grouse management and sage grouse habitat protection in Wyoming on BLM-managed lands.

21.     The Final Rule contains a specific section concerning the "objectives" of the rule, found at 43 C.F.R. § 6101.2. The objectives do not include any mention of giving a defined role to an entity such as the SGIT. In fact, the specified objectives do not even discuss a desire or objective on the part of the BLM to involve state and local governments in the implementation of the Final Rule.

22.     In the so-called "Management Actions for Ecosystem Resilience" portion of the Final Rule, the BLM was careful to note that it would assume an affirmative obligation to "meaningfully consult" with tribal governments in decision making processes under the rule, especially on actions that would "potentially have a substantial effect" on a tribe. 43 C.F.R. § 6102.5(b)(4). In my opinion, while it is important that tribal governments have such a role, the Final Rule should similarly require that the BLM "meaningfully consult" with state and local governments, especially with entities such as the SGIT. However, the Final Rule only specifies that the BLM shall "allow" state and local governments to serve as cooperating agencies in decisions made in relation to the rule (or in the limited circumstances set forth in 40 C.F.R. § 1501.7(b) to serve as a joint lead agency). 43 C.F.R. § 6102.5(b)(5).

23. Assuming that the Final Rule is otherwise valid (which is not admitted), it would be critical that an entity such as the SGIT be allowed to become a lessee of BLM-managed public lands, but the Final Rule does not afford such an opportunity to an entity such as the SGIT. The Final Rule allows only individuals, businesses, non-governmental organizations, Tribal governments, conservation districts, and state fish and wildlife agencies to qualify as entities to hold a restoration lease or mitigation lease under the rule. 43 C.F.R. § 6102.4. Yet, given the important role the SGIT plays in conservation and management of sage grouse and sage grouse habitat in Wyoming, the Final Rule provides no such opportunity for the SGIT if the SGIT felt such role were appropriate and necessary.

24. As noted, under the Final Rule, with respect to coal mining (and all other mining) the Final Rule would only "allow" the LQD to serve as a cooperating agency in decision making processes in implementation of the rule. 43 C.F.R. § 6102.5(b)(5). The same holds true for SGIT.

25. In my opinion, given LQD's primacy over surface coal mining in Wyoming and SGIT's exclusive role managing sage grouse populations, the BLM should impose a requirement that the BLM "meaningfully consult" with the LQD and the SGIT concerning implementation of the Final Rule in Wyoming. It does not do so.

26. Finally, in my opinion, the Final Rule would interfere with LQD's administration of existing mining leases on BLM-managed public lands. The BLM's discussion of the background of the rule claims the "rule also does not enable conservation use to occur in places where an existing, authorized, and incompatible use is occurring." 89 Fed. Reg. 40310. Yet, the language of the rule's provision that authorizes conservation leasing contains no such limitation. 43 C.F.R. § 6102.4, absent *passim.* In fact, the leasing rule specifies a different result: the rule states that once the BLM has issued a conservation lease, "the BLM shall not issue new

7

authorizations to use the leased lands if the use would be incompatible with the authorized restoration or mitigation use," subject only to "valid existing rights and existing law." 43 C.F.R. § 6102.4(a)(4). Moreover, the leasing rule expressly contemplates BLM issuance of a conservation lease when there are other "existing permittees" and "lease holders" for the area in question. 43 C.F.R. § 6102.4(c)(2)(viii).

27.     Thus, if a mining lease on BLM-managed lands that was permitted by the LQD nears the end of its permitted term, under the Final Rule the BLM conceivably could not allow for a renewal of the mining lease.

28.     In my opinion, this could be the case notwithstanding the "subject to valid existing rights" language in the Final Rule. This is because the Final Rule does not define the phrase "valid existing rights," and I am informed that courts are thus forced to try to interpret the phrase. *Nat'l Mining Ass'n v. Kempthorne*, 512 F3d 702, 712 n. 3 (D.C. Cir. 2008) ("the task of interpretation [of the phrase] thus falls on the executive branch . . . or the courts.") As one court noted, the agencies and the courts often disagree on the meaning of the phrase. *McMaster v. U.S.,* 731 F.3d 881, 901 n. 9 (9th Cir. 2013).

29.     Thus, the Final Rule could interfere with LQD's regulatory authority over an existing mining operation on BLM-managed public land where the permit in question is expiring and there is a question of whether the permittee is entitled to obtain a new lease to continue operations. It may well be that the permittee would be entitled to a new permit from LQD but the BLM could potentially interpret the Final Rule as prohibiting a new lease. Such a scenario is not just hypothetical: Wyoming's Environmental Quality Act provides that "[a]ny valid surface coal mining permit issued pursuant to this act is entitled to a right of successive renewal upon expiration . . . ." Wyo. Stat. Ann. § 35-11-406(e). In such a circumstance where the BLM would deny a new

8

permit because of the Final Rule, the LQD would face an immediate and unexpected task of having to go from exercising regulatory authority over an active mining operation to regulating reclamation activities that were not part of the LQD's permit administration plan for a particular mine site.

30. The state of Wyoming has established Memorandum of Agreements with the BLM for mineral extraction of the various solid mineral types. The Final Rule fails to recognize those existing and longstanding agreements and the obligations of the BLM established in those agreements. The Final Rule will interfere with these established agreements that guide the development of solid minerals on BLM-managed lands. The BLM provides for no method to recognize, disclose, and discuss these state level agreements and their effect on LQD mining permits.

31. In summary, as Administrator of LQD and a member of the Wyoming SGIT, it is my opinion the Final Rule impermissibly interferes with proper administration of the LQD's work regulating land uses within its jurisdiction that occur on BLM-managed lands, in particular with respect to surface coal mining, as to which the LQD has near-exclusive jurisdiction to regulate. Additionally, the Final Rule subverts, ignores, and improperly interferes with the SGIT's sole management authority over sage grouse populations in Wyoming, including on BLM-managed lands. The Final Rule will directly impede the work of the SGIT to protect and enhance sage grouse populations and land management activities that affect the sagebrush steppe habitat type necessary to survival of the species long term (much of which is located on BLM-managed lands).

32. I declare under penalty of perjury that the statements in this declaration are true and correct to the best of my knowledge, information, and belief.

Executed in Cheyenne, Wyoming on June 17, 2024.

9

Kyle Wendtland
Administrator
Wyoming Dept. of Environmental Quality
Land Quality Division