# Exhibit 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

STATE OF UTAH,
STATE OF WYOMING,

*Plaintiffs,*

v.

DEB HAALAND, in her official capacity as the
Secretary of the U.S. Department of the Interior; U.S.
DEPARTMENT OF THE INTERIOR; TRACY
STONE-MANNING, in her official capacity as the
Director of the Bureau of Land Management; and U.S.
BUREAU OF LAND MANAGEMENT,

*Defendants.*

Case No. _____

I, Tom Kropatsch, declare as follows:

1.      My name is Tom Kropatsch. I am the State Oil and Gas Supervisor of the Wyoming Oil and Gas Conservation Commission (WOGCC) and have served in this role for approximately three (3) years. Before this, I served as Deputy Supervisor for approximately seven (7) years, one and a half (1.5) years as the Natural Resources Supervisor, and three (3) years as the natural resource analyst for the WOGCC.

2.      I have a bachelor's degree in Geology from Oklahoma State University. I am a registered Professional Geologist in the State of Wyoming.

3.      I am over eighteen (18) years of age, I know the facts stated herein either from my own knowledge or from records of the WOGCC, and I am competent to testify thereto.

I.      **Future NEPA Participation and Workloads**

4.      The Final Rule directs the Bureau of Land Management's (BLM) land management objectives, presumes that BLM will approve proposed areas of critical environmental concern (ACECs) meeting applicable criteria, and allows conservation leases. Preserving the status quo is

important because (1) WOGCC's role as a cooperating agency will be constrained during future National Environmental Protection Act (NEPA) reviews and (2) WOGCC and BLM will waste time and agency resources in later NEPA processes and corresponding litigation related to invalid conservation leases if this Court vacates the Final Rule.

5.      The Final Rule imposes requirements on BLM for future land-use planning that could affect WOGCC's role in future NEPA reviews. For example, "BLM must manage certain landscapes to protect their intactness, including habitat connectivity and old-growth forests" and "[a]uthorized officers will seek to prioritize actions that conserve and protect landscape intactness in accordance with 6101.2." 43 C.F.R. § 6102.1 (a), (b) (emphasis added). The requirement to manage towards "intactness" could affect WOGCC's ability to provide alternatives and input during the NEPA process if BLM views the proposed alternative as contrary to its new duty to manage towards "intactness." Accordingly, the Final Rule affects avenues of participation that the State agencies normally have under federal regulations. *See* 40 C.F.R. § 1501.7(h)(2) ("the lead agency shall … Consider any analysis or proposal created by a cooperating agency and, to the maximum extent practicable, use the environmental analysis, proposal, and information provided by cooperating agencies").

6.      The Final Rule allows entities to apply for a conservation lease, which will undergo project-level NEPA. WOGCC will most likely participate in these NEPA processes, along with other State agencies, to protect its interests. During the NEPA process, WOGCC staff will spend hours reviewing the application and NEPA documents, preparing comments, and preparing protest letters. However, because the Final Rule does not require BLM to allocate specific lands as available for a conservation lease, the scale of the resources that the State must expend to participate in these NEPA processes is unknowable. However, WOGCC is worried that the number

2

may be very high because BLM gave itself the authority to reduce or waive administrative cost recovery, fees, and rent of a restoration lease. *See* 43 C.F.R. § 6102.4(j).

7.  As a practical matter, while WOGCC's staff are busy participating in the NEPA processes for the conservation leases, these staff members are not performing their normal responsibilities. Once approved WOGCC staff would have to map and understand the restrictions imposed by the conservation lease. Then, WOGCC staff would have to evaluate permits in light of those restrictions on operators when determining whether the permit complies with the Wyoming Oil and Gas Conservation Act. In sum, the Final Rule will consume considerable limited agency resources that would otherwise be dedicated to regulatory efforts.

8.  Likewise, the Final Rule has established new obligations for BLM to create reports, gather data, prepare assessments, create new land health standards, evaluate proposed ACECs and conservation leases, and assess areas for "intactness." These responsibilities burden BLM staffing and workload capacity, unnecessarily affecting services that benefit the State and the public like the oil and gas lease sales.

**II.  Effects on Future Leases**

9.  BLM has generally held quarterly federal oil and gas lease sales in Wyoming since Congress amended the Mineral Leasing Act in 1987. When BLM conducts a lease sale, the State is entitled to forty-eight percent (48%) of the total bids paid for parcels. 30 U.S.C. § 191(a), (b). The State distributes this revenue to schools, local governments, infrastructure funds, and State reserve accounts. *See* Wyo. Stat. Ann. § 9-4-601. Lease sales lead to good socioeconomic outcomes for Wyoming communities and help support energy demands.

10.  Because lease sales are held quarterly, BLM begins preparing the decision documents for the lease sale months in advance. In recent years, BLM has frequently deferred

parcels due to ongoing planning efforts or to preserve special habitats. The Final Rule provides multiple provisions that could influence how BLM proceeds in future lease sale decisions. For instance, the Final Rule requires authorized officers to collect and track landscape intactness data and to manage certain landscapes to protect their "intactness." Even if BLM decides not to defer parcels based on the Final Rule, it is foreseeable that it will deter operators from submitting expressions of interest or bidding on parcels if they get to the lease sale stage.

### III.    Effects on Current Parcels

11.    Wyoming routinely ranks first in the nation for gas production from onshore federal minerals and second for oil production from onshore federal minerals. Production from federal minerals comprises a significant portion of total oil and gas production in Wyoming. Approximately sixty-five percent (65%) of total oil production and seventy-nine percent (79%) of total gas production in Wyoming is produced from federal minerals.

12.    Wyoming and its many counties and communities, rely on oil and gas development as an important part of their economic base. In 2021, the oil and gas industry contributed 58,780 jobs to Wyoming's economy.[1] State and local revenue mainly consists of federal mineral royalties, severance taxes, and ad valorem taxes.

13.    Like the lease sale bids, Wyoming receives forty-eight percent (48%) of the rentals and federal royalties from oil and gas production. 30 U.S.C. § 191(a), (b). Wyoming also collects severance tax on oil and gas produced within its borders. Wyo. Stat. Ann. §§ 39-14-203(a), through – 204(a).

14.    WOGCC regulates all oil and gas wells on federal, fee, and State trust lands in Wyoming. Wyo. Stat. Ann. § 30-5-104. Before beginning well pad construction or drilling

---

[1] https://pawyo.org/facts-figures-2023/

operations, oil and gas operators must secure a State application for a permit to drill (APD) from WOGCC. *Rules, Wyo. Oil & Gas Conservation Comm'n* ch. 3, § 8. WOGCC also enforces rules to protect the environment. *See* Wyo. Stat. Ann. § 30-5-104(a)-(d).

15. While BLM stated that it would not issue restoration or mitigation leases if incompatible with existing authorizations, BLM notably did not make the same promise with temporary management for ACECs. The fact that it is up to BLM's discretion to temporarily manage land as an ACEC, which only allows non-commercial recreation or uses that protect the values of the land, without first undergoing a land planning process would cause several repercussions. First, getting a lease ready to start extracting fluid minerals is an extensive and resource-intensive process. Some required activities include —obtaining a federal and State APD, creating a road to the lease, securing equipment and drilling contracts, etc. A reasonable operator might decide not to risk losing its long-term investment mid-way. If so, the State loses on the potential federal mineral royalties, severance taxes, and ad valorem taxes.

16. Furthermore, a significant number of authorized oil and gas leases could be affected by a temporarily managed ACEC or a conservation lease. Below is an example in the "golden triangle" with potential ACECs identified by BLM during the sage grouse amendment process in green. Since BLM has identified this area as potentially subject to special management, BLM could likely temporarily manage for an ACEC or grant a conservation lease.

(Prepared by WOGCC staff)

17.    Depending on the nature and location of these leases, there could be increased disturbance by requiring the permittee to go around the "conserved" parcel to reach its leased parcel. Thus, the conservation lease or ACEC could harm resource values by removing the ability to site the path in the least impactful manner. Alternatively, it could add enough delay and expense to the project that the operator cannot extract fluid minerals during the lease term. In addition, the Final Rule does not explicitly allow disturbance to put in pipeline, road access, or any other infrastructure necessary to operate on the leased parcel, which could affect leases that have not begun operations. These scenarios could lead to waste and deny an operator a chance to protect their correlative rights.

6

## IV.    Impacts on Waste and Correlative Rights

18.    The WOGCC is charged with preventing waste of oil and gas and protecting correlative rights. "Waste" includes physical waste, the drilling or production of any oil and gas well in a manner that causes a reduction in the quantity of oil and gas ultimately recovered from a pool under prudent and proper operations, or drilling any well not in conformance to a well density or spacing program.

19.    Wyoming Statute § 30-5-102 prohibits the waste of oil and gas in the State, including federal oil and gas. WOGCC creates efficient and orderly development of oil and gas by establishing drilling and spacing units (DSUs). DSUs regularly encompass intermingled private, state, and federal minerals. When separate tracts of federal minerals cannot be developed, the Mineral Leasing Act authorizes federal leases to be voluntarily pooled through a communitization agreement. These agreements combine tracts to provide orderly development, prevent waste, and protect correlative rights within a DSU.

20.    The Final Rule has the potential to take several parcels that would have been available for leasing to develop under a drilling and spacing unit and instead "preserve" the parcel. The availability of parcels within a DSU allows drilling and production activities to conform to WOGCC's statutory obligation to prevent waste and protect correlative rights in oil and gas development enabling the operator to locate wells based on geology, engineering, and the optimum spacing to develop the DSU, and not based on the necessity to avoid ACECs or conservation leases.

21.    Modifying DSUs to avoid areas taken away from development potential may result in uneconomic wells, which operators will likely choose not to drill. Modification will be especially necessary if BLM determines not to lease the federal minerals due to the overlying ACEC or conservation lease. Avoiding those federal minerals will cause a lot of paperwork and

7

labor for the WOGCC and operators within the unit to adjust and reconfigure the DSU. Alternatively, if WOGCC cannot add the federal minerals to an adjacent DSU, they will be stranded. Stranding of the federal minerals means that they are situated in a manner that they can no longer be economically or technologically drilled and will likely never be producible. Where federal minerals will be stranded, the operator and WOGCC must evaluate whether this creates waste or impacts correlative rights, which could violate Wyoming statutes.

22.     If fluid minerals are stranded the State will lose severance and ad valorem taxes collected from oil and gas production. The State also does not collect its share of federal mineral royalties from unrecovered oil and gas on unleased federal lands.

23.     These and other potential effects, which BLM should have discovered and addressed through an NEPA process, affect the State's main revenue source.

24.     I declare under penalty of perjury that the statements in this declaration are true and correct to the best of my knowledge, information, and belief.

DATED this _28th_ day of June, 2024.

Tom Kropatsch
Oil and Gas Supervisor
Wyoming Oil and Gas Conservation Commission

8