# Exhibit 5

Case 2:24-cv-00438-DBB-DAO     Document 18-5     Filed 07/11/24     PageID.153     Page 1 of 7

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| STATE OF UTAH,<br>STATE OF WYOMING,<br><div align="right">*Plaintiffs,*</div><br>v.<br><br>DEB HAALAND, in her official capacity as the Secretary of the U.S. Department of the Interior; U.S. DEPARTMENT OF THE INTERIOR; TRACY STONE-MANNING, in her official capacity as the Director of the Bureau of Land Management; and U.S. BUREAU OF LAND MANAGEMENT,<br><div align="right">*Defendants.*</div> | Case No. _____ |

I, Angela Bruce, declare as follows:

1.     My name is Angela Bruce. I am the Deputy Director of External Affairs for the Wyoming Game and Fish Department (WGFD). I have worked for the WGFD for seven (7) years and in resource management for twenty-seven (27) years. For two (2) years, I worked as a supervisor for the Habitat Protection Program for WGFD, which provides environmental review for development projects around the State that have the potential to impact wildlife and their habitat. Before working for the State of Wyoming, I worked for the Iowa Department of Natural Resources as their deputy chief of wildlife.

2.     I have a bachelor's degree in environmental science and wildlife management from the University of Dubuque. I also received a Certificate of Public Administration from Drake University.

3.     As the Deputy Director of External Affairs, I work closely with our state and federal partners, energy developers, and non-governmental organizations. My work includes overseeing

the Department's wildlife environmental reviews including the Governor's executive orders concerning sage-grouse, mule deer, and the antelope migration corridor protection.

4.     I am over eighteen (18) years of age, I know the facts stated herein either from my own knowledge or from records of the WGFD, and I am competent to testify thereto.

5.     The Wyoming Game and Fish Commission (Commission) is responsible for providing an adequate and flexible plan for control, propagation, and management of all Wyoming wildlife (with the exception of a few federal enclaves).

6.     The WGFD carries out these duties under the Commission's direction and supervision. No other entity has statewide responsibility for the management of wildlife and wildlife resources within Wyoming.

7.     Wildlife within the State are the property of the State of Wyoming. The WGFD and the Commission manage such wildlife within the State in trust for the public. To protect the State's sovereign interests, the WGFD and the Commission strive to attain and maintain wildlife management objectives within the State.

## I.     Future NEPA Participation and Workloads

8.     The Final Rule directs the Bureau of Land Management's (BLM) land management objectives, presumes that BLM will designate proposed areas of critical environmental concern (ACECs) meeting applicable criteria, and allows for conservation leases. Preserving the status quo is important because (1) WGFD's role as a cooperating agency may be limited during future National Environmental Policy Act (NEPA) and (2) due to the cumbersome review needed on a project by project basis WGFD and BLM will needlessly commit administrative resources in later NEPA processes and corresponding litigation related to invalid conservation leases due to the lack of landscape level NEPA analysis in the development of the Final Rule

2

9.      The Final Rule imposes requirements on BLM for future land-use planning that could affect WGFD's role in future NEPA reviews. For example, "BLM must manage certain landscapes to protect their intactness, including habitat connectivity and old-growth forests" and "[a]uthorized officers will seek to prioritize actions that conserve and protect landscape intactness in accordance with 6101.2." 43 C.F.R. § 6102.1 (a), (b). The requirement to manage towards "intactness" could affect WGFD's ability to provide alternatives and mitigate impacts during the NEPA process if BLM views the proposed alternative as contrary to its new duty to manage towards "intactness." Accordingly, the Final Rule affects avenues of participation that the State agencies normally have under federal regulations. *See* 40 C.F.R. § 1501.7(h)(2) ("the lead agency shall … [c]onsider any analysis or proposal created by a cooperating agency and, to the maximum extent practicable, use the environmental analysis, proposal, and information provided by cooperating agencies").

10.      The Final Rule allows entities to apply for a conservation lease, which will undergo project-level NEPA. WGFD will most likely participate in these NEPA processes, along with other State agencies, to protect its interests. During the NEPA process, WGFD staff will spend hours reviewing the application and NEPA documents, preparing comments, and preparing protest letters. Because the Final Rule does not require BLM to allocate specific lands as available for a conservation lease, the scale of the resources that the State must expend to participate in these NEPA processes is unknowable. However, WGFD is worried that the cost may be very high because BLM gave itself the authority to reduce or waive administrative cost recovery, fees, and rent of a restoration lease. *See* 43 C.F.R. § 6102.4(j).

11.      As a practical matter, while WGFD's staff are busy participating in the NEPA processes for the conservation leases, these staff members are not performing their normal

3

responsibilities. The Final Rule will consume considerable limited agency resources that would otherwise be dedicated to conserving and managing wildlife.

## II.    Potentially Mismatched Wildlife Management Policy

12.    For decades, the State of Wyoming has provided wildlife specific data and analysis, technical expertise, and important and crucial habitat locations to BLM to aid in the federal agency's decision-making processes. However, throughout the Final Rule BLM is mandated to collect, track, and analyze its own data. I am concerned that this Final Rule, and its vague definitions of terms, is a departure from the status quo of BLM using the identified habitats and landscapes provided by the State.

13.    A departure from the status quo is concerning because it can cause a mismatch in habitat management. In the past, the State has provided BLM its data on mule deer migration corridors, sage-grouse habitat, and other data. Now, if BLM decides to use analyzes from other sources, for example USGS, or interpret the data itself, without involving the State, the BLM and the State could draw management boundaries differently.

14.    Part of wildlife management requires making a decision, using the best available science, to take actions that will bolster the targeted species but may affect other species. The Final Rule fails to address the multiple types of conservation actions and decisions that may be implemented. Examples of such conservation actions consist of — stabilizing eroding stream banks, controlling predators to protect threatened and endangered species, removing encroaching pinyon and juniper trees to restore healthy sagebrush rangelands, adapting grazing systems to better conserve native plants, improving fencing to protect riparian areas, installing wells and pipelines to provide water to native wildlife, and so much more. Conflicting management may happen, for example sage grouse and Pinyon Jay or lynx. Without using the expertise of WGFD,

BLM actions made for the benefit of one species may have detrimental effects on another. BLM's project level analysis may not include these considerations.

15.    The conservation leases, ACECs, and the policy of purchasing property to preserve "intactness" could also disturb the State's ability to coordinate conservation activities and site projects to minimize habitat disturbance. ACECs only allow non-commercial recreation or uses that ensure the protection of the relevant and important value for which the ACEC was created. As mentioned above, part of wildlife management requires the wildlife management agency to make decisions to implement a conservation action that will help the target species but may affect other species. If the ACEC protects a non-targeted species the WGFD's ability to perform its chosen conservation action will be limited, especially when state and federal lands are intermingled. Furthermore, more habitat designations mean more areas are removed as potential areas to site other uses. Since conservation leases are subject to project-level NEPA and do not need to be allocated in a Resource Management Plan, the BLM may unnecessarily be removing flexibility in the next land use planning process. Further, removing flexibility on BLM lands will increase the use of private lands and may negatively impact the species, contradicting the ACEC goal of species protection.

16.    Without conducting a NEPA analysis that would likely have examined the potential indirect impacts, the Final Rule displaces the WGFD's role with BLM or an entity with a conservation lease. However, the wildlife within the State of Wyoming are the State's property. Thus, the Final Rule injures the State by limiting its ability to manage its wildlife.

**III.    Unnecessary complexity in conservation efforts**

17.    Close cooperation between the respective agencies is vital to integrate fish and wildlife objectives in each BLM land use plan. Instead of respecting this relationship, the Final

5

Rule allows third parties to obtain conservation leases. This creates two categories of problems. First, these entities have no duty to coordinate with the State to manage water supply, mitigate wildlife risk, or address invasive plant and animal species. Furthermore, they have no obligation to undergo activities consistent with the State's conservation measures like Wyoming's Sage-grouse Core Area Strategy that Wyoming has spent millions of dollars implementing. Second, even if the individual or entity is willing to cooperate with the State in its conservation measures, the Final Rule adds complexity because WGFD must coordinate the conservation efforts involving different projects on each individual lease.

18.    The Final Rule could affect WGFD's ability to collect data on lands subject to a conservation lease. BLM retains the discretion to determine if other uses on conservation leases are "compatible." Accordingly, WGFD is now at BLM's mercy as to whether collecting data to use for tracking and mapping wildlife is "compatible."

19.    These and other potential effects, which BLM should have discovered and addressed through an NEPA process, affect the State's ability to manage its wildlife.

20.    I declare under penalty of perjury that the statements in this declaration are true and correct to the best of my knowledge, information, and belief.

DATED this 2nd day of July, 2024.

Angela Bruce
Deputy Director of External Affairs
Wyoming Game and Fish Department