**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

|  |  |  |
|---|---|---|
| STATE OF UTAH,<br>STATE OF WYOMING<br><br>        Plaintiffs,<br><br>    v.<br><br>DEB HAALAND, in her official capacity<br>as the Secretary of the U.S. Department of<br>the Interior *et al.*,<br><br>        Defendants,<br>  and,<br><br>SOUTHERN UTAH WILDERNESS<br>ALLIANCE *et al.*, Proposed Intervenor-<br>Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 2:24-cv-00438-DBB-DAO<br><br>Judge David Barlow<br>Magistrate Judge Daphne Oberg |

**<u>DECLARATION OF RAY BLOXHAM</u>**

I, Ray Bloxham, declare as follows:

1.     I have personal knowledge of each of the facts set forth below, and if called upon to do so, could and would testify regarding the following. This declaration is filed in support of Southern Utah Wilderness Alliance (Alliance) and The Wilderness Society's Motion to Intervene in the above-captioned matter.

2.     I am an active member of the Alliance. I live in Salt Lake City, Utah.

3.     I am the Field Director for the Alliance and have served in this position since 1999. My position requires me to spend considerable time on-the-ground visiting federal public lands throughout Utah, and particularly lands managed by the Bureau of Land Management (BLM). This includes mapping and photo-documenting their natural condition, including

evidence of wilderness characteristics such as the naturalness of the area and opportunities for solitude; and also documenting degradation to natural resources—such as biological soil crusts, vegetation, and riparian areas—and to cultural resources that is attributable to activities such as off-road vehicle use, oil and gas development, mining, grazing, and other extractive activities.

4.    For decades I have also traveled BLM-managed lands throughout Utah, Wyoming, and other western states extensively for personal recreation. During my visits I enjoy sightseeing, bird watching and wildlife viewing, hiking, backpacking, camping, kayaking or rafting, scenic photography, and visiting cultural sites and unique landscapes across the western states. I also enjoy the clear air and expansive vistas, engage in quiet contemplation, and appreciate the solitude that BLM-managed lands provide.

5.    In the average year, I spend around 75 days traveling BLM-managed lands in the western United States for either work or personal enjoyment and recreation.

6.    With approximately 13,000 members throughout the United States, the Alliance is a non-profit environmental organization dedicated to the sensible management of public lands within the state of Utah. The Alliance advocates for the conservation of Utah's remaining wild lands through engagement with BLM's various decision-making processes. Depending upon the particular action being taken, the Alliance participates in BLM's decision-making by submitting detailed public comments, meeting directly with agency staff, and, when necessary, litigating either against or in support of BLM's ultimate decision. As discussed further below, the Alliance's goal in engaging the BLM during decision-making is to achieve maximal conservation of Utah's wilderness-quality lands through the preservation, protection, and restoration of public lands to benefit: native plant communities and wildlife; air and water quality; and cultural, archaeological and paleontological resources. The Alliance also advocates

2

for the conservation of sensitive landscapes by minimizing human-caused fragmentation through, for example, the responsible management of motorized vehicles and preventing or mitigating impacts from extractive development. Often, the Alliance's participation in BLM decision-making processes provides the agency with unique information from extensive field work and detailed scientific information.

7.      The Alliance has offices in Salt Lake City and Moab, Utah and in Washington, D.C. Its members live in all fifty states and several foreign countries. The Alliance's members use and enjoy public lands in and throughout the western United States and in Utah for a variety of purposes, including: scientific study, recreation, wildlife viewing, hunting, fishing, aesthetic appreciation, and financial livelihood. Alliance members frequently visit and recreate (*e.g.*, sightsee; view and appreciate cultural sites; kayak; bird watch; hunt; fish; enjoy clean air and water, expansive vistas, dark night nights, and solitude) on the federal public lands throughout Utah and in other western states.

8.      The Alliance is a charter member of the Utah Wilderness Coalition, a union of over 200 local and national organizations dedicated to the passage of America's Red Rock Wilderness Act (ARRWA), [1] which would designate more than eight million acres of public lands in Utah as Wilderness—the most protective designation for federal public lands. Millions of acres of the BLM-managed public lands identified in ARRWA are currently managed under FLPMA's multiple use and sustained yield mandate. SUWA's ultimate goal is to achieve designated Wilderness status for lands identified in ARRWA and conservation of those lands is critical to SUWA's mission, until such time as Congress designates them as Wilderness.

---

[1] America's Red Rock Wilderness Act, S. 1310, H.R. 3031 118th Cong. (2023).

3

9.      A 2020 analysis commissioned by the Alliance and prepared by EcoAdapt demonstrated how the lands identified in ARRWA are critical to ensuring that healthy, functioning ecosystems on public lands will remain resilient in the face of climate change.[2] ARRWA lands help species and ecosystems withstand changing ecological conditions and new pressures associated with climate change in three important ways. First, they can serve as climate change refugia for sensitive species, preserving biodiversity and allowing species time to adapt. Second, they can maintain landscape connectivity, which facilitates species movement in response to changing environmental pressures. Third, preventing or mitigating surface disturbances within ARRWA lands will reduce disturbances that can exacerbate the impacts of climate change on species and ecosystems, thus minimizing vegetation loss, promoting clean water, and minimizing the progress of invasive species.

10.     I am also an active member of The Wilderness Society.

11.     For the remainder of this declaration I will refer to the Alliance and The Wilderness Society together as "SUWA."

12.     For decades, SUWA and their members have engaged extensively with various BLM decision-making processes to conserve and protect public lands throughout Utah and Wyoming. This includes, but is not limited to, participating in planning-level efforts to develop Resource Management Plans (RMPs), broad-scale implementation-level decisions such as travel planning, and in site-specific decisions that pertain to, for example, vegetation removal, road improvements, oil and gas leasing and permitting, as well as other mineral leasing and permitting decisions.

---

[2] Hilberg, Laura, et al., *Contribution of the America's Red Rock Wilderness Act (ARRWA) to climate change adaptation and mitigation efforts (2020)*, https://suwa.org/wp-content/uploads/ARRWA-Climate-Report-EcoAdapt-2020-final.pdf.

13.     SUWA's engages with BLM's decision-making to inform the agency on how it's decision will achieve (or fail to achieve) the conservation of public lands, and to advocate for actions that will accomplish conservation through restoration, mitigation, or protection of the lands subject to the particular decision being made. Examples include, but are not limited to:

    a.  Submitting detailed public comments for each of the six Utah RMPs that were finalized in 2008 (Vernal, Price, Moab, Monticello, Richfield and Kanab), several of which are the most recent plans for public lands in Utah that are managed for multiple use and sustained yield. Each of SUWA's comments emphasized BLM's authority and obligation to conserve ecosystems on public lands as authorized in FLPMA. Among other things, SUWA encouraged BLM to conserve lands by (1) formally designating lands as Areas of Critical Environmental Concern (ACECs),[3] and (2) responsibly designating which lands are most appropriate for activities that fragment and degrade public lands within the multiple use and sustained yield management framework. For example, SUWA's comments on the 2008 Kanab Draft RMP and Environmental Impact Statement encouraged BLM to choose the conservation alternative. SUWA's comments identified lands that should be prioritized as ACECs and discussed the particular resources and management needs of those resources in detail. SUWA emphasized BLM's authority and responsibility to conserve ecosystems on lands that are relatively unspoiled and unfragmented. SUWA explained, *inter alia*, how the conservation of healthy, relatively intact ecosystems provide important wildlife habitat, support biodiversity, and protect clean air and water. SUWA encouraged BLM to adopt a

---

[3] *See* 43 U.S.C. §§ 1702(a), 1712(c)(3).

plan for oil and gas leasing that would maximize protection of sensitive public lands—such as those containing important wildlife habitat—and to focus leasing, development and other extractive activities on degraded and/or less sensitive lands. SUWA's comments specifically identified lands that BLM should consider managing to maintain their unspoiled character and, therefore, should be either excluded from oil and gas leasing or should require special stipulations to mitigate impacts to and prevent degradation of surface resources and habitat fragmentation. SUWA's comments submitted on each of the other five 2008 RMPs contained similarly detailed information encouraging BLM to use its authority to conserve lands—and particularly to conserve intact landscapes—through either special designations or through its authority to balance uses on lands managed for multiple use and sustained yield. While some of SUWA's recommendations for ACECs and more broadly for conserving sensitive lands were adopted by BLM, many were not. As an example, SUWA submitted nominations for over two dozen ACECs during the scoping period that proceeded the 2008 Richfield RMP.[4] The final RMP designated a mere 2,530 acres as ACECs across two units.[5] In comparison, the 2008 Monticello RMP designated 73,492 acres across seven ACEC units, including along the San Juan River, for

---

[4] *See* Bureau of Land Mgmt., RICHFIELD FIELD OFFICE DRAFT RESOURCE MANAGEMENT PLAN/DRAFT ENVIRONMENTAL IMPACT STATEMENT at A1-2 ("Richfield Draft RMP"), https://eplanning.blm.gov/public_projects/lup/68293/87070/104325/Appendix_1.pdf.
[5] *See* Bureau of Land Mgmt., RICHFIELD FIELD OFFICE RECORD OF DECISION & APPROVED RESOURCE MANAGEMENT PLAN at 36 (2008) ("Richfield RMP 2008"), https://eplanning.blm.gov/public_projects/lup/68293/86880/104137/Richfield_Final_Plan.pdf.

the purpose of protecting scenic, cultural, wildlife and natural systems.[6] SUWA has similarly participated in other more recent, large-scale planning efforts by the BLM for public lands in Utah, including the 2020 Monument Management Plans for Bears Ears and the Grand Staircase Escalante National Monuments; the 2020 Kanab-Escalante Planning Area RMP; and the 2016 and 2023 management plans for the Red Cliffs and Beaver Dam Wash National Conservation Areas.

b.  After BLM finalized the 2008 RMPs, SUWA and other conservation organizations challenged the RMPs and the motorized vehicle travel plans associated with them, arguing among things that the travel plans had failed to minimize the impacts from off-highway vehicles to soils, vegetation, wildlife, air, water, and cultural resources.[7] In 2013, a Utah District Court agreed with SUWA, ruling that BLM had failed to demonstrate that the travel plan minimized impacts to natural resources in the Richfield Field Office travel plan.[8] That decision ultimately led to a settlement agreement which established a schedule and process for BLM to complete thirteen new travel plans across eastern and southern Utah.[9] The Alliance has been engaged in BLM's ongoing efforts to create these new travel plans by submitting detailed public comments. The Alliance's comments include extensive mapping, photographs of travel routes, and information

---

[6] *See* Bureau of Land Mgmt., MONTICELLO FIELD OFFICE RECORD OF DECISION AND APPROVED RESOURCE MANAGEMENT PLAN at 31, 126 (2008) ("Monticello RMP 2008"), https://eplanning. blm.gov/public_projects/lup/68097/85493/102694/Monticello_Final_Plan.pdf.
[7] *See S. Utah Wilderness All. v. Burke*, 981 F. Supp. 2d 1099, 1103 (D. Utah 2013) *vacated sub nom. S. Utah Wilderness All. v. Dep't of the Interior*, No. 2:12CV257 DAK, 2017 WL 11516766 (D. Utah May 17, 2017) (vacated subsequent to settlement agreement).
[8] *Id.* at 1105-06.
[9] *S. Utah Wilderness All. v. U.S. Dep't of the Interior*, No. 2:12-cv-257 (D. Utah Jan 13, 2017).

regarding the particular resources—including soils, vegetation, wildlife habitat, air, water, and cultural resources—that will be negatively impacted by motor vehicle travel. Frequently, BLM would not have this information but for the Alliance's comments and on-the-ground knowledge. An important goal for the Alliance while participating in BLM travel planning processes is to prevent the degradation and fragmentation of healthy, functioning ecosystems on public lands, and to restore resources such as clean water and wildlife habitat that have been degraded by inappropriate motor vehicle use. The Alliance's work has paid off as BLM travel plans finalized in 2022-2023 have closed certain dirt trails to motorized use to protect various public resources (e.g., riparian vegetations and wildlife habitat).

c.  Outside of RMP and travel planning processes, SUWA has regularly advocated for BLM to conserve public lands by submitting nominations for ACECs. In the last decade, SUWA has submitted several ACEC nominations on lands currently managed for multiple use and sustained yield. For example, the Alliance has nominated for ACEC designation the Parowan Gap, Mineral Mountains, and portions of the Book Cliffs, and also supported Utah Clean Air Alliance's nomination for Sevier Lake. In each case, BLM has refused to evaluate the ACEC nominations because it is not engaged in land use planning context, putting significant public resources at risk.

d.  Over more than four decades, SUWA has also advocated for the conservation of public lands in Utah by encouraging BLM to relegate oil and gas leasing to lands outside of healthy, intact landscapes. And more broadly, on lands that BLM

8

identifies as available for oil and gas leasing and development, SUWA encourages the agency to use its authority to require mitigation of the disturbance to public lands or to restore the lands after development activities are completed. Consequently, SUWA often engages with BLM decision-making on oil and gas development at multiple stages: from high-level planning in RMPs, down to site-specific decisions to permit a particular oil and gas well. Engagement in oil and gas decision making is critical to SUWA's mission to conserve public lands, even if the lands are subject to some development under the multiple use and sustained yield framework.

14.     The Alliance submitted timely comments on BLM's proposed public lands rule, highlighting how the rule is consistent with the Federal Land Policy and Management Act ("FLPMA") and that conservation is a proper use of BLM-managed lands. Its comments also discussed and suggested improvements to how the rule would promote conservation to achieve ecosystem resilience, as well as to the proposed ACEC regulations.

15.     These are just a few examples of how SUWA engages at every level of BLM's various decision-making processes to achieve conservation of public lands, including on those lands managed under FLPMA's multiple use and sustain yield mandate. As discussed above, the Alliance focuses its participation on lands that are some of the least degraded ecosystems in Utah. The BLM Public Lands Rule provides much needed clarity and consistency regarding BLM's authority to conserve public lands, whether they are managed under the standard of multiple use and sustained yield, or deserving of special designation as an ACEC. The Public Lands Rule ensures that BLM will consider its obligation to treat conservation as on par with other multiple uses—such as extractive development and motorized vehicle uses that threaten to

fragment and degrade intact landscapes—in every level of decision making in the future. This consistent approach bolsters the Alliance's mission and its engagement with BLM by establishing guiding principles to manage for healthy landscapes and ecosystems though the conservation of intact lands for the benefit of native plants, wildlife, and clean air and water, to the benefit of the Alliance's members and the public.

16. In my personal capacity, I enjoy regularly recreating on public lands in Utah, Wyoming, and throughout the western United States, as mentioned above. In my personal time, as well as in my professional capacity, I have witnessed first-hand that while BLM sometimes chooses to conserve public lands, too often the scales are tipped in favor of activities such as development or motor vehicle use that significantly degrade public lands, and there is too little effort to mitigate or restore the areas that have been impacted. For example, I frequently visit places in Utah such as the Upper Desolation Canyon river corridor, the Dirty Devil River, and the mountains of the West Desert. Over the past several decades, I have witnesses the increasing oil and gas development in Upper Desolation Canyon in places like the Moon Bottom Canyon and King's Canyon areas. The lands are increasingly degraded due to the proliferation of well pads, oil rigs and roads to service the necessary infrastructure. Increased development visibly and obviously degrades the surrounding lands by removing vegetation, increasing the proliferation of invasive weeds, and destroying wildlife habitat. The public lands surrounding the Dirty Devil River are emblematic of what is left behind by such development activities. In my many trips down the Dirty Devil River I have hiked the surrounding area extensively and observed the scars left on the land from previous oil and gas development and mining that is no longer active. The land is scarred by the imprints of multiple well pads, and abandoned drill holes, and old seismic lines. The lands surrounding Upper Desolation Canyon and the Dirty

10

Devil River stand in stark contrast to the mountain ranges in the West Desert such as the House Range and Wah Wah Mountains. Although portions of these ranges and surrounding BLM-managed lands are managed for multiple use, they have largely escaped development by the impacts of oil, gas and other extractive activities.



**Central Wah-Wah Mountains, Beaver County, Utah**

17.     I specifically seek out large, intact landscapes for my personal enjoyment. I find deeper spiritual and recreational enjoyment on public lands that have not been degraded through development, or other activities that fragment otherwise intact, healthy ecosystems. I find that these types of intact landscapes offer markedly better opportunities for me to observe native wildlife, find unique wildflowers and contemplate centuries' old cultural and historic resources, than landscapes that have been degraded by extractive uses.

18.     As a member of the Alliance and The Wilderness Society, a frequent visitor of public lands throughout the western United States, including Utah and Wyoming, and lifelong conservation advocate, my health, recreational, scientific, spiritual, educational, and aesthetic interests—and those of the Alliance's and The Wilderness Society's members—will be impaired if Plaintiffs succeed in their litigation challenging the BLM's Public Lands Rule. The Public Lands Rule establishes a framework that, along with anticipated future agency guidance, the Alliance plans to use to: advocate for conservation of relatively intact landscapes, such as those surrounding and encompassing the House Range and Wah Wah Mountains; to encourage BLM to mitigate impacts from oil and gas development on lands where that use is allowed, such as lands surrounding Upper Desolation Canyon; and to consider restoring lands that have previously been degraded by previous development, such as lands surrounding the Dirty Devil River. Also, where appropriate, the Alliance intends to use to rule to advocate for creation of ACECs through land use plan revisions and the protection of relevant and important values in the interim, including for the Alliance's nominations that remain outstanding. If Plaintiffs' claims succeed, SUWA expects to be less successful in its efforts to conserve Utah's remaining wild places and ultimately achieve congressional designation of these places as Wilderness.

19.     I DECLARE under penalty of perjury that the foregoing is true and correct.

DATED: July 23, 2024

12