**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| STATE OF UTAH, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DEB HAALAND, in her official capacity as the Secretary of the U.S. Department of the Interior *et al.*,<br><br>Defendants,<br><br>and,<br><br>SOUTHERN UTAH WILDERNESS ALLIANCE, *et al.*,<br><br>Proposed Defendant-Intervenors. | Case No. 2:24-cv-00438-DBB-DAO<br><br>Judge David Barlow<br>Magistrate Judge Daphne Oberg |

**<u>DECLARATION OF ROBERT MASON</u>**

I, Rob Mason, hereby declare as follows:

1.     I am a member and staff member of The Wilderness Society (TWS).

2.     I have long-standing personal and professional interests in the sound management and conservation of public lands managed by the Bureau of Land Management (BLM) under its multiple use and sustained yield mission. This includes BLM-managed lands in my home state of Idaho, as well as in other Western States such as Utah where I enjoy recreating in my free time.

3.     I currently serve as Idaho State Director for TWS. In this role I oversee TWS's work in Idaho, including our work on BLM lands in Idaho. I work at both the planning level and project level on BLM issues, including work on BLM Resource Management Plan revisions,

BLM travel management plans, BLM recreation management plans, BLM state-level policy, and inventories of BLM lands to support our land management recommendations. I have also worked on legislative efforts that have impacted BLM lands within Idaho including legislation that designated wilderness in Idaho and legislation related to BLM land tenure issues in Idaho. In addition to working on Idaho-specific BLM plans and projects, I have played a role in supporting TWS's advocacy on the BLM Public Lands Rule, which will affect the management of BLM lands in Idaho. Through these roles, I am familiar with all aspects of TWS's mission and activities as they relate to our work advocating for conservation-oriented uses and management of deserving public lands through project-level and land management planning decisions, and through policies like the BLM Public Lands Rule.

4.      Prior to my work at TWS, I served as Executive Director for the Selway-Bitterroot Frank Church Foundation (SBFC), which focuses on working in partnership with the Forest Service to help steward the Selway-Bitterroot Wilderness and Frank Church-River of No Return Wilderness. I also served as Wilderness Manager on the Sierra National Forest prior to my work with the SBFC. I hold a Master of Science in Renewable Natural Resources from the University of Arizona and a Bachelor of Science in Environmental Biology from the Georgia Institute of Technology. Outside of my professional work, I also served as a State Representative in the Idaho State Legislature from 2018 to 2020, representing District 16. In that role I served on the House Resources and Conservation Committee which periodically addressed various BLM issues.

5.      The Wilderness Society is a national non-profit membership organization founded in 1935. Our mission is to unite people to protect America's wild places. With more than one million members and supporters nationwide, we have led the effort to permanently protect nearly

2

112 million acres of wilderness and to ensure sound management of our shared national lands. Going forward, we envision a future where people and wild nature flourish together, meeting the challenges of a rapidly changing planet. To accomplish that vision, we must work to ensure that public lands are a solution to the climate and extinction crises and that all people benefit equitably from the myriad ecological and social benefits that public lands provide.

For decades, TWS has focused a significant amount of its work on the 245 million acres of surface and 700 million acres of subsurface managed by the BLM, including through engagement in national policy, programmatic and field-office-level land and resource management planning, and project-level decision-making. We have thus garnered significant expertise in how the agency implements its multiple use and sustained yield mission and have worked to support and improve long-standing management approaches and innovative solutions to a range of land management challenges.

6.      Just 14 percent of U.S. land is protected from threats like drilling, mining, and road-building, and human-caused nature loss, along with climate change, is killing off species, damaging communities, and worsening racial and social inequities. By protecting and connecting an intact network of lands and waters that includes remaining undeveloped lands, while simultaneously working to restore degraded lands, we can ensure wildlife are able to migrate, adapt, and endure in the face of climate change and other threats. This will also help people, who rely on nature for food, water, and refuge. These wild places also bolster our ability to combat climate change itself and blunt its worst impacts, especially when combined with rapid deployment of a just and responsible clean energy transition. Working with local communities and heeding both rigorous science and Indigenous knowledge, TWS is working to build a network of lands and waters that will sustain people and nature for generations to come.

This vision is consistent with what scientists, conservation organizations, and governments around the globe agree is an urgent need to protect more lands and waters in nature reserves to ensure that biodiversity and natural processes are conserved in the face of climate change.

7.      Protection of intact ecosystems and restoration of degraded habitats on public lands are critical components of achieving The Wilderness Society's vision. Unfortunately, historic and current management of BLM public lands – which often prioritizes extractive uses instead of conservation – has left many public lands in a degraded state. Less than 14% of BLM public lands have durable protections that prevent development by extractive industry, while almost 10% have active mining claims, 24 million acres are leased for oil and gas, and a substantial majority of all BLM lands are available for future leasing. The BLM Public Lands Rule provides much needed regulatory direction on a suite of conservation-oriented tools to help drive decision-making, ensure compliance with statutory requirements, and ultimately achieve the agency's mission by confirming that conservation is on equal footing with extractive uses and establishing a guiding principle to manage for resilient public lands through protection of intact, native habitats, restoration of degraded habitats, and informed decision-making.

8.      TWS has long advocated for conservation of BLM public lands and for administrative tools to achieve those objectives. Most recently, and based on extensive engagement with our field, science, and policy staff, as well as key national, regional, and local partners, we initiated a priority campaign in early 2021 focused on advocating for more investment by the BLM in conservation through wildlife corridors, protective designations, and regulatory changes. To those ends, TWS helped organize and run a national coalition that in turn developed advocacy materials and policy positions on issues like landscape connectivity, land health, cultural resource protection, and designation tools like Areas of Critical Environmental

Concern (ACECs). Our staff worked to educate and generate support from members of congress, local elected officials, opinion leaders, journalists, businesses, and members of the public on the important role of the BLM in addressing the climate and nature crises through conservation. For instance, we worked with national and regional partners to advocate for increased agency funding for wildlife corridor projects. And we worked with the National Association of Tribal Historic Preservation Officers to develop a national report and training webinar with over 200 participants on ACECs as a tool for cultural resource protection.

9.    As BLM considered policy mechanisms for addressing some of these issues – first through a series of Instruction Memoranda and eventually through initiation of the rulemaking process in 2023 – TWS participated actively in the administrative process. TWS established a formal internal campaign team that included staff from multiple departments and disciplines to assist with all aspects of our advocacy. This work included, among other things: developing, collecting, and sharing factsheets, background materials, sample comments, and opinion pieces; preparing detailed analyses; sending digital alerts to our members and supporters about engagement opportunities; and travelling to states across the West to meet with local officials, partners, opinion leaders, and journalists. During the 90-day public comment period on the proposed rule, TWS encouraged partners and members to participate in BLM virtual and in-person public meetings and to submit comments.

10.    TWS also prepared and submitted detailed technical comments on the proposed rule that included a compilation of peer-reviewed scientific articles, an analysis of potential new ACECs, and a report on fair market valuation of restoration and mitigation leases. While some of TWS's recommendations (e.g., recognizing old-growth forests' contributions to ecological resilience and landscape intactness) were adopted in the final rule, many others were not. For

5

example, TWS also requested that the final Public Lands Rule: (a) require BLM to identify and protect old-growth emphasis areas and habitat connectivity areas; (b) provide additional direction on managing for climate resilience; (c) provide direction on the wilderness resource, including through identification and protection of Lands with Wilderness Characteristics; (d) further strengthen priority management direction and removal requirements for ACECs; and (e) strengthen the definition of preventing unnecessary or undue degradation. Ultimately, over 200,000 comments were submitted on the proposed rule, with over 90 percent of them supporting greater conservation across BLM lands.

11.    Throughout 2023 and 2024, TWS also deployed significant capacity to defending the proposed (now final) rule and the rulemaking process from various legislative attacks. We organized multiple D.C. "fly-ins" for members and supporters to meet with their members of congress and advocate for the rule. We have worked to vigorously oppose legislative measures such as H.R. 3397 (The WEST Act), which would repeal the final rule. We also engaged at the state level. For instance, on February 27, 2024, I testified on behalf of TWS in the Idaho State Legislature at a hearing in the House Resources and Conservation Committee.  The hearing was for House Joint Memorial 6, which sought to represent the Idaho State Legislature's opposition to the BLM's Public Lands Rule.  I testified in opposition to the memorial and in support of the BLM Public Lands Rule.

12.    TWS welcomed BLM's April 18, 2024 announcement of the final Public Lands Rule, and led efforts to analyze the content of the final rule to help our members, supporters, and partners understand the lengthy and technical content and be prepared to work with BLM on its implementation. Ultimately, TWS intends to use the new rule to advocate for greater environmental and cultural resource protections, new wildlife corridors and habitat protections

and to engage partners and our members in applying direction in the rule to ensure greater conservation on BLM managed lands in their local communities. For instance, in Arizona our staff and state partners are eager to see the rule implemented across the state, especially in the Safford and Kingman Field Offices where the BLM continues to manage pursuant to two 40-year-old Resource Management Plans that fail to meaningfully consider conservation management among other multiple uses. In Colorado, TWS intends to advocate for improvements to the Uncompahgre Field Office Resource Management Plan through application of elements of the final rule. TWS reached a settlement agreement with BLM over that plan in a lawsuit we filed over the plan's failure to adequately address conservation. Finally, as described in greater detail below, here in my home state of Idaho we have been leading a regional coalition of organizations focused on protecting the critical BLM wildlife habitat linkages in the High-Divide between the Frank Church Wilderness and the Greater Yellowstone region in Montana, Idaho, and Wyoming.

13.    Similar to how we engage in national policy campaigns, TWS contributes capacity and expertise from different disciplines to our engagement in place-based agency decision-making processes. For example, and as described further below, TWS developed a comprehensive inventory of intact lands with wilderness characteristics that do not have permanent protections in the BLM Salmon Field Office and BLM Challis Field Office. We worked with our science and GIS teams to analyze the ecological integrity and human footprint of all lands within the field offices and identify the subset with the highest potential for wilderness characteristics and other related measures of ecological integrity and landscape intactness. We then hired local seasonal employees to perform an on-the-ground inventory of the highest-potential units to verify our desk-top analysis and write a report cataloging their findings

and data. And finally, we worked with our policy team and partner organizations in Idaho to craft consensus recommendations for how BLM should manage the intact, wilderness-quality lands we identified. Going forward, this same inventory data and management recommendations should help inform BLM's inventory of landscape intactness, management of certain landscapes to protect their intactness, consideration of new or expanded ACECs, and use of other tools under the Public Lands Rule.

14.    Wilderness Society staff and members, including myself, regularly visit BLM public lands to hunt, picnic, hike and camp, view wildlife, and experience nature. As a staff person and member of TWS, I have deep professional and personal interests in ensuring that BLM has the necessary regulatory direction confirming that conservation is on equal footing with consumptive multiple uses.

15.    My connection with Idaho's BLM lands is both professional and personal. Professionally, I have worked to get Congress to designate the Jim McClure-Jerry Peak Wilderness, led TWS's inventory of intact, wilderness-quality lands in the Salmon and Challis Field Offices, worked with coalitions of stakeholders to find common ground for recommendations to the BLM, and worked to achieve conservation gains through travel management plans, recreation management plans, state policy, and resource management plans. Much of my professional focus has been on advocating for conservation of intact landscapes and wildlife corridors in the Salmon, Challis, and Upper Snake Field Offices. I spent a significant amount of time in 2014, 2015 and 2016 working on an inventory of BLM lands with significant conservation values (i.e., those that qualify as Lands with Wilderness Characteristics under BLM policy) in these field offices. That inventory demonstrated that the BLM lands of the Upper Pahsimeroi Valley and Upper Little Lost Valley (referred to here as the Donkey Hills complex)

8

have a high degree of landscape intactness and provide critical connectivity between the large Forest Service roadless lands in the Lost River Range and Lemhi Range.

16.    The Donkey Hills complex is approximately 200,000 acres of largely unprotected, ecologically intact lands mostly managed by the BLM. The complex includes the existing approximately 4,700-acre Donkey Hills ACEC, with adjacent lands qualifying for expansion of the ACEC. The complex is also an important area for wildlife connectivity and sage-grouse. It includes a vital wildlife corridor for ungulates and other migrating species between the Lost River Range and the Lemhi Range. It also provides winter range and calving grounds for a major elk population, as well as critical habitat for the greater sage-grouse, a bird whose numbers are in decline. Indeed, the 2015 Idaho and SW Montana Greater Sage Grouse Plan Amendment (currently under revision) identified the entirety of the Donkey Hills complex as a Sagebrush Focal Area (SFA). Overall, the Donkey Hills complex is a prime candidate to be managed as an intact landscape under the Public Lands Rule.

17.    TWS submitted our inventory to the BLM Salmon and Challis Field Offices in 2017, and a partner organization submitted a corresponding one to the BLM Upper Snake Field Office. Since that time, TWS has repeatedly requested that BLM use our data and/or perform its own inventory to inform land management decisions, including but not limited to long overdue resource management planning. Unfortunately, and despite years of urging, the BLM has taken no action in any of the three field offices, leaving important areas for habitat connectivity, potential ACECs, and landscape intactness like the Donkey Hills complex unprotected and vulnerable to a wide array of potential management actions that might impair their intactness and ecological values. One such action has already materialized since our inventories were submitted: the Rally in the Pines motorized use event occurred during the summers of 2021,

2022 and 2023, generating many reports of illegal motorized use on both BLM and Forest Service lands in the Donkey Hills region. Rally in the Pines is an example of the kind of land use that TWS believes causes harm to this intact and ecologically important landscape. The BLM Public Lands Rule directs the BLM to consider how to manage areas with landscape intactness, like the Donkey Hills complex, including whether or under what conditions to authorize uses that may cause harm to the area and its intactness.

18.     In addition to my professional interest in conserving the intactness and ecological integrity of the Donkey Hills complex, I also enjoy recreating there personally. I have taken many trips to the Upper Little Lost and Upper Pahsimeroi to recreate with friends and family, and look forward to going back to camp and hike in the fall of 2024. I enjoy and appreciate the wild landscape far from pavement and where there is ample opportunity to find solitude, view wildlife and hike as far as your legs can take you. I have hiked, camped, and hunted throughout the complex on both BLM and Forest Service lands. The images below depict a few trips to the Donkey Hills, Upper Little Lost and Upper Pahsimaroi that I have made over the years (and have photos from). The first image is from a trip in June 2014 with some work colleagues to the Donkey Hills, where we spent a day driving and hiking in the Donkey Hills as part of the inventory work we were doing there. The second photo is from November 2015, when I spent approximately 4 days camping and hunting in the Donkey Hills complex with a friend, specifically in the Sands Canyon area. Though the hunt was unsuccessful, we had a great time hiking in the area and watching elk through our binoculars. The final photo is from June 2016, when I was hiking with some work colleagues in the Burnt Creek Wilderness Study area while we were on a break from inventory work. I have been to the Donkey Hills complex many more

10

times since then both professionally and for personal recreation; this is just a sampling of a few

photos from a few trips that I have made.



*Walking in the Donkey Hills, looking towards the Lost River Range.  June 15, 2014.*



*Hunting in Sands Canyon community-proposed LWC unit.  November 5, 2015.*



*Rest on a hike overlooking Burnt Creek WSA and Donkey Hills; Lemhi Range in distance. June 21, 2016.*

19.     I have also taken many trips to BLM lands in Utah to hike, camp, and backpack.  I have explored canyons throughout the Grand Staircase-Escalante National Monument and the San Rafael Swell region for many years, and look forward to returning as soon as my schedule allows.

20.     Other TWS members who, like me, have personal, professional, and/or economic interests in the conservation of BLM managed lands rely on TWS to communicate with and educate them about opportunities for conservation of public lands, and to represent their interests through our advocacy on the Public Lands Rule and its implementation. Individuals who may lack the time, skillset, or knowledge to effectively advocate for protection of important public

13

lands and resources entrust TWS conservation advocacy experts with their donations and support. In return, they expect us to represent their interests in our advocacy work that helped secure a strong final BLM Public Lands Rule, in defending the rule from legal or legislative attacks, and in ensuring its successful implementation through our engagement in a range of place-based decisions, including, for instance, about how to manage the intact landscapes, potential ACECs, and other documented values of the Donkey Hills complex that contribute to ecosystem resilience. Our staff and members expect that TWS's work will result in concrete protections for the wildlife habitat, scientific, recreation, cultural, scenic, watershed, air and atmospheric, and other ecological and social public lands values that they cherish and want to preserve for their enjoyment and the enjoyment of future generations. As a result, TWS staff and members celebrated the release of the final Public Lands Rule. If successful, the State of Utah and the State of Wyoming's challenge to the rule would harm the interests of TWS and its members.

I declare under penalty of perjury that the foregoing declaration is true and correct.

Dated: July 24, 2024                    By: _____

                                              Rob Mason

14