TODD KIM
Assistant Attorney General
Environment & Natural Resources Division
United States Department of Justice

SHANNON BOYLAN
LUTHER L. HAJEK
United States Department of Justice
Environment and Natural Resources Division
150 M St NE
Washington, D.C. 20002
Tel: (202) 598-9584 / Fax: (202) 305-0506
shannon.boylan@usdoj.gov
Tel: 303-844-1376 / Fax: 303-844-1350
luke.hajek@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| STATE OF UTAH, *et al.*, | ) | Case No. 2:24-cv-438-DBB-DAO |
| | ) | Honorable David Barlow |
| Plaintiffs, | ) | Magistrate Judge Daphne A. Oberg |
| | ) | |
| v. | ) | |
| | ) | **DEFENDANTS' RESPONSE IN** |
| DEB HAALAND, in her official capacity | ) | **OPPOSITION TO PLAINTIFFS'** |
| as the Secretary of the U.S. Department of | ) | **MOTION FOR PRELIMINARY** |
| the Interior, *et al.,* | ) | **INJUNCTION** |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................ 1

    I.      National Environmental Policy Act ........................................................ 1

    II.     Public Lands Rule ................................................................................... 2

LEGAL STANDARDS ............................................................................................... 5

    I.      A Preliminary Injunction is an Extraordinary Remedy........................... 5

    II.     Administrative Procedure Act Review of Agency Action ...................... 6

ARGUMENT ............................................................................................................. 6

    I.      Plaintiffs Have Failed to Demonstrate Irreparable Harm ....................... 7

    II.     Plaintiffs Lack Standing and Are Not Likely to Succeed on the Merits .............. 13

          A.      Plaintiffs Lack Standing.......................................................... 13

          B.      BLM's Reliance on a Categorical Exclusion Was Proper......................... 14

                1.      Interior's Categorical Exclusion at 43 C.F.R. § 46.210(i) Applies .........................................................................15

                2.      BLM Appropriately Considered Extraordinary Circumstances ........................................................... 19

    III.    The Balance of the Harms and the Public Interest Weigh Against a Preliminary Injunction ........................................................................... 23

    IV.    Any Preliminary Injunctive Relief Should Be Narrowly Tailored ....................... 25

CONCLUSION......................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alaska Envtl. Ctr. v. Kempthorne*,
   457 F.3d 969 (9th Cir. 2006) ................................................................ 22

*Am. Wild Horse Campaign v. Bernhardt*,
   963 F.3d 1001 (9th Cir. 2020) .............................................................. 21

*Amoco Prod. Co. v. Vill. of Gambell*,
   480 U.S. 531 (1987) .............................................................................. 23

*Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*,
   562 F.3d 1067 (10th Cir. 2009) .............................................................. 5

*BlueRibbon Coal. v. U.S. Bureau of Land Mgmt.*,
   No. 2:23-CV-923-DAK-JCB, 2024 WL 1197862 (D. Utah Mar. 20, 2024) ............................ 13

*California ex rel. Lockyer v. U. S. Dep't of .Agric.*,
   575 F.3d 999 (9th Cir. 2009) ................................................................ 16

*Citizen Band Potawatomi Indian Tribe of Okla. v. Okla. Tax Comm'n*,
   969 F.2d 943 (10th Cir. 1992) .............................................................. 25

*Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*,
   297 F.3d 1012 (10th Cir. 2002) ............................................................ 14

*Colorado v. United States EPA*,
   989 F.3d 874 (10th Cir. 2021) ........................................... 5, 7, 9, 11, 12, 13

*Ctr. for Biological Diversity v. Ilano*,
   928 F.3d 774 (9th Cir. 2019) ................................................................ 19

*Davis v. Mineta*,
   302 F.3d 1104 (10th Cir. 2002) .............................................................. 8

*Dine Citizens Against Ruining Our Envt. v. Jewell*,
   839 F.3d 1276 (10th Cir, 2016) .............................................................. 8

*District of Columbia v. U.S. Dep't of .Agric.*,
   444 F. Supp. 3d 1 (D.D.C. 2020) ........................................................... 13

*DTC Energy Group, Inc. v. Hirschfeld*,
   912 F.3d 1263 (10th Cir. 2018) .............................................................. 7

*Heartwood v. U.S. Forest Serv.*,
   435 F.3d 1204 (10th Cir. 2006) ............................................................ 14

ii

*Heideman v. Salt Lake City,*
  348 F.3d 1182 (10th Cir. 2003) ........................................................................ 9

*Highlands Ranch Neighborhood Coal. v. Cater,*
  No. 16-cv-01089-RM, 2016 WL 8737775 (D. Colo. Dec. 7, 2016) ......................... 8

*Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs,*
  702 F.3d 1156 (10th Cir. Nov. 28, 2012) .......................................................... 21

*Keyes v. Sch. Dist. No. 1, Denver, Colo.,*
  895 F.2d 659 (10th Cir. 1990) ......................................................................... 25

*Loud v. Denver,*
  32 F.4th 1259 (10th Cir. 2022) ......................................................................... 6

*Mazurek v. Armstrong,*
  520 U.S. 968 (1997) ........................................................................................ 6

*Mexico Dept. of Game & Fish v. U.S. Dept. of the Interior,*
  854 F.3d 1236 (10th Cir. 2017) ......................................................................... 7

*Monsanto Co. v. Geertson Seed Farms,*
  561 U.S. 139 (2010) ....................................................................................... 25

*New Mexico ex rel. Richardson v. BLM,*
  565 F.3d 683 (10th Cir. 2009) ..................................................................... 3, 24

*Nken v. Holder,*
  556 U.S. 418 (2009) .................................................................................... 6, 23

*NRDC v. EPA,*
  822 F.2d 104 (D.C. Cir. 1987) .......................................................................... 1

*Olenhouse v. Commodity Credit Corp.,*
  42 F.3d 1560 (10th Cir. 1994) ........................................................................... 6

*Or. Nat. Desert. Ass'n. v. Cain,*
  17 F. Supp. 3d 1037 (D. Or. 2014) ................................................................... 21

*Prairie Band of Potawatomi Indians v. Pierce,*
  253 F.3d 1234 (10th Cir. 2001) ......................................................................... 7

*Renewable Fuels Ass'n v. United States EPA,*
  948 F.3d 1206 (10th Cir. 2020) ......................................................................... 6

*Robertson v. Methow Valley Citizens Council,*
  490 U.S. 332 (1989) ........................................................................................ 1

*Rocky Mtn. Peace & Justice Ctr. v. U.S. Fish and Wildlife Serv.,*
  548 F. Supp. 3d 1042 (D. Colo. 2021) .............................................................. 21

*Safari Club Int'l v. Jewell,*
  960 F. Supp. 2d 17 (D.D.C. 2013) .................................................................... 15

iii

*Sierra Club v. Bosworth*,
    510 F.3d 1016 (9th Cir. 2007) ................................................................. 20, 21

*Solar Energy Industries Association v. FERC*,
    80 F.4th 956 (9th Cir. 2023) ...................................................................... 16

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ................................................................................... 13, 14

*Town of Superior v. U.S. Fish & Wildlife Serv.*,
    913 F. Supp. 2d 1087 (D. Colo. 2012) ........................................................ 21

*Vill. of Logan v. U.S. Dept. of the Interior*,
    577 F. Appx. 760 (10th Cir. 2014) ............................................................. 8, 9

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982) ................................................................................... 23

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990) ................................................................................... 14

*Wilderness Watch & Pub. Employees for Envtl. Responsibility v. Mainella*,
    375 F.3d 1085 (11th Cir. 2004) .................................................................. 15

*Winter v. NRDC*,
    555 U.S. 7 (2008) ............................................................................. 1, 5, 6, 7, 8, 23

**Statutes**

42 U.S.C. § 4332(2)(C) ...................................................................................... 2

42 U.S.C. § 4332(C) ........................................................................................... 1

43 U.S.C. § 1702(c) ............................................................................................ 24

43 U.S.C. § 1702(c), (h) .................................................................................... 3

43 U.S.C. § 1712(c)(3) ...................................................................................... 5

43 U.S.C. § 1732(a) ........................................................................................... 3

43 U.S.C. § 1732(b) ........................................................................................... 4

5 U.S.C. § 706(2)(A) .......................................................................................... 6

5 U.S.C. §§ 701-706 ........................................................................................... 6

**Regulations**

18 C.F.R. § 380.4(a)(1) ...................................................................................... 16

18 C.F.R. § 380.4(a)(2)(ii) ................................................................................. 16

40 C.F.R. § 1501.3 .............................................................................................. 2

40 C.F.R. § 1501.4(b)(1) .................................................................................... 2

iv

40 C.F.R. § 1501.4(b)(2) ................................................................................. 2

40 C.F.R. § 1508.1(g)(3) ............................................................................... 22

43 C.F.R. § 1602.4(b)-(d) ............................................................................... 9

43 C.F.R. § 1610.2 ......................................................................................... 9

43 C.F.R. § 1610.3-1 ...................................................................................... 9

43 C.F.R. § 1610.7-2 .................................................................................. 3, 5

43 C.F.R. § 1610.7-2(a) ............................................................................... 25

43 C.F.R. § 1610.7-2(a)-(c) ...................................................................... 5, 19

43 C.F.R. § 1610.7-2(b) ................................................................................. 9

43 C.F.R. § 1610.7-2(d) ................................................................................. 5

43 C.F.R. § 1610.7-2(i)(2)(ii) ........................................................................ 9

43 C.F.R. § 46.205(c)(1) ................................................................................ 2

43 C.F.R. § 46.210 ......................................................................................... 2

43 C.F.R. § 46.210(a) ................................................................................... 17

43 C.F.R. § 46.210(i) ....................................................................... 15, 18, 19

43 C.F.R. § 46.215(c) ................................................................................... 20

43 C.F.R. § 46.215(e) ................................................................................... 20

43 C.F.R. § 46.215(f) ................................................................................... 22

43 C.F.R. § 6101.4(j) ..................................................................................... 3

43 C.F.R. § 6101.4(w) .................................................................................... 4

43 C.F.R. § 6102.2(a) ..................................................................................... 3

43 C.F.R. § 6102.4 .......................................................................................... 4

43 C.F.R. § 6102.4(a)(4) ............................................................................... 25

43 C.F.R. § 6102.4(a)(4)-(5), (f)-(h) .............................................................. 4

43 C.F.R. § 6102.4(a)(4), (f)-(g) .................................................................. 10

43 C.F.R. § 6102.4(a)-(d) ............................................................................... 4

43 C.F.R. § 6102.4(a)-(i) ................................................................................ 4

43 C.F.R. § 6102.4(b)-(e) ............................................................................. 24

43 C.F.R. § 6102.4(d)-(f) .............................................................................. 11

43 C.F.R. § 6103.1(a) ..................................................................................... 4

43 Fed. Reg. 55,978 (Nov. 29, 1978) .................................................................. 2

51 Fed. Reg. 15,618 (Apr. 25, 1986) ................................................................... 2

85 Fed. Reg. 43,304 (July 16, 2020) ................................................................... 2

85 Fed. Reg. 75,874 (Nov. 27, 2020) ................................................................ 17

85 Fed. Reg. 82,359 (Dec. 18, 2020) ................................................................ 17

87 Fed. Reg. 23,469 (Apr. 20, 2022) ................................................................... 2

87 Fed. Reg. 47,296 (Aug. 2, 2022) .................................................................. 17

88 Fed. Reg. 20,364 (May 5, 1983) ..................................................................... 5

89 Fed. Reg. 35,442 (May 1, 2024) ...................................................................... 2

89 Fed. Reg. 35,634 (May 1, 2024) .................................................................... 18

89 Fed. Reg. 40,308 (May 9, 2024) ........................................................... 2, 3, 23

89 Fed. Reg. 40,313 (May 9, 2024) ...................................................................... 9

89 Fed. Reg. 40,313-14 (May 9, 2024) ................................................................ 3

89 Fed. Reg. 40,327 (May 9, 2024) ................................................... 10, 11, 24, 25

89 Fed. Reg. 40,333 (May 9, 2024) ............................................................. 15, 18

## INTRODUCTION

The U.S. Bureau of Land Management's ("BLM") Conservation and Landscape Health Rule, also known as the "Public Lands Rule," provides a procedural framework for the protection of public lands, but it does not mandate any agency action, much less imminent agency action, that could warrant emergency injunctive relief. The Rule does not impose any new regulatory obligations on third parties, affect any existing authorizations to use the public lands, or elevate conservation use above other allowable uses of federal lands. Plaintiffs' claims that the Rule will cause imminent irreparable environmental harm are therefore entirely unfounded. And because Plaintiffs only assert speculative injuries arising from future applications of the Rule, they also lack standing. In addition, Plaintiffs' claims under the National Environmental Policy Act ("NEPA") are unlikely to succeed because the Rule falls within a categorical exclusion, and therefore a detailed NEPA analysis was not required. Plaintiffs' preliminary injunction motion should be denied.

## BACKGROUND

### I.    National Environmental Policy Act

NEPA requires that federal agencies consider the environmental impacts of proposed major federal actions. 42 U.S.C. § 4332(C); *see also Winter v. NRDC*, 555 U.S. 7, 16 (2008). NEPA imposes purely procedural requirements, and "does not require that certain outcomes be reached as a result of the evaluation." *NRDC v. EPA*, 822 F.2d 104, 129 (D.C. Cir. 1987). NEPA serves the dual purpose of informing agency decision-makers of the significant environmental effects of proposed major federal actions and ensuring that relevant information is made available to the public. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). To meet these procedural goals, NEPA requires that an agency prepare an Environmental Impact

Statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

An EIS, however, is not required in every instance. In accordance with the Council on Environmental Quality's ("CEQ") regulations implementing NEPA, an agency should first determine the appropriate level of environmental review. *See* 40 C.F.R. § 1501.3.[1] If a type of action would not normally have significant environmental effects, then it may be categorically excluded from the requirement to prepare an EIS. *Id.* § 1501.3(a)(1). Agencies may establish NEPA procedures identifying the types of actions subject to categorical exclusions ("CXs"). *Id.* § 1501.4(a). Before administratively establishing a CX, an agency must coordinate with CEQ, provide for public review and comment, and publish its CX and any other final NEPA procedures. *Id.* § 1507.3(b). The Department of the Interior has established several CXs to exclude certain categories of actions from NEPA analysis. 43 C.F.R. § 46.210. If a proposed action falls within a CX, then the agency must evaluate whether extraordinary circumstances are present. 40 C.F.R. § 1501.4(b)(1); 43 C.F.R. § 46.205(c)(1). If extraordinary circumstances are present, then the agency may not rely on a CX and instead must prepare an environmental assessment ("EA") or an EIS. 40 C.F.R. § 1501.4(b)(2); 43 C.F.R. § 46.205(c)(1).

## II.    Public Lands Rule

BLM promulgated the Public Lands Rule on May 9, 2024, and it became effective on June 10, 2024. 89 Fed. Reg. 40,308 (May 9, 2024). BLM manages federal public lands in

---

[1] CEQ promulgated regulations implementing NEPA in 1978, 43 Fed. Reg. 55,978 (Nov. 29, 1978), and a minor substantive amendment to those regulations in 1986, 51 Fed. Reg. 15,618 (Apr. 25, 1986). In 2020, CEQ published a final rule substantially revising the 1978 regulations. 85 Fed. Reg. 43,304 (July 16, 2020). CEQ published a final rule making additional minor revisions to the NEPA regulations in 2022. 87 Fed. Reg. 23,469 (Apr. 20, 2022). CEQ issued a final rule regarding further amendments to the NEPA regulations in May 2024, and those amendments became effective on July 1, 2024. 89 Fed. Reg. 35,442 (May 1, 2024). The 2020 regulations, as amended by the 2022 rule, apply to BLM's issuance of the Rule.

accordance with the Federal Land Policy and Management Act ("FLPMA") under the principles

of multiple use and sustained yield, unless otherwise directed by law. 43 U.S.C. § 1732(a); 89

Fed. Reg. at 40,308. These principles require BLM to manage public lands for a wide variety of

uses, including conservation where appropriate. *See* 43 U.S.C. § 1702(c), (h); 89 Fed. Reg. at

40,313-14; *see New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 710 (10th Cir. 2009)

("Development is a possible use, which BLM must weigh against other possible uses—including

conservation to protect environmental values."). BLM's success as a land manager depends on

the maintenance of functioning, resilient ecosystems. 40 C.F.R. § at 40,308. To achieve this

objective, the Rule establishes a framework for protecting healthy landscapes, restoring degraded

habitat and ecosystems, and making well-informed decisions based on science and data. *Id.* The

Rule does not impose any new regulatory obligations on third parties, affect any existing

authorizations to use the public lands, or otherwise shift the balance of allowable uses. *See* 89 *Id.*

at 40,333. The major provisions of the Rule, which are set forth at 43 C.F.R. subparts 6101-03

and 43 C.F.R. § 1610.7-2, are summarized below.

    *Subpart 6102: Conservation Use.* Subpart 6102 regulates BLM's management of

conservation use. Among other things, it requires BLM to maintain inventories of "landscape

intactness"[2] as a resource value. 43 C.F.R. § 6102.2(a). During the land use planning process,

BLM will review that inventory and other information to delineate intact landscapes and

consider at least one plan alternative to protect such landscapes. *Id.* § 6102.2(b). Another aspect

---

[2] *Intact landscape* "means a relatively unfragmented landscape free of local conditions that could permanently or significantly disrupt, impair, or degrade the landscape's composition, structure, or function. Intact landscapes are large enough to maintain native biological diversity, including viable populations of wide-ranging species." 43 C.F.R. § 6101.4(j).

of conservation use management is restoration.[3] The Rule articulates principles for BLM to follow in identifying opportunities for restoration and conducting restoration. *Id.* § 6102.3.

The Rule also creates a new category of lease, which allows BLM to lease land for the purpose of conservation, and specifically for either restoration or mitigation. 43 C.F.R. § 6102.4. The Rule itself does not directly grant any such leases, but creates a regulatory framework for BLM to evaluate applications and potentially authorize such leases. *Id.* § 6102.4(a)-(d); *see also* 43 U.S.C. § 1732(b) (authorizing BLM to grant easements, permits, leases, or licenses for use of the public lands). The Rule establishes standards for who may hold leases, sets out the application process, identifies the information and documentation prospective lessees must submit before lease approval, and identifies criteria for evaluating lease proposals, among other requirements. *See* 43 C.F.R. § 6102.4(a)-(i). The Rule also expressly provides that a lease does not convey any exclusive right to use the public lands or interfere with other authorized uses of the public lands, and that BLM may consider and approve later-in-time proposals to use the public lands, provided that they not interfere with the goals of an existing restoration or mitigation lease. *Id.* § 6102.4(a)(4)-(5), (f)-(h).

*Subpart 6103: Land Health.* Subpart 6103 creates a framework for BLM to establish land health standards, assess the condition of the public lands against those standards, and take management actions to make progress toward achieving the fundamentals of land health. The Rule defines the conditions that constitute the fundamentals of land health and requires BLM to develop national standards to measure whether public lands are achieving those fundamentals. 43 C.F.R. § 6103.1(a). The Rule also requires that BLM conduct watershed condition assessments

---

[3] *Restoration* "means the process or act of conservation by passively or actively assisting the recovery of an ecosystem that has been degraded, damaged, or destroyed to a more natural, native ecological state." 43 C.F.R. § 6101.4(w).

for all public lands at least every ten years. *Id.* § 6103.2(a). BLM will use those assessments to guide its decision-making on the uses of the public lands. *Id.* §§ 6103.1.1(a), 6103.1.2(a)-(d).

   *Section 1610.7-2, ACECs.* The Rule revises the existing land use planning regulations at 43 C.F.R. § 1610.7-2 governing the designation of areas of critical environmental concern ("ACEC"). The ACEC regulation, which has been included in the planning regulations since 1983, implements FLPMA's provision that "[i]n the development and revision of land use plans, the [BLM] shall . . . give priority to the designation of areas of critical environmental concern." 43 U.S.C. § 1712(c)(3); *see* 88 Fed. Reg. 20,364, 20,375 (May 5, 1983). ACECs are designated through the land use planning process, and the Rule requires BLM to facilitate the identification of ACECs early in that process by analyzing existing inventory, assessment, and monitoring data; reevaluating all presently designated ACECs; and seeking ACEC nominations through the public scoping process. 43 C.F.R. § 1610.7-2(a)-(c). Among other things, the Rule amends the existing regulations by adding a third criterion that must be present to designate an ACEC—that, in addition to having "relevance" and "importance," the value, resource, system, or process for which the area is designated must require "special management attention" for its protection. *Id.* § 1610.7-2(d). *See also* Decl. of Sharif Branham ¶¶ 6- 7.

## LEGAL STANDARDS

### I.    A Preliminary Injunction is an Extraordinary Remedy

   To obtain a preliminary injunction a movant must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20; *Colorado v. EPA*, 989 F.3d 874, 883 (10th Cir. 2021); *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009) (clarifying that movant must establish that all four factors "weigh in its favor"). "[T]he final two factors 'merge when the

Government is the opposing party.'" *Denver Homeless out Loud v. Denver*, 32 F.4th 1259, 1278

(10th Cir. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Because a "preliminary

injunction is an extraordinary and drastic remedy," *Mazurek v. Armstrong,* 520 U.S. 968, 972

(1997) (citation omitted), the party seeking such an injunction must make "a clear showing that

[it] is entitled to such relief." *Winter*, 555 U.S. at 22.

## II.    Administrative Procedure Act Review of Agency Action

The Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA"), waives the sovereign

immunity of the United States to allow for judicial review of certain types of agency action.

Under the APA, a court may set aside an agency action only if it is "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This

standard of review is "narrow" and "deferential." *Renewable Fuels Ass'n v. EPA*, 948 F.3d 1206,

1254 (10th Cir. 2020). "The duty of a court reviewing agency action under the 'arbitrary or

capricious' standard is to ascertain whether the agency examined the relevant data and articulated

a rational connection between the facts found and the decision made." *Olenhouse v. Commodity

Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994) (footnote omitted).

## ARGUMENT

Plaintiffs fail to satisfy any aspect of the four-factor test for a preliminary injunction.

They provide no credible basis for finding that they will suffer irreparable injury in the absence

of preliminary injunctive relief, and their claims on the merits suffer serious flaws. Moreover, the

Public Lands Rule enjoys broad support and represents the outcome of a public planning process

serving the very environmental protection goals that Plaintiffs claim will be impaired by

implementation of the Rule. And because Plaintiffs only assert injuries arising from hypothetical

applications of the Rule, they also lack standing. Therefore, Plaintiffs fail to meet their burden in

seeking the extraordinary remedy of a preliminary injunction, and the motion should be denied.

## I.    Plaintiffs Have Failed to Demonstrate Irreparable Harm

The Rule, which only prescribes procedures regarding the management of federal land (not state land), has been in effect for nearly two months. And since its enactment, there have been no agency actions implementing the Rule. Against this backdrop, Plaintiffs have not shown that imminent irreparable harm is likely in the absence of an injunction. *Winter*, 555 U.S. 22; *see also Colorado*, 989 F.3d at 884 ("To merit preliminary injunctive relief, a movant must present a 'significant risk' it 'will experience harm that cannot be compensated after the fact by money damages.") (quoting *N. Mexico Dept. of Game & Fish v. U.S. Dept. of the Interior*, 854 F.3d 1236, 1250 (10th Cir. 2017)). Such harm "'must be both certain and great,' not 'merely serious or substantial.'" *Colorado*, 989 F.3d at 884 (quoting *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001)). "[S]peculative or theoretical injury will not suffice," and "[t]he injury must also be of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm" before the court can rule on the merits. *Id.* (citations and internal quotation marks omitted). "[A] showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction," and a preliminary injunction may not be issued unless the movant makes such a showing. *DTC Energy Group, Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018) (citation omitted).

Plaintiffs have failed to show that the Rule, particularly given its procedural nature, will result in any imminent irreparable harm to the environment or otherwise before the case could be heard on the merits, and therefore their motion must be denied. Plaintiffs offer five grounds supporting their alleged imminent irreparable harm. None has merit.

First, Plaintiffs claim that they are irreparably injured by the agency's failure to comply with NEPA. Pls.' Mem. in Supp. of Mot. for Prelim. Inj. ("Pls.' Mem.") at 21-22, ECF No. 18. But Plaintiffs misunderstand the standard for showing irreparable harm in the NEPA context.

Their theory relies on the Tenth Circuit's decision in *Davis v. Mineta*, in which the court stated that "harm to the environment may be presumed when an agency fails to comply with the required NEPA procedure." 302 F.3d 1104, 1115 (10th Cir. 2002), *abrogated on other grounds by Dine Citizens Against Ruining Our Envt. v. Jewell*, 839 F.3d 1276, 1281-82 (10th Cir. 2016). The Supreme Court in *Winter*, however, suggested that plaintiffs seeking preliminary injunctions in the NEPA context carry the same burden as other plaintiffs to demonstrate irreparable harm. There, the Court rejected the notion that in a NEPA case, a plaintiff may obtain an injunction upon a showing of merely possible—as opposed to likely—irreparable harm. 555 U.S. at 22; *see also Highlands Ranch Neighborhood Coal. v. Cater*, No. 16-cv-01089-RM, 2016 WL 8737775 (D. Colo. Dec. 7, 2016) (questioning the applicability of the presumption of harm following *Winter*); *see Dine Citizens*, 839 F.3d at 1282 (broadly construing *Winter* to have overruled the Tenth Circuit's prior balancing test and requiring a plaintiff to demonstrate a likelihood of success on the merits). In other words, there is no basis for concluding that the burden of demonstrating irreparable harm in NEPA cases is somehow lower or different than other cases.

Even assuming the Tenth Circuit would apply the presumption of harm, it applies only where the plaintiff has demonstrated a likely NEPA violation. *Vill. of Logan v. U.S. Dept. of the Interior*, 577 F. Appx. 760, 767 (10th Cir. 2014). For the reasons demonstrated below, *see* section II, *infra*, Plaintiffs have not demonstrated a likely NEPA violation and therefore the presumption does not apply. Further, while "harm to the *environment* may be presumed" under this theory, the plaintiffs "must still make a specific showing that the environmental harm results in irreparable injury to their specific environmental interests." *Davis*, 302 F.3d at 1115; *see also Vill. of Logan*, 577 F. Appx. at 767. In other words, Plaintiffs cannot rely solely on a presumption of harm. Instead, the Plaintiffs must still demonstrate that the rule will irreparably harm their interest in

the environment and that "the injury complained of is of such *imminence* that there is a clear and present need for equitable relief." *Id.* (quoting *Heideman v. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003)). As discussed below, Plaintiffs offer only vague assertions of potential future harm, not imminent irreparable harm, and thus have failed to meet their burden.

Second, the states claim that the Rule will cause irreparable harm to their interest in the environment. Pls.' Mem. at 22-23. Specifically, they argue that the Rule's provisions regarding restoration and mitigation leases and ACECs on federal land will harm their own ability to manage resources and environmental risks on state land. *Id.*; *see also id.* at 8-12. As an initial matter, the states point to no proposed restoration or mitigation leases or ACECs, let alone ones that are soon to be approved, such that they could potentially affect their asserted environmental interests during the time needed to litigate this case. If an entity wishes to propose a restoration or mitigation lease, it must submit an application. *See* 43 C.F.R. § 1602.4(b)-(d). No applications have been submitted yet. Branham Decl. ¶ 3. Likewise, Plaintiffs fail to point to any BLM planning process that may result in the designation of ACECs following the Rule's procedures. Where BLM does consider designating an ACEC, Plaintiffs may participate in the associated planning process, including as cooperating agencies involved in preparing the analysis and documents associated with each step of the process. 43 C.F.R. §§ 1610.2, 1610.7-2(b), 1610.3-1. If an ACEC is proposed outside of the land use planning process, BLM may implement temporary management to protect relevant and important values from irreparable damage, but it must comply with applicable law, including NEPA, and provide notice to the public if it chooses to do so. 43 C.F.R. § 1610.7-2(i)(2)(ii); 89 Fed. Reg. at 40,313. Plaintiffs' speculation about future restoration or mitigation leases or new ACECs on federal land is insufficient to demonstrate imminent irreparable harm to state land. *See Colorado*, 989 F.3d at 884.

Further, Plaintiffs have failed to show, even in a general sense, how any restoration or mitigation leases or new ACECs would cause environmental harm at all. Utah theorizes that the approval of a hypothetical future restoration lease on federal land could impede the state's management of rangeland improvement projects on state land. Pls.' Mem. at 22-23; Buttars Decl. ¶ 19. But the State fails to explain how the restoration of adjacent federal land would in any way affect rangeland improvement projects on state land, which it would not. To the extent Utah is claiming that restoration or mitigation leases would interfere with grazing improvement projects that have been approved on federal land, it is incorrect because such leases may not interfere with previously authorized uses. 89 Fed. Reg. at 40,327 ("Restoration and mitigation leases would not disturb existing authorizations, valid existing rights, or State or Tribal land use management."); *see* 43 C.F.R. § 6102.4(a)(4), (f)-(g). Indeed, as BLM explained in response to comments on the proposed rule, "If the proposed activities in a restoration or mitigation lease would conflict with existing authorizations, such as if a specific type of restoration would not be compatible with grazing and the proposed location is already under grazing authorization, then the restoration or mitigation lease could not be issued on those particular lands unless the proposal were modified to eliminate the conflict." 89 Fed. Reg. at 40,327.

Utah offers other vague theories as to how BLM's management of hypothetical future restoration or mitigation leases (which are intended to restore the land to a healthier condition) would cause environmental damage. It claims that such leases would employ "passive management," which would "lead to degraded landscapes, proliferation of noxious weeds, and a heightened risk of catastrophic wildfires." Buttars Decl. ¶ 18. Given that the goal of the Rule is to improve the condition of federal lands, the assumption that BLM would approve a restoration or mitigation lease that would degrade the land is entirely unsubstantiated and, in any event,

underscores why challenges to the Rule untethered to any specific agency action implementing it are flawed. Thus, there is no basis for Utah's assertion that restoration and mitigation leases would cause increased fire risk, harm Utah's water supply, or result in an increase in invasive species. *See* Pls.' Mem. at 23. There is also no truth to Plaintiffs' repeated assertion that BLM would hand control of restoration and mitigation leases to outside entities. *See* Pls' Mem. at 23. Every lease would be approved and managed by BLM. 43 C.F.R. § 6102.4(d)-(f); *see also* 89 Fed. Reg. 40,327. Finally, Utah cannot rely on mere "uncertainty," Pls.' Mem. at 22, to demonstrate irreparable harm—such uncertainty is not sufficient to demonstrate "certain and great" irreparable harm. *Colorado*, 989 F.3d at 884 (internal citation omitted).

Wyoming's theories of environmental harm fare no better. It argues that potential future restoration and mitigation leases, as well as future ACECs, may harm its ability to manage wildlife. Pls.' Mem. at 23. Specifically, Wyoming claims that such conservation efforts, if undertaken by BLM, will interfere with its ability to manage its land to protect sage grouse and complicate the State's conservation efforts. *Id.*; Decl. of Angela Bruce ¶¶ 12-18. Ms. Bruce speculates that if BLM designates an ACEC for the protection of another species, it could impair the state's ability to protect sage grouse where sage grouse habitat overlaps state and federal land. *Id.* ¶ 15. She also claims that a restoration or mitigation lease might interfere with the state's ability to collect data on species for conservation purposes. *Id.* ¶ 18. Wyoming may raise such concerns if and when an ACEC governed by the Rule or a restoration or mitigation lease is proposed. But without any such proposal, Wyoming's concerns about how a future ACEC or lease may impact its interests amount to no more than speculation, not a showing of imminent irreparable injury.

Third, Plaintiffs argue that they will suffer irreparable harm because they will be compelled to commit resources towards administrative processes for future restoration or mitigation leases that may issue, potentially including related litigation. *See* Pls.' Mem. at 22. Without identifying any specifics, they assert that state agencies may wish to apply for restoration or mitigation leases, and that to do so, the states will need to provide funding for the requisite application processes. *Id.*; *see also* Kropatsch Decl. ¶ 6, ECF No. 18-4; Bruce Decl. ¶ 10, ECF No. 18-5. The Rule, however, does not require the states to commit *any* funding toward securing restoration or mitigation leases; instead, if the states choose to apply for leases or participate in the NEPA processes for pending lease applications, that would be entirely voluntary. Utah professes an "interest in holding every available restoration and mitigation lease," but the Rule does not require Utah to do so. Buttars Decl. ¶ 17, ECF No. 18-1.

Similarly, the mere cost to the states of participating in the voluntary administrative processes for leases proposed by other entities does not constitute irreparable harm. *See* Kropatsch Decl. ¶ 6 (explaining that state agency "staff will spend hours reviewing the application and NEPA documents, preparing comments, and preparing protest letters"). There is no obligation on the states to participate in the administrative processes for proposed leases. If they choose to do so, such costs are routine and not imminent, and Plaintiffs have failed to show that the cost of participating in anticipated future NEPA processes will be so great as to cause them irreparable harm. *See Colorado*, 989 F.3d at 886 (finding that the asserted need "to divert resources from other clean water programs to the detriment of those programs" was insufficient to demonstrate irreparable harm). As in this case, in *Colorado*, the state asserted that a change in a Clean Water Act rule would cause it to expend additional resources on its regulatory program—in that case to pursue enforcement actions. *Id.* at 886. But the court found that the plaintiffs could

not demonstrate any imminent irreparable harm because they had failed to identify any actual enforcement actions that the state wished to pursue. *Id.* Instead, the Tenth Circuit found, the state had shown only "the mere possibility of the potential for a small increase in Colorado's enforcement burden at some point in the future," which was insufficient to demonstrate irreparable harm. *Id.* at 887. The same is true here because the states have failed to identify any proposed applications for leases that would cause them to expend funds.[4] Moreover, Plaintiffs acknowledge that such costs are "unknowable" at this point because no restoration or mitigation leases have yet been proposed. Kropatsch Decl. ¶ 6. Speculation about potential future costs is not a sufficient basis to establish imminent irreparable harm. *See Colorado*, 989 F.3d at 884 ("[A] speculative or theoretical injury will not suffice."); *see also BlueRibbon Coal. v. U.S. Bureau of Land Mgmt.*, No. 2:23-CV-923-DAK-JCB, 2024 WL 1197862, at *10 (D. Utah Mar. 20, 2024) ("Plaintiffs' assertion of imminent harm is speculative and, therefore, insufficient to warrant a preliminary injunction while these proceedings occur.").

## II.    Plaintiffs Lack Standing and Are Not Likely to Succeed on the Merits

### A.    Plaintiffs Lack Standing

Plaintiffs' failure to identify any specific application of the Rule that harms them also means that they lack standing. To establish Article III standing, the Plaintiffs must show that the Rule will affect them in a way that threatens an "'injury in fact' that is concrete and particularized." *Summers v. Earth Island Inst.*, 555 U.S. 488, 494, 493 (2009). This injury "must be actual and imminent, not conjectural or hypothetical." *Id.* at 493. Indeed, the Supreme Court

---

[4] Plaintiffs' reliance on *District of Columbia v. U.S.D.A.*, 444 F. Supp. 3d 1, 42 (D.D.C. 2020), is misplaced. In that case, the court found that a change to a national food assistance program would cause irreparable harm to a non-profit organization dedicated to providing food services because it would force the organization to divert resources to meet the added need for food assistance. *See id.* at 40-42. In contrast, the Public Lands Rule will not cause the states to expend any resources, and any resources that the states choose to spend will not impair state programs.

has stressed that an injury must be "'*certainly* impending' to constitute injury in fact"—
"'[a]llegations of *possible* future injury' are not sufficient.'" *Clapper v. Amnesty Int'l USA*, 1133
S. Ct. 1138, 1147 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). Plaintiffs
must also demonstrate that the injury is fairly traceable to the challenged action and that it is
likely that a favorable judicial decision will prevent or redress the injury. *Summers,* 555 U.S. at
493. Here there is no "actual or imminent" injury. *Id.* Plaintiffs lack standing because, as shown
above, *see* section I, *supra*, they have failed to show that the Rule's procedural framework—as
opposed to potential future actions implementing the Rule—will injure them. Their speculation
about possible future injuries emanating from the Rule does not suffice to establish standing.

### B.     BLM's Reliance on a Categorical Exclusion Was Proper

Even if Plaintiffs had standing, their claims would fail on the merits. Contrary to
Plaintiffs' arguments, BLM's reliance on a CX was proper. NEPA and its implementing
regulations allow an agency to identify categories of actions that normally "do not have any
significant effect on the environment," which the agency, in coordination with CEQ and through
a public notice-and-comment process, "may classify . . . as categorical exclusions." *Colorado
Wild; Heartwood v. U.S. Forest Serv.*, 435 F.3d 1204, 1209 (10th Cir. 2006). "Once an agency
establishes categorical exclusions, its decision to classify a proposed action as falling within a
particular categorical exclusion will be set aside only if a court determines that the decision was
arbitrary and capricious." *Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d
1012, 1023 (10th Cir. 2002).

For the Rule, BLM appropriately applied the Department of the Interior's CX for
"[p]olicies, directives, regulations, and guidelines[] that are of an administrative, financial, legal,
technical, or procedural nature; or whose environmental effects are too broad, speculative, or
conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA

process, either collectively or case-by-case." 43 C.F.R. § 46.210(i). The Rule, consistent with the plain language of the CX, merely provides a procedural framework that guides BLM's administration of public lands and does not standing alone alter the activities undertaken or authorized on public lands. Moreover, any future decisions made under the Rule will be subject to NEPA. Thus, the CX applies.

### 1.    Interior's Categorical Exclusion at 43 C.F.R. § 46.210(i) Applies

As a threshold matter, BLM adequately explained its reliance on the applicable CX. Agencies are "not required to provide an elaborate explanation of the reasons for applying the categorical exclusion." *Safari Club Int'l v. Jewell*, 960 F. Supp. 2d 17, 81 (D.D.C. 2013). The documentation of an agency's "reliance on a categorical exclusion need only be long enough to indicate to a reviewing court that the agency indeed considered whether or not a categorical exclusion applied and concluded that it did." *Id*. at 81-82. "In most instances, a short statement that a categorical exclusion has been invoked will suffice to assure a reviewing court that environmental effects have been considered." *Wilderness Watch & Pub. Employees for Envtl. Responsibility v. Mainella*, 375 F.3d 1085, 1095 (11th Cir. 2004). Contrary to Plaintiffs' assertions, BLM provided more than "one sentence in the Final Rule" to explain its use of the CX. *See* 89 Fed. Reg. at 40,333. BLM thus adequately explained its reliance on the CX.

Further, BLM's reliance on the CX was reasonable. As BLM explained in the Rule, reliance on the CX is appropriate because the Rule is "administrative or procedural in nature" because "it does not itself make substantive changes on the ground and will not (absent future decisions that implement the rule) restrict the BLM's discretion to undertake or authorize future on-the-ground action." at 40,333. In other words, the CX applies because the Rule merely sets up a procedural framework to guide the agency's administrative process for future decisions

regarding federal public lands. It does not by itself effectuate any substantive changes on the ground.

Plaintiffs contend that all "rules that implement a change to an existing framework—for example, by 'revis[ing]' existing regulations—'qualify as "substantive" action' and 'meet the relatively low threshold to trigger some level of environmental analysis under [NEPA].'" Pls. Mem. at 14 (quoting *Cal. ex rel. Lockyer v. U.S.D.A.*, 575 F.3d 999, 1013 (9th Cir. 2009)). This argument is baseless. Plaintiffs have pieced together words from two independent sentences in the *Lockyer* opinion to contrive a standard that does not exist. *Lockyer* does not stand for the proposition that any rule "revising" existing regulations must by nature be substantive. The court in that case found that the agency's rule, which specifically supplanted another substantive rule, could not be "administrative" or "procedural" because the rule at issue had the effect of "taking substantive environmental protections off the books." *Lockyer*, 575 F.3d at 1013. The Rule here does not supplant any prior substantive rule, let alone one with substantive environmental protections, and therefore *Lockyer* is inapposite.[5]

Plaintiffs also argue that the Rule cannot be "administrative" because it "does not relate to internal agency management." Pls. Mem. at 14-15. In support of this argument, they cite to a list of categorical exclusions from other agencies. *See e.g.,* Pls. Mem. at 15 (citing 18 C.F.R.

---

[5] Plaintiffs' reliance on *Solar Energy Industries Association v. FERC*, 80 F.4th 956, 992 (9th Cir. 2023), is similarly misplaced. In that case, in promulgating rules governing certain types of energy production facilities, FERC relied on a categorical exclusion for rules that are "clarifying, corrective, or procedural, or that do not substantially change the effects of . . . regulations being amended." *Id*. at 992 (quoting 18 C.F.R. § 380.4(a)(2)(ii)). The court found that the changes to the rules were "broad, transformative, and substantive," not corrective, and therefore did not fall within the meaning of the categorical exclusion. *Id*. A different CX with different terms is at issue here. Moreover, unlike the rule at issue in *Solar Energy*, the Public Lands Rule does not change the way that industry is regulated. Instead, the Rule adopts only procedures that are applicable to the agency in considering methods to conserve public lands.

§ 380.4(a)(1) (FERC) ("internal administrative and management actions . . . including procurement, contracting, [and] personnel actions")). But how another agency defines its CXs is irrelevant to how Interior defines and interprets its own CXs. If Interior intended the CX to only encompass rules related to internal agency management, it would not have needed to designate separate CXs that specifically cover such matters. *See*, *e.g.*, 43 C.F.R. § 46.210(a) ("personnel actions and investigations and personnel services contracts"); § 46.210(b) ("internal organizational changes and facility and bureau reductions and closings"); § 46.210(c) ("routine financial transactions including such things as salaries and expenses, procurement contracts (e.g., in accordance with applicable procedures and Executive Orders for sustainable or green procurement), guarantees, financial assistance, income transfers, audits, fees, bonds, and royalties"); § 46.210(f) ("routine and continuing government business, including such things as supervision, administration, operations"); § 46.210(g) ("management, formulation, allocation, transfer, and reprogramming of the Department's budget at all levels").

BLM's application of its CX here is consistent with and further supported by Interior's historical use of the CX for other rules that provide procedural frameworks for future agency decision-making, including in response to third-party applications, but do not, by themselves, cause any environmental effects. *See Alaska Native Vietnam-Era Veterans Allotments Rule*, 85 Fed. Reg. 75,874 (Nov. 27, 2020) (enabling certain Alaska Native Vietnam-era veterans to apply for land allotments under Section 1119 of the Dingell Act); *Paleontological Resources Preservation Rule*, 87 Fed. Reg. 47,296 (August 2, 2022) (establishing a new permitting system for collecting paleontological resources from Federal land); *Forest Management Decision Protest Process and Timber Sale Administration Rule*, 85 Fed. Reg. 82,359 (December 18, 2020) (amending BLM's administrative procedures for forest management activities); *Rights-of-Way,*

17

*Leasing, and Operations for Renewable Energy Rule*, 89 Fed. Reg. 35,634 (May 1, 2024) (amending existing right-of-way regulations to adjust acreage rents and capacity fees for solar and wind energy, provide BLM with more flexibility in how it processes applications for solar and wind energy development inside designated leasing areas, and update agency criteria on prioritizing solar and wind applications); *Fluid Mineral Leases and Leasing Process Rule*, 89 Fed. Reg. 30,916 (April 23, 2024) (revising oil and gas leasing regulations to implement provisions of the Inflation Reduction Act pertaining to royalty rates, rentals, and minimum bids, and updating the bonding requirements for leasing, development, and production). Thus, the Rule is "administrative and procedural" within the meaning of the CX.

The second prong of the CX—regulations "whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case"—also applies to the Rule. 43 C.F.R. § 46.210(i). As BLM explained in the Rule:

> Any future actions, including both land use planning and individual project-level decisions, including decisions to issue a restoration or mitigation lease, will be subject to the appropriate level of NEPA review at the time of that decision. Where the BLM will undertake such actions, which of the various tools provided in this rule it will use when doing so, and the particular methods and activities it will employ are unknown at this time, making the environmental effects associated with those future actions too speculative or conjectural to meaningfully evaluate now.

89 Fed. Reg. at 40,333. Promulgation of the Rule itself will not result in any direct environmental effects because the Rule does not, standing alone, alter the activities undertaken or authorized on public lands. Any indirect environmental impacts resulting from the Rule would depend on future BLM land use planning and individual project-level decisions that implement and are otherwise shaped by the Rule. For example, with respect to restoration and mitigation leasing, BLM cannot know who will apply for a restoration or mitigation lease, which lands

18

across the hundreds of millions of acres that BLM manages will be applied for, or whether the authorized officer in his or her discretion will approve any given lease application and on what terms. Similarly, BLM cannot predict where new ACECs may be designated through future land use planning processes across its many state and field offices, or whether or in what location new ACECs may be nominated by the public. *See* 43 C.F.R. § 1610.7-2(a)-(c) (establishing that ACECs are designated through the land use planning process, including by seeking nominations through the public scoping process).

Because BLM cannot predict with particularity what decisions may issue from the Rule—and so cannot predict what environmental effects may flow from them—any indirect environmental effects the Rule may have are "too broad, speculative, or conjectural to lend themselves to meaningful analysis." 43 C.F.R. § 46.210(i); *cf. Ctr. for Biological Diversity v. Ilano*, 928 F.3d 774, 780 (9th Cir. 2019) (finding that the designation of a landscape-level area for potential treatment for damage from insects and disease was not an action that changed the environmental status quo and therefore did not trigger a NEPA analysis). Moreover, when those future decisions are made, they will each be supported by their own separate administrative record, and NEPA and other environmental laws will apply. Finally, and as explained above, *supra*, Section I, Plaintiffs have failed to demonstrate that the Rule itself causes "non-speculative environmental effects" that BLM should have carefully studied. Pls. Mem. at 16.

### 2.    BLM Appropriately Considered Extraordinary Circumstances

BLM's conclusion that no extraordinary circumstances that would preclude reliance on the CX apply is reasonable, not arbitrary and capricious, and supported by analysis in separate documentation from the Rule. *See* CX Documentation, attached as Ex. 1.

First, Plaintiffs argue that extraordinary circumstances exist because the Rule "[e]stablish[es] a precedent for future action or represent[s] a decision in principle about future

19

actions with potentially significant environmental effects." Pls. Mem. at 17 (quoting 43 C.F.R. § 46.215(e)). As BLM explained in its CX Documentation, this factor does not apply because "the rule does not mandate a particular land use planning or individual project-level decision; it is procedural only." CX Documentation at 3. The Rule does not set a "precedent for future action," nor does it establish a "decision in principle," because it does not require BLM to make any particular substantive decision or take any particular action. It does not itself issue any leases or designate any ACECs, but merely provides a procedure and framework for BLM to use in the exercise of its discretion in the future. Plaintiffs seem to conflate the term "framework" with "precedent," *see* Pls. Mem. at 17-18, but the terms have distinct meanings. *Compare precedent,* Google Dictionary ("an earlier event or action that is regarded as an example or guide to be considered in subsequent similar circumstances") *with framework*, Google Dictionary ("a basic structure underlying a system, concept, or text"). While the Rule does create a structure to guide BLM's exercise of its discretion in future decision-making processes, it does not effectuate any "event or action" that can be used as an example or model in "subsequent similar circumstances." And while the preamble to the final rule reflects the policy considerations that led to its development, the Rule itself is simply a procedural framework to consider and implement future proposed decisions related to the conservation of public lands.

Second, Plaintiffs argue that extraordinary circumstances exist because the rule will have "highly controversial environmental effects," pointing to the public controversy surrounding the Rule. Pls. Mem. at 18 (quoting 43 C.F.R. § 46.215(c)). But public controversy is not tantamount to controversial environmental effect. *See Sierra Club v. Bosworth*, 510 F.3d 1016, 1030-31 (9th Cir. 2007) ("A proposal is highly controversial when substantial questions are raised as to whether a project may cause significant degradation of some human environmental factor, or

there is a substantial dispute about the size, nature, or effect of the major Federal action.")
(internal citation and quotation marks omitted); *see also Rocky Mtn. Peace & Justice Ctr. v. U.S. Fish and Wildlife Serv.*, 548 F. Supp. 3d 1042, 1064 (D. Colo. 2021). "Public opposition on its own . . . does not make an issue controversial under NEPA." *Town of Superior v. U.S. Fish & Wildlife Serv.*, 913 F. Supp. 2d 1087, 1124 (D. Colo. 2012); *see also Am. Wild Horse Campaign v. Bernhardt*, 963 F.3d 1001, 1011 (9th Cir. 2020) ("Mere opposition to an action does not, by itself, create a controversy within the meaning of NEPA regulations.").

Here, Plaintiffs have failed to show that the Rule will cause either significant environmental degradation or that there is a "substantial dispute about the size, nature, or effect" of the rule. *Bosworth*, 510 F.3d at 1031. Instead, Plaintiffs argue that the rule is controversial because many public comments were submitted, some of which expressed opposition to the Rule. The relevant inquiry is not whether there were many comments—or even whether many of them opposed the rule—but whether those comments raised significant questions about the nature or magnitude of environmental impacts. *See Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1181 (10th Cir. Nov. 28, 2012) ("When analyzing whether a proposal is controversial, we consider the substance of the comments, not the number for or against the project."). Plaintiffs' "mere disagreement falls short of establishing that the [rule is] highly controversial." *Or. Nat. Des. Ass'n. v. Cain*, 17 F. Supp. 3d 1037, 1058 (D. Or. 2014).

Moreover, as BLM reasonably explained in documenting compliance with the CX, the Rule will not have immediate on-the-ground impacts. CX Documentation at 2. Instead, any environmental impacts will only be felt after BLM makes further decisions implementing the Rule. *See id.* And any future implementing decisions will be subject to NEPA compliance. BLM

reasonably concluded that "[t]he rule will not directly and of its own force result in any environmental effects, let alone highly controversial ones." *Id.*

Third, Plaintiffs argue that extraordinary circumstances exist because the rule will have "a direct relationship to other actions with individually significant but cumulatively significant environmental effects." Pls. Mem. at 19 (citing 43 C.F.R. § 46.215(f)). Plaintiffs have not demonstrated, however, how the Rule will cause cumulative impacts that are significant when added to other related actions. In fact, Plaintiffs do not name a single other related action. Rather, Plaintiffs argue that section 46.215(f) applies to "other actions" beyond "land use planning or individual project-level actions." Pls.' Mem. at 20 (internal quotation marks omitted). But by invoking both land use planning and project-level actions, BLM was acknowledging the full range of actions it might take in implementing the Rule. It is not clear what "other actions" Plaintiffs could mean.

More fundamentally, BLM cannot analyze the cumulative impacts of future land use planning or project-level actions without knowing what those future planning decisions or actions might be, where they might occur, or what resources they would be aimed at conserving. Plaintiffs further argue that the definition of cumulative impacts includes reasonably foreseeable actions, and that it is reasonably foreseeable that BLM will take "many actions" to implement the Rule. Pls.' Mem. at 20 (citing 40 C.F.R. § 1508.1(g)(3). But without knowing what actions may be proposed, it is not possible for BLM to analyze the impacts of such actions. *Cf. N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 977 (9th Cir. 2006) (ruling that BLM was not required to do a "parcel by parcel examination of [the] potential environmental effects" of oil and gas development before specific development projects were proposed). Although Plaintiffs further assert generally that the cumulative impacts prong "plainly applies," Pls.' Mem. at 20, they fail to

explain how BLM could have analyzed hypothetical impacts without knowing what actions will be taken to implement the rule.

### III.   The Balance of the Harms and the Public Interest Weigh Against a Preliminary Injunction

The third and fourth factors of the preliminary injunction test—balancing the equities and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). In considering the balance of the equities between the parties, traditionally a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987)). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (citation omitted). "[W]here an injunction is asked [for] which will adversely affect a public interest . . . the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff." *Id*. at 312-13 (citation omitted).

Enjoining the Rule would not be in the public interest. The Rule seeks to reaffirm the importance of conservation as part of BLM's multiple use mandate under FLPMA. 89 Fed. Reg. at 40,308. Through implementation of the Rule, BLM would take action to protect and improve the health of ecosystems and restore lands that are degraded by fire, resource extraction and other uses of the lands. *See id.* at 40,308-09. Such actions are consistent with the FLPMA's multiple use mandate, which includes "the management of the public lands and their various resources so they are utilized in the combination that will best meet the present and future needs of the American people" and the "use of some land for less than all of the resources." *Id.* at 40,309

23

(quoting 43 U.S.C. § 1702(c)). The Rule thus serves the public interest by ensuring that FLPMA's mandate to protect lands for future generations is followed across BLM's programs. *See Richardson*, 565 F.3d at 710 (noting that "possible uses" under principles of multiple use "includ[e] conservation to protect environmental values"); *see also* Branham Decl. ¶ 8.

In contrast, Plaintiffs fail to show that the public interest and balance of the equities weigh in favor of a preliminary injunction. They repeat their flawed argument that the Rule is likely to cause imminent irreparable injury to the environment. *See* Pls.' Mem. at 24. But the Rule does not result in any imminent change to the management of the public lands. As discussed above, at some point in the future entities may apply for restoration or mitigation leases, at which point BLM will evaluate such applications and go through an appropriate NEPA process before deciding whether or not to grant the lease. 43 C.F.R. § 6102.4(b)-(e); *see also* 89 Fed. Reg. at 40,327 ("A project-level decision to issue a restoration or mitigation lease will comply with NEPA, as is typically the case for Federal actions on public lands, and BLM will prepare a NEPA analysis to support such project-level decisions when appropriate."). At this point, however, no such leases have even been proposed. Branham Decl. ¶ 3. Further, as already discussed, Plaintiffs have failed to show that leases, should they materialize, would actually cause environmental harm when that is what they are designed to prevent.

Likewise, Plaintiffs' argument that potential ACECs or restoration or mitigation leases would impact state revenue is pure speculation. Wyoming theorizes that the future designation of an ACEC or future issuance of a lease could interfere with its management of Wyoming trust lands, which are managed to produce revenue for state programs. *See* Pls.' Mem. at 24. But Wyoming fails to cite any examples of proposed ACECs or leases that would interfere with revenue generating uses on state land. Instead, Wyoming's declarants merely speculate that a

24

future ACEC or lease could somehow interfere with such uses. *See* Kropatsch Decl. ¶¶ 9-23;

Scoggins Decl. ¶¶ 7-11, ECF No. 18-6. Moreover, the Rule makes clear that a restoration or

mitigation lease may not interfere with any previously authorized uses or valid existing rights. 43

C.F.R. § 6102.4(a)(4); *see* 89 Fed. Reg. 40,327 ("Restoration and mitigation leases would not

disturb existing authorizations, valid existing rights, or State or Tribal land use management.").

And for ACECs to be designated, BLM must first complete a land use planning and NEPA

process during which issues regarding impacts on adjacent state land can be fully aired. 43

C.F.R. § 1610.7-2(a). Plaintiffs' speculation that the rule will, nevertheless, cause imminent harm

to the public interest is insufficient to warrant injunctive relief.

## IV.    Any Preliminary Injunctive Relief Should Be Narrowly Tailored

If this Court were to determine that Plaintiffs are entitled to preliminary injunctive relief,

any resulting injunction should be no broader than necessary to remedy any demonstrated

irreparable harm to the Plaintiffs. *Citizen Band Potawatomi Indian Tribe of Okla. v. Okla. Tax

Comm'n*, 969 F.2d 943, 948 (10th Cir. 1992) (recognizing "the well-settled principle that an

injunction must be narrowly tailored to remedy the harms shown"); *see also Keyes v. Sch. Dist.

No. 1, Denver, Colo.*, 895 F.2d 659, 668 (10th Cir. 1990) ("[Rule 65] requires that an injunction

be reasonably specific in identifying what acts are prohibited or required . . . ."). Here, there are

no "harms shown" but only speculation about the impacts of Rule implementation. An injunction

is therefore not warranted. At most, the Court should limit its relief to the Plaintiff states. *See

Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010) (where "a less drastic

remedy" is available, "the additional extraordinary relief of an injunction" is not warranted).

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be

denied.

Respectfully submitted this 1st day of August, 2024,

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division
United States Department of Justice

*/s/ Shannon Boylan*
SHANNON BOYLAN
Trial Attorney
United States Department of Justice
Environment and Natural Resources Division
150 M St NE
Washington, D.C. 20002
Tel: (202) 598-9584 / Fax: (202) 305-0506
shannon.boylan@usdoj.gov

*/s/ Luther L. Hajek*
LUTHER L. HAJEK
Trial Attorney
United States Department of Justice
Environment and Natural Resources Division
999 18th St.
South Terrace – Suite 370
Denver, CO 80202
Tel: 303-844-1376 / Fax: 303-844-1350
luke.hajek@usdoj.gov

*Attorneys for Defendants*