# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

STATE OF UTAH, and
STATE OF WYOMING,

*Plaintiffs*,

v.

DEB HAALAND, in her official capacity as
the Secretary of the U.S. Department of the
Interior; et al.,

*Defendants*.

Case No. 2:24-cv-00438

Judge David A. Barlow

Magistrate Judge Daphne A. Oberg

## MOTION FOR REVIEW OF AGENCY ACTION

# TABLE OF CONTENTS

Table of Authorities ....................................................................................................iii

Introduction..................................................................................................................1

Issues Presented ...........................................................................................................2

Statement .....................................................................................................................2

      A.    NEPA requires agencies to take a hard look at the environmental consequences of their actions. ... ……………………………………………………………………..2

      B.    BLM failed to satisfy its NEPA obligations with respect to the Public Lands Rule. ...5

           1.    When BLM first proposed the Public Lands Rule, it previewed its intent to sidestep NEPA, inspiring objections both in and outside of the formal comment process. ...................................................................................................5

           2.    BLM ignored all those objections and acted without satisfying its obligations under NEPA...........................................................................................................9

Summary of Argument ................................................................................................10

Standard of Review .....................................................................................................12

Argument ....................................................................................................................12

I.    The Plaintiff States have standing.......................................................................12

      A.    The States have suffered injury in fact. ......................................................13

           1.    Utah has suffered an injury in fact. ...................................................13

           2.    Wyoming has suffered an injury in fact. ............................................16

      B.    The States' injuries are fairly traceable to the Final Rule and likely redressable by an order vacating it.............................................................................................17

II.    BLM's reliance on the categorical exclusion in §46.210(i) is arbitrary and capricious............19

      A.    The Rule is not administrative or procedural. ............................................20

      B.    The Rule's effects are not speculative or conjectural. ..................................26

III.    BLM's failure to analyze extraordinary circumstances is arbitrary and capricious..................29

      A.    The Final Rule is a precedent for future action and decision in principle..................30

      B.    The Final Rule is highly controversial. ........................................................31

      C.    The Final Rule will result in cumulatively significant environmental effects. .............33

Conclusion ................................................................................................................................. 35

Certificate of Compliance ........................................................................................................ 36

Certificate of Service ............................................................................................................... 37

## TABLE OF AUTHORITIES

**CASES**

*AFL-CIO v. NLRB,*
  57 F.4th 1023 (D.C. Cir. 2023) ...........................................................................25

*Cal. ex rel. Lockyer v. U.S. Dep't of Agriculture,*
  575 F.3d 999 (9th Cir. 2009) ....................................................................... 24, 25

*California v. Norton,*
  311 F.3d 1162 (9th Cir. 2002) ...........................................................................36

*Citizens for Better Forestry v. Department of Agriculture,*
  481 F. Supp. 2d 1059 (N.D. Cal. 2007) .......................................... 25, 32, 36, 38

*Citizens for Better Forestry v. U.S. Dep't of Agric.,*
  341 F.3d 961 (9th Cir. 2003) .............................................................................21

*Citizens' Cmte. to Save Our Canyons v. U.S. Forest Serv.,*
  297 F.3d 1012 (10th Cir. 2002) .................................................................. 22, 39

*City of Ft. Morgan v. FERC,*
  181 F.3d 1155 (10th Cir. 1999) .........................................................................30

*Cmte. to Save the Rio Hondo v. Lucero,*
  102 F.3d 445 (10th Cir. 1996) .......................................................... 14, 15, 19, 21

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
  140 S. Ct. 1891 (2020) .......................................................................................28

*Dine Citizens Against Ruining Our Env't v. Haaland,*
  59 F.4th 1016 (10th Cir. 2023) ..........................................................................21

*Dine Citizens Against Ruining Our Envt. v. Bernhardt,*
  923 F.3d 831 (10th Cir. 2019) ..................................................................... 14, 18

*Douglas County v. Babbitt,*
  48 F.3d 1495 (9th Cir. 1995) .............................................................................15

*Encino Motorcars, LLC v. Navarro,*
  579 U.S. 211 (2016)............................................................................................29

*FCC v. Prometheus Radio Project,*
  592 U.S. 414 (2021)..................................................................................... 22, 33

*Fund For Animals v. Hall*,
    448 F. Supp. 2d 127 (D.D.C. 2006) ................................................................. 32

*Gerber v. Norton*,
    294 F.3d 173 (D.C. Cir. 2002) ....................................................... 26, 29, 32

*Greenpeace Action v. Franklin*,
    14 F.3d 1324 (9th Cir. 1992) ......................................................................... 35

*Idaho Conservation League v. Mumma*,
    956 F.2d 1508 (9th Cir. 1992) ...................................................................... 21

*Kisor v. Wilkie*,
    588 U.S. 558 (2019) ..................................................................................... 27

*Marin Audubon Soc'y v. Fed. Aviation Admin.*,
    121 F.4th 902 (D.C. Cir. 2024) ....................................................................... 4

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ....................................................................................... 39

*New Mexico ex rel. Richardson v. BLM*,
    565 F.3d 683 (10th Cir. 2009) ..................................................................... 14

*Olenhouse v. Commodity Credit Corp.*,
    42 F.3d 1560 (10th Cir. 1994) ..................................................................... 13

*Pub. Employees for Environmental Responsibility v. NPS*,
    605 F. Supp. 3d 28 (D.D.C. 2022) ......................................................... 27, 28

*Public Employees for Environmental Responsibility v. National Park Service*,
    605 F. Supp. 3d 28 (D.D.C. 2022) ............................................................... 31

*Qwest Commc'ns Int'l, Inc. v. FCC*,
    398 F.3d 1222 (10th Cir.2005) ..................................................................... 14

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) ....................................................................................... 3

*Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n*,
    481 F.2d 1079 (D.C. Cir. 1973) ............................................................. 30, 31

*Sierra Club v. Bosworth*,
    510 F.3d 1016 (9th Cir. 2007) ............................................................... 36, 37

*Sierra Club v. U.S. Dep't of Energy*,
    287 F.3d 1256 (10th Cir. 2002) ............................................................. 16, 19

*Solar Energy Indus. Ass'n v. FERC*,
    80 F.4th 956 (9th Cir. 2023)...................................................................................24

*Sorenson Comm'ns, Inc. v. F.C.C.*,
    567 F.3d 1215 (10th Cir. 2009)...............................................................................14

*Theodore Roosevelt Conservation P'ship v. Salazar*,
    616 F.3d 497 (D.C. Cir. 2010)................................................................................31

## STATUTES

42 U.S.C. §4332 ........................................................................................................3

43 U.S.C §1702 .........................................................................................................6

43 U.S.C. §1701 .........................................................................................................6

5 U.S.C. §553 ...........................................................................................................25

## OTHER AUTHORITIES

*Biden plan to sell land leases for conservation gets pushback*, AP News (May 16, 2023) ....................................9

*Biden-Harris Administration Finalizes Strategy to Guide Balanced Management, Conservation of Public Lands*
    (Apr. 18, 2024) ......................................................................................................10

*BLM National Environmental Policy Act Handbook* (H-1790-1) ........................................... 23, 39

BLM, *CX Documentation for the Conservation and Landscape Health Rule* (June 10, 2024) .........................11

H.R. 3397, 118th Cong. (2023) ...........................................................................................9

*Hearing on H.R. 3397 Before the H. Comm. On Nat. Res.*, 118th Cong. 2 (2023)....................................10

Idaho Farm Bureau Fed'n, Comment Letter on Proposed Rule on Conservation and Landscape
    Health at 1-2 (June 28, 2023) ...........................................................................8, 27

Scott Streater, *BLM proposed seismic shift in lands management*, E&E News (Mar. 30, 2023) .....................6

Utah Dep't of Nat. Res. Pub. Lands Policy Coordinating Office ("PLPCO"), Comment Letter on
    Proposed Rule on Conservation and Landscape Health at 5 (June 30, 2023) ................................7, 8

## REGULATIONS

7 C.F.R. §1b.3 ..........................................................................................................23

14 C.F.R. §1216.304 ..................................................................................................23

18 C.F.R. §380.4 ................................................................................................ 23, 24

40 C.F.R. §1501.4 ......................................................................................................4

40 C.F.R. §1502.3 .................................................................................................................3

40 C.F.R. §1508.1 .................................................................................................3, 4, 37, 38

40 C.F.R. §6.204 .................................................................................................................23

43 C.F.R. §1610.7-2 ............................................................................................................25

43 C.F.R. §46.205 ....................................................................................................4, 8, 33

43 C.F.R. §46.210 ......................................................................................................passim

43 C.F.R. §46.215 ......................................................................................................passim

43 C.F.R. §6102.4 ..............................................................................................................25

# INTRODUCTION

The Bureau of Land Management's ("BLM") new "Public Lands Rule" (also referred to herein as "the Final Rule" or "Rule") represents a seismic shift in the agency's management of 245 million acres of federal public land. The Public Lands Rule as finally published overhauls BLM's substantive priorities under the Federal Land Policy and Management Act ("FLPMA"). It both revises existing regulations and creates new land-management tools. BLM intended those changes to significantly impact the environment; it explained that it fashioned the Final Rule in response to an alleged increased degradation of the public lands and intended the Final Rule to make those lands more resilient. And, given the sweeping nature of the changes, the Final Rule will undoubtedly have significant environmental consequences.

The National Environmental Policy Act ("NEPA") requires rules of such significance to be subject to careful environmental study. NEPA requires an agency to follow specific procedures to ensure that the agency has taken a hard look at possible environmental impacts before it proceeds with a major action. There's no dispute—BLM failed to satisfy those procedural obligations for the Final Rule. BLM thus has violated NEPA.

BLM tries to justify its NEPA violation by invoking a so-called "categorical exclusion." When BLM determines that its actions are administrative or procedural in nature, or the actions' environmental effects are too speculative or conjectural, by regulation they are "categorically excluded" from NEPA review. But BLM's invocation of the categorical exclusion was neither reasonable nor reasonably explained. The Final Rule, which establishes a comprehensive framework for a new class of lease, is not merely procedural or administrative. And BLM could have analyzed the Final Rule's environmental effects—many of which are already occurring and identified in comments.

Even if BLM had appropriately invoked the categorical exclusion, BLM also had to analyze whether any extraordinary circumstances required preparing further environmental reviews. But BLM

1

failed to analyze or explain that issue in the Final Rule. And this Court cannot consider BLM's post hoc attempt to do so over a month after the Final Rule's publication. In any event, BLM's belated analysis is insufficient on its own terms because it is devoid of reasoning.

This Court should vacate the Final Rule and remand to BLM for the careful environmental study and hard look that NEPA requires.

## ISSUES PRESENTED

1. Whether BLM acted arbitrarily and capriciously by invoking the categorical exclusion for "[p]olicies, directives, regulations, and guidelines: that are of an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case." 43 C.F.R. §46.210(i).

2. Whether BLM acted arbitrarily and capriciously by failing to consider whether extraordinary circumstances exist mandating further NEPA review.

## STATEMENT

BLM failed to satisfy its procedural obligations under NEPA when it issued the Final Rule. Plaintiff States bring this action to hold BLM to those obligations and ensure that BLM carefully considers environmental consequences before overhauling its framework for managing all 245 million acres of Americans' public land.

### A. NEPA requires agencies to take a hard look at the environmental consequences of their actions.

NEPA requires agencies contemplating any major action to carefully consider possible environmental consequences before moving forward. NEPA does not require substantive results but instead is a procedural statute that imposes "a set of 'action-forcing' procedures that require that agencies take a 'hard look' at environmental consequences" before they act. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). NEPA "also guarantees that the relevant information will

2

be made available to the larger audience that may also play a role in both the decision making process and the implementation of that decision." *Id.* "Simply by focusing the agency's attention on the environmental consequences of a proposed project, NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Id.*

NEPA establishes three levels of review for agencies to assess proposed actions.

First, the highest level of review applies when an agency proposes a major action that will significantly affect the quality of the human environment. In those circumstances, the agency must prepare a "detailed written statement" assessing the foreseeable environmental effects of the proposed action. 40 C.F.R. §1508.1(l); *see also* 42 U.S.C. §4332(C); 40 C.F.R. §1502.3. An agency's end-product at the highest level is called an Environmental Impact Study ("EIS").

Second, if the agency is uncertain whether its actions will have significant environmental effects, it can conduct a less-comprehensive review and prepare an Environmental Assessment ("EA"). An EA is a "concise public document" prepared by a federal agency to aid an agency's compliance with NEPA and support its "determination of whether to prepare an environmental impact statement … or a finding of no significant impact [FONSI]." 40 C.F.R. §1508.1(j). A FONSI, in turn, is "a document by a federal agency briefly presenting the agency's reasons … why an action … will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared." 40 C.F.R. §1508.1(q).

Third, in limited circumstances, the agency can avoid preparing either an EIS or an EA by determining that its proposed action fits within a "categorical exclusion." Categorical exclusions are "a category of actions that an agency has determined … normally do not have a significant effect on the human environment." 40 C.F.R. §1508.1(e). Each agency can identify "categories of actions that normally do not have a significant effect on the human environment, … and therefore do not require

preparation of an environmental assessment or environmental impact statement." 40 C.F.R. §1501.4(a). But even when an agency determines that an action fits within a categorical exclusion, the agency is required to "evaluate the action for extraordinary circumstances in which a normally excluded action may have a significant effect." 40 C.F.R. §1501.4(b).[1]

BLM's relevant categorical exclusion covers "[p]olicies, directives, regulations, and guidelines: that are of an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case." 43 C.F.R. §46.210(i). Such actions "are categorically excluded … *unless* any of the extraordinary circumstances in section 46.215 apply." 43 C.F.R. §46.210 (emphasis added). In other words, the categorical exclusion has an exception: "Any action that is normally categorically excluded *must be evaluated* to determine whether it meets any of the extraordinary circumstances in section 46.215; if it does, further analysis and environmental documents *must be prepared* for the action." 43 C.F.R. §46.205(c)(1) (emphases added).

BLM's regulations list twelve possible extraordinary circumstances under which an action that would otherwise be categorically excluded requires additional environmental analysis. 43 C.F.R. §46.215. Extraordinary circumstances exist when an action:

> (1) has "significant impacts on public health or safety;"
> (2) has "significant impacts on … natural resources and unique geographic characteristics,"
> (3) has "highly controversial environmental effects or involve[s] unresolved conflicts concerning alternative uses of available resources,"
> (4) has "highly uncertain and potentially significant environmental effects or involve[s] unique or unknown environmental risks,"
> (5) "establish[es] a precedent for future action or represent[s] a decision in principle about future actions with potentially significant environmental effects,"

---

[1] The D.C. Circuit recently held that the Council of Environmental Quality's enactment of a regulation providing for a categorical exclusion was ultra vires because CEQ is not granted rulemaking authority by statute. *Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902 (D.C. Cir. 2024). For purposes of this review, Plaintiff States do not contest the Department of the Interior's authority to grant categorical exclusions.

(6) has "a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects,"

(7) has "significant impacts on properties listed, or eligible for listing, on the National Register of Historic Places as determined by the bureau,"

(8) has "significant impacts on species listed, or proposed to be listed, on the List of Endangered or Threatened Species or have significant impacts on designated Critical Habitat for these species,"

(9) "[v]iolate[s] a federal law, or a State, local, or tribal law requirement imposed for the protection of the environment,"

(10) has "a disproportionately high and adverse effect on low income or minority populations,"

(11) "[l]imit[s] access to and ceremonial use of Indian sacred sites on Federal lands by Indian religious practitioners or significantly adversely affect[s] the physical integrity of such sacred sites," or

(12) "[c]ontribute[s] to the introduction, continued existence, or spread of noxious weeds or non-native invasive species known to occur in the area or action that may promote the introduction, growth, or expansion of the range of such species."

*Id.*

## B. BLM failed to satisfy its NEPA obligations with respect to the Public Lands Rule.

### 1. When BLM first proposed the Public Lands Rule, it previewed its intent to sidestep NEPA, inspiring objections both in and outside of the formal comment process.

In April 2023, BLM proposed a sweeping new rule on "Conservation and Landscape Health," seeking, among other things, to clarify FLPMA's multiple-use framework. 88 Fed. Reg. 19583 ("Proposed Rule"). In FLPMA, Congress declared that the public lands should be managed "on the basis of multiple use and sustained yield" and defined those terms. 43 U.S.C. §1701(a)(7); *see also id.* §§1702(c); 1702(h). With its Proposed Rule, BLM outlined its intent to "clarify that conservation is a 'use' within FLPMA's multiple-use framework," "revise existing regulations to better meet FLPMA's requirement that the BLM prioritize designating and protecting Areas of Critical Environmental Concern (ACECs)," and "provide an overarching framework for multiple BLM programs to promote ecosystem resilience on public lands." 88 Fed. Reg. at 19583-84. In numerous places, BLM went out of its way to emphasize that the Proposed Rule provides a "framework" to guide the agency's future actions in managing the public lands. *See, e.g.*, 88 Fed. Reg. 19584 ("The proposed rule provides a

framework to protect intact landscapes, restore degraded habitat, and ensure wise decisionmaking[.]"); *id.* ("The proposed regulatory changes would … establish a more comprehensive framework for the BLM to identify, evaluate, and consider special management attention for ACECs in land use planning."); *id.* at 19588 (explaining that the rule "aims to … establish[] a regulatory framework for those seeking to use the public lands"); *id.* at 19591 ("[T]he proposed rule would provide a framework for the BLM to issue conservation leases on public lands for the purpose of pursuing ecosystem resilience through mitigation and restoration."); *id.* at 19592 ("Proposed § 6102.5 would set forth a framework for the BLM to make wise management decisions based on science and data[.]"). These proposed changes represented a "seismic shift in lands management." Scott Streater, *BLM proposed seismic shift in lands management*, E&E News (Mar. 30, 2023), https://perma.cc/8GWG-CH2D.

As to NEPA compliance, BLM noted its intent to avoid preparing an EIS or an EA. Instead, the agency outlined its plans to invoke a categorical exclusion—which it abbreviated "CX"—and "document the applicability of the CX concurrently with development of the final rule." 88 Fed. Reg. at 19596. The CX the agency cited covers "[p]olicies, directives, regulations, and guidelines: that are of an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case." 43 C.F.R. §46.210(i).

BLM received 216,403 formal public comments on the Proposed Rule. *See* 89 Fed. Reg. 40308, 40316 (May 9, 2024). Numerous commenters raised concerns about the agency's intent to rely on the CX and argued that the Proposed Rule would have significant environmental consequences. Those commenters included agencies and interest groups in the Plaintiff States, local-government entities in other States, grassroots organizations, industry groups, and more. Although those commenters' perspective on the merits of the Proposed Rule varied, *all* of them highlighted concerns about BLM moving forward without conducting the environmental study that NEPA requires.

For one, numerous commenters argued that BLM's reliance on the CX was "misplaced" because "[t]he sea-change created by the Proposed Rule certainly cannot be described as 'administrative, financial, legal, technical or procedural.'" Utah Dep't of Nat. Res. Pub. Lands Policy Coordinating Office ("PLPCO"), Comment Letter on Proposed Rule on Conservation and Landscape Health at 5 (June 30, 2023), https://perma.cc/F5VQ-S5C4; *see also, e.g.*, Idaho Farm Bureau Fed'n, Comment Letter on Proposed Rule on Conservation and Landscape Health at 1-2 (June 28, 2023), https://perma.cc/S93S-HE7F ("Clearly, the proposed rule, by its own admission, is attempting to transform the landscape in a significant way … [if] BLM's allegation is allowed to stand that the proposed rule meets the criteria of a CX under 43 CFR §46.210(i), then there is no proposed action, no matter how sweeping, that would not fit within these criteria."); *see generally* Compl. ¶¶32-48 (detailing numerous other comment letters).

For another, many commenters argued that even if BLM had properly invoked the CX, extraordinary circumstances applied, thereby requiring the agency to conduct further environmental study. DOI's NEPA regulations provide that "[a]ny action that is normally categorically excluded must be evaluated to determine whether it meets *any* of the extraordinary circumstances in section 46.215; if it does, further analysis and environmental documents must be prepared for the action." 43 C.F.R. §46.205(c)(1) (emphasis supplied). Section 46.215, in turn, lists twelve extraordinary circumstances that warrant further environmental review. *See supra* at 4-5. Commenters, and especially Plaintiff States, argued that all twelve extraordinary circumstances applied to the Proposed Rule. *See, e.g.*, PLPCO Comment Letter, *supra*, at 6 (arguing that "all" of the extraordinary circumstances in 43 C.F.R. §46.215 "have potential applicability to the Proposed Rule"); *see also, e.g.*, Compl. ¶¶35, 40, 42, 44, 46, 47, 48. In particular, commenters highlighted that extraordinary circumstances applied because the Proposed Rule would "[e]stablish a precedent for future action," would have "highly controversial

environmental effects," and would relate "to other actions with individually insignificant but cumulatively significant environmental effects." 43 C.F.R. §46.215 (c), (e), (f).

Outside the formal comment process, state and federal elected officials prominently and repeatedly objected to BLM's intended course of action. They specifically highlighted the need for BLM to comply with NEPA. Indeed, both houses of the U.S. Congress held hearings on the Proposed Rule and introduced legislation to require BLM to withdraw the Proposed Rule altogether.

In the Senate, Wyoming Senator John Barasso "berated" Interior Secretary Haaland at a hearing over the Proposed Rule. Matthew Brown, *Biden plan to sell land leases for conservation gets pushback*, AP News (May 16, 2023), https://perma.cc/54JW-RMBJ. The next day, Senator Barasso sponsored a Senate bill to block BLM from implementing the Proposed Rule. Twelve Senators from eight Western States (Alaska, Idaho, North Dakota, Utah, Nebraska, Oklahoma, South Dakota, and Wyoming) co-sponsored the legislation. *See* S. 1435, 118th Cong. (2023).

In the House, Representative John Curtis of Utah introduced legislation that likewise sought to require BLM to withdraw the Proposed Rule. *See* H.R. 3397, 118th Cong. (2023). The House Committee on Natural Resources held a hearing on the bill featuring testimony from Representative Curtis, South Dakota Governor Kristi Noem, Wyoming Governor Mark Gordon, and others. Governor Noem testified that BLM's proposal "should trigger an environmental impact statement," and she criticized the agency for "fail[ing] to follow long-established NEPA requirements" and "open[ing] the door for a mechanism to circumvent the NEPA process." *Hearing on H.R. 3397 Before the H. Comm. On Nat. Res.*, 118th Cong. 7 (2023) (statement of Kristi Noem, Gov. of South Dakota). Governor Gordon raised similar concerns. *See Hearing on H.R. 3397 Before the H. Comm. On Nat. Res.*, 118th Cong. 2 (2023) (statement of Mark Gordon, Gov. of Wyoming).

**2.  BLM ignored all those objections and acted without satisfying its obligations under NEPA.**

More than a year after its initial proposal, BLM issued the Final Rule, which the Biden Administration titled the "Public Lands Rule." *See* Conservation and Landscape Health, 89 Fed. Reg. 40308 (May 9, 2024); *see also* Dep't of Interior, *Biden-Harris Administration Finalizes Strategy to Guide Balanced Management, Conservation of Public Lands* (Apr. 18, 2024), https://perma.cc/Z5WK-4H8J.

Despite all the comments and controversy surrounding the Proposed Rule and BLM's intent to sidestep NEPA, BLM refused to conduct any level of environmental study. Instead, as it signaled, BLM invoked the categorical exclusion in 43 C.F.R. §46.210(i), which applies to agency actions "of an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case."

BLM did not meaningfully respond to the many comments arguing that the CX did not apply. BLM merely asserted that the "categorical exclusion applies because the rule sets out a framework but is not self-executing in that it does not itself make substantive changes on the ground and will not (absent future decisions that implement the rule) restrict the BLM's discretion to undertake or authorize future on-the-ground action; thus, the rule is administrative or procedural in nature." 89 Fed. Reg. at 40333. And with respect to those future decisions, BLM concluded that their environmental effects were "too speculative or conjectural to meaningfully evaluate." *Id.*

And BLM did not respond at all in the Final Rule to the many comments arguing that extraordinary circumstances required further review under NEPA even if the CX applied. The agency simply concluded—without any analysis—"that *none* of the extraordinary circumstances identified at 43 C.F.R. §46.215 applies to this rulemaking." *Id.* (emphasis added). Although §46.215 lists twelve different extraordinary circumstances, BLM did not cite which (if any) of those twelve specific,

potentially applicable circumstances it considered, let alone explain its reasons for rejecting the (undisclosed) circumstances' applicability. *See id.*

One month later—on June 10, 2024, the Final Rule's effective date—the agency published an additional document to supplement its analysis of the CX and extraordinary circumstances. *See* BLM, *CX Documentation for the Conservation and Landscape Health Rule* (June 10, 2024), https://perma.cc/LK8G-NELQ (hereinafter "CX Documentation"). In this document, and for the first time, BLM laid out and briefly analyzed all twelve extraordinary circumstances in §46.215. But this additional document still failed to provide a reasonable explanation for the agency's extraordinary circumstances conclusion.

## SUMMARY OF ARGUMENT

**I.** The Plaintiff States have standing to challenge the Public Lands Rule. **A.** The Plaintiff States have suffered several injuries in fact due to the Public Lands Rule. **1.** Utah has shown that the Public Lands Rule itself creates environmental harm by authorizing activities like passive management that can lead to degraded landscapes, proliferation of noxious weeds, and greater wildfire risk on State lands. It has also shown that the Public Lands Rule is imposing and will imminently impose significant compliance costs and burdens upon the State. **2.** Additionally, Wyoming has shown injury in fact to its ability to manage its sage grouse populations and habitat. It also has shown injury because the Rule authorizes BLM to lease lands to individuals and entities that have no duty to coordinate with the State.

**B.** The States' harms are caused by the Public Lands Rule and redressable by an order vacating it. BLM's failure to analyze the Rule's effects is sufficient by itself to establish causation between the Rule's promulgation and the States' injuries under NEPA. And the States have thoroughly demonstrated that their environmental harms are a result of the Rule itself and not dependent on any future lease proceeding. Beyond that, Utah is currently expending resources to mitigate the Rule's

environmental harm. Redressability follows naturally because a vacatur order would require BLM to perform the appropriate environmental review procedures before authorizing the restoration and mitigation leases that the Final Rule allows.

**II.** BLM's reliance on the CX is arbitrary and capricious. **A.** The Final Rule does not qualify for the administrative or procedural CX. The Rule is not "administrative" because it does not pertain to internal agency management. It is not "procedural" because it works substantive changes to an existing framework. Even if these terms were ambiguous, BLM's invocation of the CX is substantively unreasonable because it expressly alters agency criteria for the provision of leases to the public. To hold otherwise would be to allow BLM to circumvent NEPA's careful requirements. BLM also failed to reasonably explain its invocation of the CX because it offered only cursory conclusory justifications.

**B.** The Final Rule does not qualify for the "speculative or conjectural" CX. The Rule's effects are not dependent upon a lease ever being issued—it is the Rule's authorization of restoration and mitigation leases itself that causes harm. And, in any event, the Rule's effects are reasonably foreseeable, and BLM cannot shirk its NEPA obligations by failing to even attempt to predict the environmental effects of this new class of lease.

**III.** BLM acted arbitrarily and capriciously by failing to analyze extraordinary circumstances, which required further NEPA review. Even if BLM properly invoked the CX, it was still required to provide a reasonable explanation of whether extraordinary circumstances mandated further environmental review. But in the Final Rule, BLM included one conclusory sentence simply declaring that no extraordinary circumstances apply. BLM's later-issued CX Documentation cannot be considered because it is a prohibited post-hoc agency justification. And even if the post-hoc CX Documentation can be considered, it fails to justify bypassing NEPA review. **A.** The Rule establishes a precedent and represents a decision in principle about environmentally significant future actions. The Rule itself states in several places that its purpose is to guide future BLM decisionmaking and the

Rule clearly sets out a framework for future action. **B.** The Final Rule has highly controversial environmental effects as demonstrated by the extensive controversy it has engendered in public comments and from legislators and state governments. **C.** The Final Rule has a direct relationship with other actions that will result in cumulatively significant environmental effects. The cumulative effects of the reasonably foreseeable leases that BLM will issue under the Rule are environmentally significant. Accordingly, three separate extraordinary circumstances apply and required greater consideration than the agency's cursory treatment.

**STANDARD OF REVIEW**

"[T]he essential function of judicial review" of agency action "is a determination of (1) whether the agency acted within the scope of its authority, (2) whether the agency complied with prescribed procedures, and (3) whether the action is otherwise arbitrary, capricious or an abuse of discretion." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994). "Review under the arbitrary and capricious standard is narrow in scope, but is still a 'probing, in-depth review.'" *Sorenson Commc'ns, Inc. v. F.C.C.*, 567 F.3d 1215, 1221 (10th Cir. 2009) (quoting *Qwest Commc'ns Int'l, Inc. v. FCC*, 398 F.3d 1222, 1229 (10th Cir.2005)).

**ARGUMENT**

**I.  The Plaintiff States have standing.**

"Under NEPA, 'an injury of alleged increased environmental risks due to an agency's uninformed decisionmaking may be the foundation for injury in fact under Article III.'" *Dine Citizens Against Ruining Our Envt. v. Bernhardt*, 923 F.3d 831, 840 (10th Cir. 2019) (quoting *Cmte. to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 559 (10th Cir. 1996)). Here, the States have "standing because of the threat of environmental damage to lands within [their] boundaries … as well as a financial burden through the costs of lost resources." *New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 696 n.13 (10th Cir. 2009). The States' injuries are fairly traceable to the Public Lands Rule and redressable by a court

order vacating the Public Lands Rule and remanding to the agency for compliance with NEPA. And while the States have standing under the traditional analysis, they also "have special solicitude to raise injuries to their quasi-sovereign interest in lands within their borders." *Id.*

## A. The States have suffered injury in fact.

Plaintiff States have suffered injuries in fact because BLM failed to adhere to its NEPA obligations. The injury-in-fact analysis here "breaks down into two parts." *Dine Citizens*, 923 F.3d at 840 (quoting *Lucero*, 102 F.3d at 449). The States "must show that (1) in making its decision without following NEPA's procedures, the agency created an increased risk of actual, threatened, or imminent environmental harm, and (2) the increased risk of environmental harm injures [the States'] concrete interests." *Id.* (cleaned up). The States clear both hurdles.

### 1. Utah has suffered an injury in fact.

***Environmental Harm***. Utah has shown that "'in making its decision without following [NEPA's] procedures, the agency created an increased risk of actual, threatened, or imminent environmental harm.'" *Id.* For one, the Utah Department of Agriculture and Food (UDAF) Commissioner has explained that the Final Rule authorizes BLM to issue restoration and mitigation leases for activities, such as passive management, that can lead to degraded landscapes, proliferation of noxious weeds, and a heightened risk of catastrophic wildfires on State lands. *See* Dkt. 18-1, ¶18; *see also* 89 Fed. Reg. at 40341 (defining "restoration" to include "passively … assisting the recovery of an ecosystem"). That is, Utah has legitimate interests in protecting its lands "adjacent to" federal lands, and those interests "could be threatened by how the adjoining federal lands are managed." *Douglas County v. Babbitt*, 48 F.3d 1495, 1501 (9th Cir. 1995); *see also Lucero*, 102 F.3d at 449 (citing this portion of *Douglas County* approvingly).

For another, the Rule empowers BLM to issue these leases without requiring that leaseholders coordinate with State agencies in managing those risks. *See* Dkt. 18-2, ¶10. A lack of coordination

impairs Utah's ability to manage its water supply, wildfire risk, and invasive plant and animal species, thereby creating risks of environmental harm that would not exist but for the Final Rule. *See id.*

What's more, the Final Rule creates uncertainty about which lands will soon be leased or designated as ACECs. *See* Dkt. 18-1, ¶¶17, 21. That uncertainty *alone* will impede Utah's implementation of rangeland improvement projects, such as those managed by Utah's Grazing Improvement Program ("GIP"). *See id.* ¶¶4, 19. Those GIP projects lead to significant positive environmental outcomes, including benefits to water quality, native wildlife species, and native flora species. *Id.* ¶¶7-9. By postponing or eliminating GIP's anticipated environmental improvements, the uncertainty created by the Final Rule causes imminent environmental harm. *Id.* ¶19.

"To establish an increased risk of environmental injury," Utah does not need to prove that a *particular* lease "will surely harm the environment, and that [it] will go forth because of" the Final Rule. *Sierra Club v. U.S. Dep't of Energy*, 287 F.3d 1256, 1265 (10th Cir. 2002). Utah "need only show that, in making its decision without following the NEPA … procedures, the agency created an increased risk of actual, threatened, or imminent environmental harm." *Id.* Here, Utah has shown both that the Final Rule itself creates an increased risk of environmental harm *and* that BLM's implementation of the Final Rule is "a necessary step" towards issuing the leases, "which ha[ve] the potential of harming the environment. This is sufficient to establish an increased risk of environmental harm." *Id.*

***Costs and Compliance Burdens***. The Final Rule also increases costs and workload for multiple State agencies in Utah. Utah's Division of Wildlife Resources (DWR), along with the State's Conservation Districts, which are overseen by UDAF, are both authorized under the Final Rule to hold restoration and mitigation leases and must expend resources to participate in, or at minimum evaluate, the leasing program. Even before BLM starts issuing leases, those agencies will suffer multiple concrete harms resulting from the Final Rule's creation of the leasing tool.

*First*, DWR must retain additional personnel to handle Utah's leasing efforts and prepare the "detailed restoration or mitigation development plans" that the Final Rule requires applicants to submit. 89 Fed. Reg. at 40322. To that end, DWR must retain a Habitat Biologist to review leases, provide BLM with lease recommendations for leases issued to non-State entities, and implement restoration efforts under any leases granted to the State. *See* Dkt. 18-2, ¶12. DWR must also retain a Lands and Realty Biologist, a Range Trend Biologist, a Grant Writer, and administrative and legal personnel. Hiring all those individuals will cost DWR an estimated $475,000 yearly. *See id.* ¶¶12-17. In addition, evaluating leases will increase the workload for existing personnel at UDAF, necessitating the use of additional resources within that agency. *See* Dkt. 18-1, ¶21.

*Second*, Utah must increase DWR's budget to fund the leases themselves and efforts related to the leasing program. DWR has identified significant one-time costs it must cover related to the new leasing program, including $450,000 to develop a database for environmental data. *See* Dkt. 18-2 ¶22. Under the Final Rule, BLM can require States to provide this data. 89 Fed. Reg. at 40322 (as part of the application process, BLM "can require additional information such as environmental data and proof that the applicant has the technical and financial capability to perform the restoration and mitigation activities"). The agency has also identified significant recurring costs, including $2,000,000 annually to fund lease payments. *See* Dkt. 18-2, ¶¶18-20. In all, DWR has projected one-time and recurring costs totaling $5,035,000. *Id.* ¶24.

To be sure, the Final Rule does not indicate where restoration and mitigation leases may be issued. *See* 89 Fed. Reg. at 40321 ("The final rule does not identify or limit public lands that could be leased for restoration or mitigation purposes."). But Utah is home to 22.8 million acres of public land, and BLM is highly likely to issue leases covering at least some of that ground. And even if BLM *never issues* a single lease in Utah, the State will nonetheless have suffered those concrete harms because the harms arise from the Final Rule itself and the creation of the leasing tool—not the ultimate approval

of leases. Indeed, the uncertainty surrounding which lands will be leased—and to whom the leases will issue—only *increases* the burden on Utah by requiring it to prepare for numerous contingencies. As UDAF's Commissioner explains, Utah must be proactive in addressing any change to how lands within its borders might be managed; anything less than proactive management can lead to "catastrophic" environmental harms. Dkt. 18-1 ¶22.

### 2. Wyoming has suffered an injury in fact.

Wyoming has also shown that "in making its decision without following NEPA's procedures, the agency created an increased risk of actual, threatened, or imminent environmental harm." *Dine Citizens*, 923 F.3d at 840. Wyoming is home to the world's largest population of Greater Sage-grouse, and the Final Rule increases the risk of harm to the sage grouse by undermining Wyoming's ability to manage populations and habitat. Wyoming has a Sage Grouse Implementation Team ("SGIT") charged with implementing the State of Wyoming Executive Department Executive Order 2019-3, Greater Sage Grouse Core Area Protection ("Sage Grouse Executive Order"). *See* Dkt. 18-3, ¶¶12-14. Wyoming maintains about 15 million acres of sage grouse habitat and works collaboratively with federal land-management agencies, including BLM, to ensure a uniform and consistent application of the Sage Grouse Executive Order. *See id.* ¶15.

The Final Rule increases the risk of environmental harm in Wyoming by allowing BLM to cede control of leased lands to individuals and entities that have no duty to coordinate with Wyoming to implement the Sage Grouse Executive Order. *See id.* ¶18. That lack of coordination alone creates an increased risk of harm to the sage grouse species in Wyoming. And even if BLM never grants any leases, the Final Rule itself injures Wyoming by changing BLM's overarching framework for managing the public lands and thereby impeding Wyoming's efforts to protect sage grouse.

What's more, "'the increased risk of environmental harm injures [Wyoming's] concrete interests.'" *Dine Citizens*, 923 F.3d at 840. Wyoming owns wildlife within its borders and has a duty to

protect, preserve, and nurture wild game. *See O'Brien v. State*, 711 P.2d 1144, 1148-49. The increased risk to sage grouse is itself a harm to Wyoming's concrete interests. Moreover, Wyoming's unique and substantial efforts to manage and enhance sage grouse populations and habitat demonstrate Wyoming's "concrete and particularized interests" in sage-grouse protection and show that Wyoming will "suffer the environmental consequences" of the Final Rule. *Lucero*, 102 F.3d at 449.

Similar to Utah, the Final Rule also injures Wyoming's concrete interests where the State must divert agency resources that would otherwise be spent conserving and managing wildlife. *See* Dkt. 18-5, ¶11. Additionally, Wyoming has also explained that the Final Rule increases risks of wildfires and the spreading of invasive plant species where the BLM can cede control of leased lands to parties with no obligation to coordinate with the State. *See* Dkt. 18-3, ¶¶17-18. Thus, Wyoming faces an increased risk of harm to its land and wildlife based on how the adjacent federal lands are managed under the Final Rule.

### B. The States' injuries are fairly traceable to the Final Rule and likely redressable by an order vacating it.

The second prong in the standing inquiry is easily established here because the States' injuries are "fairly traceable to the failure of [BLM] to conduct a NEPA … analysis." *Sierra Club,* 287 F.3d at 1265. "An injury under the NEPA results not from the agency's decision, but rather from the agency's uninformed decision making." *Id.* (cleaned up). Thus, BLM's failure to analyze the environmental effects of the Public Lands Rule is—standing alone—sufficient to establish causation between the Rule and the States' injuries.

Utah's harm from the Rule's authorization of passive management is directly caused by the Rule. This harm is not contingent on any later discrete lease proceedings. By failing to analyze the environmental effects of the Rule's authorization of passive management, the Rule directly harms Utah's environment. Dkt. 18-1, ¶18. Similarly, the Rule is already harming the environment by

endangering Utah's rangeland improvement projects through the uncertainty that the Rule itself is creating—harm that arises irrespective of actions taken to implement the Rule. *Id.* ¶¶18-19.

The Rule itself is also directly causing harm to Wyoming by inhibiting the State's sage grouse management. For one, the Rule grants BLM novel authority to confer control upon non-governmental entities to implement restoration and mitigation leases, despite not analyzing the effect of doing so on Wyoming's sage grouse management efforts. Dkt. 18-3, ¶18. The Rule also carves out no role for Wyoming's SGIT in the issuance of restoration and mitigation leases. *Id.* ¶¶19-20. Additionally, the Rule grants the right to meaningful consultation to tribes, but denies such a right to SGIT, harming Wyoming's ability to ensure its environmental harms are considered. *Id.* ¶22. Finally, the Rule deprives SGIT of the right to hold a restoration or mitigation lease, which seriously endangers SGIT's ability to manage the sage grouse population. *Id.* ¶23. These harms cannot be addressed in a later lease-issuance proceeding—they are directly caused by this Rule.

The Rule is also causing the States to expend resources to mitigate environmental harms and other negative consequences. Absent this Rule, Utah would not have to undertake a massive effort to "collaborate with its conservation districts and the Division of Wildlife Resources ('DWR') to apply for every restoration and mitigation lease that becomes available under the Public Lands Rule." Dkt. 18-1, ¶17. These harms are not speculative—this effort is already underway and costing considerable resources. *Id.* (detailing increased staff workload and resource usage currently occurring); *see also* Dkt. 18-2, ¶¶11-25 (providing detailed cost estimates down to the level of job descriptions and salary hours needed). Again, these are costs that the Rule itself is currently causing—regardless of how Defendants implement it in the future. The Rule also prevents Wyoming from managing its sage grouse populations and prevents its agency charged with doing so—SGIT—from even applying for a lease: a harm caused by the Rule itself, not future implementation. Dkt. 18-3 ¶¶22-23.

These direct environmental harms are far more than sufficient under NEPA. The Public Lands

Rule is not merely an "exercise[] in paper-pushing." *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341

F.3d 961, 975 (9th Cir. 2003). It establishes a new class of lease that carries significant environmental

consequences. So long as it "plays some, if not a critical, part in subsequent [lower-level] decisions,"

standing is established. *Id.* (quoting *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1516 (9th Cir.

1992)).

The States' injuries are redressable by a favorable decision requiring BLM to comply with

NEPA. "Under the National Environmental Policy Act, the normal standards for redressability are

relaxed; a plaintiff need not establish that the ultimate agency decision would change upon National

Environmental Policy Act compliance. Rather, the [State] must establish, as it has, that its injury would

be redressed by a favorable decision requiring [BLM] to comply with National Environmental Policy

Act's procedures." *Lucero*, 102 F.3d at 452 (cleaned up). "That [BLM] may not change its decision …

after preparing an environmental impact statement is immaterial." *Id.* Here, compliance with NEPA

"would avert the possibility that [BLM] may have overlooked [the] significant environmental

consequences of its action" that Plaintiff States have highlighted. *Id.* By requiring BLM to follow the

procedures required by law, the Court's vacatur order would redress Plaintiff States' NEPA injuries.

## II. BLM's reliance on the categorical exclusion in §46.210(i) is arbitrary and capricious.

"NEPA does not create a cause of action, so NEPA challenges are brought under the APA."

*Dine Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1029 (10th Cir. 2023). The APA

requires courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2). An agency's decision to

invoke a categorical exclusion is reviewed under the arbitrary-and-capricious standard, *Citizens' Cmte.*

*to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1023 (10th Cir. 2002), which requires "that

agency action be reasonable and reasonably explained," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

BLM invoked the categorical exclusion at 43 C.F.R. §46.210(i), which applies to "[p]olicies, directives, regulations, and guidelines: that are of an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case." BLM cited two bases to invoke the CX. First, "the rule is administrative or procedural in nature." 89 Fed. Reg. at 40333. Second, "the environmental effects associated with those future actions [are] too speculative or conjectural to meaningfully evaluate now." *Id.* Neither basis was "reasonable" or "reasonably explained," as required. *See Prometheus Radio Project*, 592 U.S. at 423.

### A. The Rule is not administrative or procedural.

BLM contends that the Final Rule is covered by §46.210(i) because the Final Rule is "administrative or procedural in nature." 89 Fed. Reg. at 40333. But the terms "administrative" and "procedural" in the CX are not ambiguous, and neither term applies here.

The Final Rule is not "administrative." Throughout the Code of Federal Regulations, agencies consistently use the term "administrative" to categorically exclude from NEPA review actions related to internal agency organization and management, such as personnel and budget decisions. *See, e.g.*, 7 C.F.R. §1b.3 (USDA) ("categorically excluding" certain "administrative functions" like "personnel" and "organizational changes"); 40 C.F.R. §6.204(a)(2)(i) (EPA) (grouping categorical exclusions for "administrative" actions with "financial, personnel, and management actions necessary to support the normal conduct of EPA business"); 14 C.F.R. §1216.304(d)(1) (NASA) (categorically excluding "administrative activities including," among other things, "personnel actions," "organizational changes," and "budget proposals"); 18 C.F.R. §380.4(a)(1) (FERC) ("internal administrative and management actions ... including procurement, contracting, [and] personnel actions"). Here, in

contrast, the Final Rule does not relate to internal agency management. Instead, as discussed, it revises the substantive framework for how BLM will carry out the management of public lands. Thus, the Final Rule does not qualify as "administrative" under the CX invoked by BLM.

Nor is the Final Rule "procedural." As "[a]n example of a categorically excluded procedural action," BLM has highlighted its "proposed revision of [its] Departmental NEPA Manual chapter." *BLM National Environmental Policy Act Handbook* (H-1790-1), at 14 (referring to National Environmental Policy Act Revised Implementing Procedures, 71 Fed. Reg. 4159 (Jan. 25, 2006)). Unlike the Final Rule, that example was unrelated to the agency's substantive land-management priorities. Instead, it addressed the agency's internal rules for managing the NEPA process and determining which of its future actions require an EA or EIS. *See* 71 Fed. Reg. at 4159 ("The proposed procedures update BLM's general NEPA process to incorporate changes in responsibilities, clarify requirements for public participation, identify the appropriate level of NEPA compliance for various types of actions, and incorporate new Departmental requirements.").

Other agencies maintain similar categorical exclusions for "procedural" actions, and the kinds of actions that qualify under those exclusions are similarly unrelated to the agency's substantive priorities. *See, e.g.*, 18 C.F.R. §380.4(a)(2)(ii) (categorical exclusion for rules that are "clarifying, corrective, or procedural, or that do not substantially change the effect of … regulations being amended"); *see Solar Energy Indus. Ass'n v. FERC*, 80 F.4th 956, 992 (9th Cir. 2023) (analyzing that CX, conceding that an "update to [FERC] Form 556—used by QFs [qualifying facilities] when applying for certification—can reasonably be described as a 'procedural' change," and otherwise "reject[ing] FERC's contention … that the more substantive elements of [its action] fall within the categorical exclusion").

In contrast, rules that implement a change to an existing framework—for example, by "revis[ing]" existing regulations—"qualify as 'substantive' action" and "meet the relatively low

threshold to trigger some level of environmental analysis under [NEPA]." *Cal. ex rel. Lockyer v. U.S. Dep't of Agriculture*, 575 F.3d 999, 1013 (9th Cir. 2009). Under that standard, the Final Rule qualifies as substantive because it revises existing regulations—as BLM expressly intended it to. *See, e.g.*, 89 Fed. Reg. at 40313 ("This rule … revises the existing regulations implementing FLPMA's direction in sections 201(a) and 202(c)(3) (43 U.S.C. 1711(a) and 1712(c)(3)) that the BLM shall give priority to the designation and protection of ACECs."). The Public Lands Rule creates an entirely new type of lease not previously available—one that "allows BLM to lease land for the purpose of conservation, and specifically for either restoration or mitigation." Dkt. 40, at 4 (citing 43 C.F.R. §6102.4). The Rule also "establishes [new] standards for who may hold leases" and imposes requirements on prospective lessees. *Id.* (citing 43 C.F.R. §6102.4 (a)-(i)). Additionally, the Rule picks and chooses between entities that can apply for such leases and confers special rights upon some, but not all, governmental entities. Dkt. 18-3 ¶22. And it amends existing regulations governing the designation of areas of critical environmental concern to add new substantive criteria. *Id.* (citing 43 C.F.R. §1610.7-2(d)).

Creating an entirely new class of lease, conferring rights on certain parties (but not others), and establishing criteria and standards cannot under any fair reading of the term be deemed "procedural" actions. Thus, the Rule both supplants a prior substantive rule, as in *California ex rel. Lockyer*, 575 F.3d at 1019 (replacement of "substantive" provisions of rule triggers NEPA requirements), and goes further by creating an entirely new interest that did not previously exist. Accordingly, the existence of these indisputable and intended consequences of the Rule means BLM had a plain obligation to conduct "some level of environmental analysis under" NEPA. *Id.* at 1013. BLM failed to do so.[2]

---

[2] Cases interpreting the APA's analogous exemption of "rules of agency organization, procedure, or practice," 5 U.S.C. §553(b)(A), from notice and comment also show why the Public Lands Rule is not procedural. "Where a rule … 'encodes a substantive value judgment' … it is not procedural." *AFL-CIO v. NLRB*, 57 F.4th 1023, 1035-36 (D.C. Cir. 2023) (collecting cases interpreting

This case closely resembles *Citizens for Better Forestry v. Department of Agriculture*, 481 F. Supp. 2d 1059, 1090 (N.D. Cal. 2007). There, the agency attempted to invoke a nearly identical CX applying to "rules, regulations, or policies to establish Service-wide administrative procedures, program processes, or instruction" to avoid conducting an EA for a rule setting out new processes and criteria for land management planning. *Id.* at 1068 (quoting 70 Fed. Reg. 1023, 1053-54 (Jan. 5, 2005)). The agency argued that the CX applied because the rule at issue did "not change the physical environment in any way" and that "there are too many contingencies" because "it is only after new forest plans are adopted and site-specific projects are proposed that effects will become identifiable." *Id.* at 1084. The court had no trouble rejecting this argument because "[a]pplication of a CE is inappropriate if there is the possibility that an action *may have* a significant environmental effect." *Id.* at 1087 (citing *Gerber v. Norton*, 294 F.3d 173 (D.C. Cir. 2002)). Because the plaintiffs there "referred to a number of potential significant effects that *may* result from implementation" of the rule such as "the effects on future site-specific plans, species diversity, species monitoring, logging, and forest planning," the agency's application of the procedural CX was erroneous. *Id.* at 1087-88.

Plaintiff States' case is even stronger. They have not just submitted evidence that the Rule "may have significant environmental effect" on future actions—they have shown that the Rule is currently having such effects. *Id.* at 1089. BLM here has nothing but the same argument about waiting for environmental analysis of site-specific plans. But "all that is required to render the CE inappropriate is the *possibility* of significant effects," and Plaintiff States have shown far more than that. *Id.*

The relevant terms in §46.210(i) are thus not ambiguous. The Public Lands Rule is not administrative or procedural. But even if this Court determines that BLM's CX is "genuinely

the APA's exemption for procedural rules). Rather, this exclusion must be construed narrowly to reach what are "at bottom" "internal house-keeping measures." *Id.*

ambiguous" after "resort[ing] to all the standard tools of interpretation," BLM's interpretation of those terms to cover the Final Rule must be reasonable. *See Kisor v. Wilkie*, 588 U.S. 558, 573 (2019). And here, it is unreasonable to interpret the CX applying to regulations "of an administrative, financial, legal, technical, or procedural nature" to apply to a rule that revises BLM's substantive land-management priorities and "provides an overarching framework for multiple BLM programs." 89 Fed. Reg. at 40308. As Utah and many others objected from the beginning: "[if] BLM's allegation is allowed to stand that the proposed rule meets the criteria of a CX under 43 CFR 46.210(i), then there is no proposed action, no matter how sweeping, that would not fit within these criteria." Idaho Farm Bureau Fed'n Comment Letter, *supra*, at 1-2.

BLM cannot be allowed to circumvent NEPA's careful requirements by simply incanting the words procedural and administrative. Regardless of agency labels, this Rule on its face does not simply act on the agency—it opens an entirely new form of lease to the public and authorizes significant environmental threats to the States. It is so significant that the States themselves are already expending resources in preparing for its impacts. *See supra* 14-17. NEPA's careful protections cannot be evaded so lightly. *See, e.g.*, *Pub. Employees for Environmental Responsibility v. NPS*, 605 F. Supp. 3d 28, 59-60 (D.D.C. 2022) ("NEPA is not just a box that must be checked at some point in an agency process,  it is a crucial information-forcing statute designed 'to provide for informed decision making and foster excellent action.'"); 481 F. Supp. 2d at 1089-90 (holding agencies cannot circumvent NEPA by labelling actions simply procedural or programmatic).

BLM also failed to reasonably explain its invocation of the administrative or procedural CX. BLM provided only one sentence in the Final Rule to explain its view that the Final Rule is "of an administrative, financial, legal, technical, or procedural nature." The agency contends that §46.210(i) "applies because the rule sets out a framework but is not self-executing in that it does not itself make substantive changes on the ground and will not (absent future decisions that implement the rule)

restrict the BLM's discretion to undertake or authorize future on-the-ground action; thus, the rule is administrative or procedural in nature." 89 Fed. Reg. at 40333. In its supplementary analysis, BLM also added that the Final Rule "is administrative and procedural in nature" because "[a]ny future change in management or authorization of on-the-ground activities would be subject to a separate decision-making process." CX Documentation, *supra*, at 1.

As an initial matter, BLM cannot rely on the CX Documentation to justify invoking the CX to the extent the CX Documentation provides new reasons for the CX. "It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020). In the NEPA context, this rule is even stricter—there must be "contemporaneous documentation to show that the agency considered the environmental consequences of its action and decided to apply a Categorical Exclusion to the facts of a particular decision." *Pub. Emps. for Env't Resp.*, 605 F. Supp. 3d at 56. But here, the CX Documentation was issued on June 10, 2024, a full month after BLM issued the Rule on May 9, 2024. It is black letter law that BLM's "post hoc rationalizations … cannot serve as a sufficient predicate for agency action." *Regents of the Univ. of California*, 140 S. Ct. at 1909.

In any event, even considering the CX Documentation, BLM's post hoc analysis is conclusory, and none of the factors it highlights in support of its conclusion are relevant to whether the Final Rule is in fact "administrative or procedural" as those terms are used in the CX. For one, BLM highlights that the Final Rule "sets out a framework" for "future decisions" that will be subject to a separate decisionmaking process. But BLM does not explain *why* those facts inform whether the Final Rule is "administrative or procedural." Conclusory agency statements that it considered an important aspect of the problem are insufficient under the arbitrary and capricious standard. *See, e.g.*, *Gerber*, 294 F.3d at 185.

BLM's lack of explanation also failed to account for its past practice in land-use regulation. For example, in its 1979 regulations establishing "the planning system for public lands and resources," including the use of Areas of Critical Environmental Concern (ACEC) designations, BLM conducted an "environmental assessment" that determined that a full Environmental Impact Statement would not be necessary based on a finding of no significant impact (FONSI). 44 Fed. Reg. 46,386, 46,386 (Aug 7, 1979). Similarly, in its 1983 regulations amending the ACEC designation process, BLM stated that "[a]n environmental assessment was prepared and has been reviewed in light of the changes in the final rulemaking" and prepared a FONSI based on this environmental assessment. 48 Fed. Reg. 20,364, 20,368 (May 5, 1983). Agency decisions that depart from past practice without explanation are not "reasonably explained." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) ("[A]n '[u]nexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.'"). Because BLM failed to frankly grapple with its past decision to prepare an EA for analogous rules, its decision not to do so for the Public Lands Rule is arbitrary and capricious. *City of Ft. Morgan v. FERC*, 181 F.3d 1155, 1163 n.13 (10th Cir. 1999) ("'[W]here an agency departs from established precedent without a reasoned explanation, its decision will be vacated as arbitrary and capricious.'").

### B. The Rule's effects are not speculative or conjectural.

BLM also asserted that it could invoke the CX because "the environmental effects associated with those future actions [are] too speculative or conjectural to meaningfully evaluate now." 89 Fed. Reg. at 40333. This explanation is unreasonable. As the States explain above, the Rule itself has significant effects that are not speculative or based on future events. *See supra* 13-19. Indeed, even if BLM never issues a lease authorized by the Rule, Utah and Wyoming are suffering and will suffer environmental harms arising from the Rule itself, from the creation of the leasing tool, and from authorization of the concept of passive management in leases. It is the Rule itself—not the future

approval of leases—that is creating harm. *Id.* So, BLM is wrong that this Final Rule does not "directly result in any environmental effects." CX Documentation, *supra*, at 1.

Beyond that, BLM's reasoning is wrong as a matter of law because "[r]easonable forecasting and speculation is thus implicit in NEPA, and [courts] must reject any attempt by agencies to shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as 'crystal ball inquiry.'" *Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1092 (D.C. Cir. 1973). This means that agencies cannot—as BLM does here—throw up their hands and give up by declaring that a Rule's effects are too hard to predict. NEPA demands more.

*Public Employees for Environmental Responsibility v. National Park Service* is closely analogous and illustrates BLM's error in invoking the speculative and conjectural CX. There, the NPS relied on the speculative or conjectural CX to decline to prepare an EA for "the nation-wide impacts" of a policy because the agency asserted that the environmental effects of a broader policy would be "most meaningful at the park level." *Public Employees for Environmental Responsibility v. National Park Service,* 605 F. Supp. 3d 28 at 57 (D.D.C. 2022). The court rejected this reasoning—exactly the "lease-level" approach BLM asserts in its Rule—because the agency "mistakenly treats park-level analysis and national-level analysis as an either/or proposition." *Id.* This was error because the CX "does not excuse NEPA analysis where it would not be the 'most' meaningful," but only where such analysis "would not be meaningful at all." *Id.* Indeed, the court noted that "the entire purpose of tiering in NEPA analysis is to make both levels of review meaningful by 'incorporat[ing] by reference the general discussions of prior, broader environmental impact statements' on 'site-specific environmental analyses.'" *Id.* at 57-58 (quoting *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 512 (D.C. Cir. 2010)). The whole point of NEPA is to require an agency "to predict the environmental effects of proposed action before the action is taken and those effects fully known." *Id.* at 58 (quoting *Scientists' Inst. for Pub. Info., Inc*, 481 F.2d at 1092). Just as in *Public Employees for Environmental Responsibility*, BLM

here "commits the classic NEPA error of considering only the effects of what a policy actually, directly authorizes rather than the reasonably foreseeable impacts of a policy." *Id.*

BLM's attempt to forestall environmental review through invoking the speculative or conjectural CX also runs afoul of "the principle of anti-segmentation, which 'ensures agencies cannot evade their responsibilities under NEPA by artificially dividing a major federal action into smaller components, each without a significant impact.'" *Id.* As explained, the concept of restoration and mitigation leases itself creates significant environmental impact. But on a lease level, the impact may not approach the broad impact from the Public Lands Rule. *Now* is the opportunity for BLM to "consider the cumulative impacts of the [Rule] or consider whether the sum of the [conservation leases it authorizes] might be greater than its parts." *Id.*; *see also Fund For Animals v. Hall*, 448 F. Supp. 2d 127, 133 (D.D.C. 2006) ("'Importantly, an agency may not segment actions to unreasonably restrict the scope of the environmental review process.' Stated differently, 'the agency's EA must give a realistic evaluation of the total impacts and cannot isolate a proposed project, viewing it in a vacuum.'"). Agencies routinely prepare environmental analyses "regarding broad programmatic changes." *Citizens for Better Forestry*, 481 F. Supp. 2d at 1089. "There is no reason that the same requirements should not apply to a nationwide programmatic change such as the promulgation of the" Public Lands Rule. *Id.*

BLM also failed to reasonably explain why the effects of the Rule are speculative or conjectural. BLM's explanation for relying on this part of the exclusion also consists of one conclusory sentence: "Where the BLM will undertake such actions, which of the various tools provided in this rule it will use when doing so, and the particular methods and activities it will employ are unknown at this time, making the environmental effects associated with those future actions [are] too speculative or conjectural to meaningfully evaluate now." 89 Fed. Reg. at 40333. This conclusory statement is not sufficient. *See Gerber*, 294 F.3d at 185.

And BLM's attempted post-hoc explanation, to the extent it can be considered, *see supra* 25, fares no better. In the CX Documentation, BLM merely parrots its conclusory assertion that "environmental impacts depend on the BLM decisions that implement and are otherwise shaped by the rule, making them too speculative or conjectural at this time to lend themselves to meaningful analysis," and adds that "NEPA and other applicable environmental laws will apply on a case-by-case basis to those future land use planning and individual project-level decisions made pursuant to the processes established by the rule." CX Documentation, *supra* at 1. But this in no way explains why the effects indisputably caused by the Rule itself and not dependent on "individual project-level decisions" are speculative or conjectural. For example, it is not speculative or conjectural that passive management leads to wildfires—and no amount of further project-level analysis will shed any more light on that undisputed fact. Even in its after-the-fact supplemental analysis, BLM provides no explanation besides boilerplate for why the Rule's effects are so speculative or conjectural as to preclude the environmental review NEPA requires.

## III. BLM's failure to analyze extraordinary circumstances is arbitrary and capricious.

Even if BLM properly invoked the CX, it was still required to evaluate whether the Final Rule required "further analysis and environmental documents" due to the presence of enumerated extraordinary circumstances. 43 C.F.R. §46.205(c)(1). BLM's conclusion that no extraordinary circumstances apply is arbitrary and capricious because BLM failed to "reasonably explain[]" its determination. *Prometheus Radio Project*, 592 U.S. at 423. Numerous commenters explained why many extraordinary circumstances apply and thus trigger NEPA review. *See supra* 6-8.

In the Final Rule, BLM did not even *try* to respond to those comments or explain its reasoning. Instead, in a single sentence, it simply stated its conclusion "that none of the extraordinary circumstances identified at 43 CFR 46.215 applies to this rulemaking." 89 Fed. Reg. at 40333. There's no serious argument that agency *ipse dixit* of the type BLM offered satisfies NEPA.

Then on the Final Rule's effective date, the agency published a never-before-seen analysis of the extraordinary circumstances in §46.215. *See* CX Documentation, *supra*, at 2-4. That document included a brief rationale for each of the twelve extraordinary circumstances.

This CX Documentation cannot be considered because it is a post hoc explanation for a decision made a month earlier. *See supra* 25. And if the CX Documentation is not considered, the agency is left with no justification whatsoever. In any event, as PLPCO and other commenters argued, all twelve extraordinary circumstances are potentially applicable to the Final Rule. *See* PLPCO Comment Letter, *supra*, at 6. BLM had an obligation to reasonably explain why they do not apply— especially after numerous commenters raised the issue. It failed to do so in the Final Rule itself, and its supplementary analysis is unreasonable. Just three of the twelve extraordinary circumstances demonstrate BLM's error.

### A.  The Final Rule is a precedent for future action and decision in principle.

Extraordinary circumstances exist if the Rule "[e]stablish[es] a precedent for future action or represent[s] a decision in principle about future actions with potentially significant environmental effects." 43 C.F.R. §46.215(e). BLM provided a one-sentence rationale in its supplemental document explaining why this extraordinary circumstance does not apply: "The rule does not mandate a particular land use planning or individual project-level decision; it is a procedural rule only." CX Documentation, *supra*, at 3. That explanation is unreasonable. Nothing in the terms of §46.215(e) suggests that it applies only to "particular land use planning or individual project-level decision[s]." To the contrary: Section 46.215(e) discusses actions that "represent a decision in principle about future actions," and it is more likely that an action will do so if it is a broad change (like the Final Rule is) as opposed to an individual, project-level one.

In all events, the extraordinary circumstance in §46.215(e) applies here. For one, the Final Rule represents a decision in principle about future actions because it "provides an overarching framework

for multiple BLM programs to facilitate ecosystem resilience on public lands." 89 Fed. Reg. at 40308; *see also, e.g.*, *id.* at 40309 (the amendments to the ACEC regulations "establish a more comprehensive framework for the BLM to identify, evaluate, and consider special management attention for ACECs in land use planning"); *id.* at 40321 ("the rule provides a framework for the BLM to issue restoration and mitigation leases on public lands"); *id.* at 40322 (the Final Rule "sets forth a framework for the BLM to make informed management decisions based on science and data"); *id.* at 40328 (the Final Rule provides "a framework for how mitigation will be deployed under the rule"); *id.* at 40333 ("the rule sets out a framework").

For another, the Final Rule explains in several places that its purpose is to guide BLM's decision making in future actions with potentially significant environmental effects. *See, e.g.*, 89 Fed. Reg. at 40318 ("The final rule defines the term 'intact landscape' to guide the BLM with implementing direction."); *id.* at 40320 ("BLM updated the final rule … to … enumerate guiding principles for restoration and mitigation actions"); *id.* at 40321 ("several provisions [of the Final Rule] guide the evaluation of which lands are suitable for leasing"); *id.* at 40326 (the Final Rule "establishes procedures for addressing potential ACECs that are identified outside of an ongoing planning process").

In sum, the Public Lands Rule decides that a new class of lease should be made available that did not previously exist. Not only is this an environmentally significant "decision in principle," it also sets a precedent for the agency to issue leases based on the new criteria set out in the Rule.

### B.  The Final Rule is highly controversial.

Extraordinary circumstances apply if the Final Rule has "highly controversial environmental effects." 43 C.F.R. §46.215 (c). "A federal action is controversial if a substantial dispute exists as to its size, nature, or effect." *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1333 (9th Cir. 1992) (cleaned up). "[W]here the record reveal[s] the arguable existence of public controversy based on potential environmental consequences," the agency must "explain why an exception for actions involving public

controversy based on potential environmental effects ha[s] no application." *California v. Norton*, 311 F.3d 1162, 1177 (9th Cir. 2002) (cleaned up).

The record here leaves no doubt—the Final Rule generated extensive public controversy. The Proposed Rule received 216,403 public comments during the formal comment process, many of which raised serious concerns about the possible environmental consequences. *See supra* 3-5. Beyond that, the Proposed Rule inspired multiple hearings in Congress and bills in both houses that would have required the agency to withdraw the Proposed Rule altogether. *See supra* 8. Indeed, courts have found agency actions with far fewer comments and far less public debate to be "highly controversial." *See, e.g.*, *Sierra Club v. Bosworth*, 510 F.3d 1016, 1030-31 (9th Cir. 2007) (highlighting "the large number of comments, close to 39,000"). And the Rule engendered such controversy precisely because of its environmental effects. *See supra* 6-8. Numerous commentors—from legislators to government agencies to public interest groups to individuals—"raised substantial questions as to whether the project would cause significant environmental harm and expressed serious concerns about the uncertain risk, size, nature, and effects of actions under" the Rule. 510 F.3d at 1031; *see also, e.g.*, *Citizens for Better Forestry*, 481 F. Supp. 2d at 1089 ("[T]here can be little question that the effects of the 2005 Rule are 'highly controversial' … a proposal is highly controversial when there is a 'substantial dispute about the size, nature, or effect of the major Federal action.'").

BLM addressed none of this in its §46.215(c) analysis. Instead, it asserted that the "rule will not directly and of its own force result in environmental effects, let alone highly controversial ones[.]" CX Documentation, *supra*, at 2. That conclusion is unresponsive to, and unreasonable in light of, the numerous comments the agency received that disputed the agency's characterization of the Final Rule's environmental effects. *See supra* 6-8. "Given the large number of comments … and the strong criticism from several affected Western state agencies," among others, BLM could not "summarily conclude that the effects of the [agency action] are not controversial." *Bosworth*, 510 F.3d at 1030-31.

32

**C.  The Final Rule will result in cumulatively significant environmental effects.**

Extraordinary circumstances apply if an agency action has "a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects." 43 C.F.R. §46.215 (f). This circumstance is likewise present here.

The Final Rule makes numerous changes to BLM's framework for managing the public lands. It creates the new restoration and mitigation leasing tool, 89 Fed. Reg. at 40310; adjusts the type of information it requires BLM to use in its decisionmaking, *id.* at 40311; changes the process for designating ACECs (including, in some cases, allowing designation without public comment), *id.* at 40313; and defines more than two dozen terms (including a sweeping, unbounded definition for what qualifies as an "intact landscape"), *id.* at 40308, 40316.

The cumulative effects of these numerous changes will surely be significant. "Cumulative effects" include environmental effects of "reasonably foreseeable actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. §1508.1(i)(3). These effects "include ecological …, aesthetic, historic, cultural, economic, social, or health." *Id.* §1508.1(i)(4). They "may also include those [effects] resulting from actions which may have both beneficial and adverse effects, even if on balance the agency believes that the effects will be beneficial." *Id.*

BLM's supplementary analysis concluded that there are no "cumulatively significant environmental effects" here because "[t]he rule does not make land use planning or individual project-level decisions, and the location and timing of proposed actions to implement the rule are unknown." CX Documentation, *supra*, at 3. That conclusion is unreasonable for at least two reasons.

One, §46.215(f)'s plain terms apply to "other actions" broadly, not more narrowly to "land use planning or individual project-level" actions. *Id.* And two, it is immaterial that "the location and timing of proposed actions to implement the rule are unknown." *Id.* A "cumulative effects" analysis

includes all actions that are "reasonably foreseeable," and there is no requirement that an agency pin down a precise location and time of a future action that it can reasonably foresee. 40 C.F.R. §1508.1(i)(3). And here, many actions, such as issuing restoration and mitigation leases, are "reasonably foreseeable" such that BLM should have considered their cumulative impacts.

In all events, the extraordinary circumstance in §46.215(f) plainly applies here. Even assuming the individual future actions identified in the Final Rule will have "individually insignificant … environmental effects"—an unlikely prospect—taken together, they will undoubtedly have "cumulatively significant" environmental consequences. 43 C.F.R. §46.215(f). If the Public Lands Rule "plays some, if not a critical, part in subsequent lower-level decisions," it must be subject to NEPA safeguards. *Citizens for Better Forestry*, 481 F. Supp. 2d at 1090; *see also id.* ("Even though the chain of causation was indirect, harm was still reasonably probable to occur since regional LRMPs and site-specific plans will follow the requirements of the national [2000] rules (as they must)."). Even if "the agency believes that the [cumulative] effects will be beneficial," 40 C.F.R. §1508.1(i)(4), that does not excuse BLM from the required NEPA analysis where an extraordinary circumstance applies. Section 46.215(f) thus demands that the Rule be subject to NEPA review now.

* * *

Numerous comments specifically highlighted the need for BLM to analyze the potential applicability of extraordinary circumstances. At an absolute minimum, those public comments created uncertainty about whether any of the extraordinary circumstances applied. And "[i]f there is uncertainty about whether one or more of the extraordinary circumstances apply," BLM's own internal handbook directs the agency to at least "prepare an EA to determine whether an EIS is required." *BLM National Environmental Policy Act Handbook* (H-1790-1), at 19. "All categorically excluded actions *must be subjected to sufficient review* to determine if any of the extraordinary circumstances apply." *Id.* (emphasis added).

"It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983). But here, "the agency submitted no reasons at all" to support its conclusion that none of the extraordinary circumstances applies. *Id.* And the supplemental explanations it supplied were unreasonable. BLM's "decision to classify [the] action as falling within [the] categorical exclusion" without adequately and reasonably analyzing extraordinary circumstances was thus "arbitrary and capricious." *Citizens' Cmte. to Save Our Canyons*, 297 F.3d at 1023.

## CONCLUSION

Based upon the foregoing, this Court should vacate the Public Lands Rule.

Dated: January 9, 2025

Respectfully submitted,

/s/ Tyler R. Green
TYLER R. GREEN (USB #10660)
CONSOVOY MCCARTHY PLLC
222 S. Main Street, 5th Floor
Salt Lake City, UT 84101
(703) 243-9423
tyler@consovoymccarthy.com
*Attorney for Plaintiff State of Utah*

DANIEL SHAPIRO*
KATHLEEN S. LANE*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
daniel@consovoymccarthy.com
katie@consovoymccarthy.com
*Attorneys for Plaintiff State of Utah*


*Application for admission pro hac vice forthcoming

DEREK BROWN (USB #10476)
Utah Attorney General
STANFORD E. PURSER (USB #13440)
Utah Solicitor General
KATHY A.F. DAVIS (USB #4022)
Assistant Attorney General
JASON DEFOREST (USB #14628)
Assistant Attorney General
K. TESS DAVIS (USB #15831)
Assistant Attorney General
1594 West North Temple
Suite 300, Salt Lake City, UT 84114
(801) 538-9600
spurser@agutah.gov
kathydavis@agutah.gov
jdeforest@agutah.gov
kaitlindavis@agutah.gov
*Attorneys for Plaintiff State of Utah*

D. DAVID DEWALD*
Deputy Attorney General
Office of the Attorney General of Wyoming
109 State Capitol
Cheyenne, WY 82002
(307) 777-7895
david.dewald@wyo.gov
*Attorney for Plaintiff State of Wyoming*

**CERTIFICATE OF COMPLIANCE**

I, Tyler R. Green, certify that this brief complies with the type-volume limitation of Local Rule 7-4(d)(4)(B) because it is 11,526 pages, including footnotes and excluding the parts of the brief exempted by Rule 7-4(d)(4)(C); and complies with the typeface and type style requirements of Local Civil Rule 10-1(a)(3).

/s/ Tyler R. Green
Tyler R. Green

**CERTIFICATE OF SERVICE**

I hereby certify that on January 9, 2025, electronically filed this brief using the Court's CM/ECF system, which served copies of the brief on all ECF-registered counsel.

<u>/s/ Tyler R. Green</u>
Tyler R. Green